# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

| | | |
|---|---|---|
| **ISRAEL ALVARADO, et al.,** | : | |
| | : | |
| *Appellants-Plaintiffs,* | : | |
| | : | |
| v. | : | **Case No.: 23-1419** |
| | : | **(1:22-CV-00876-AJT-JFA)** |
| **LLOYD AUSTIN, III, et al.,** | : | |
| | : | |
| *Appellees-Defendants.* | : | |
| _____ | : | |

## APPELLANTS' RESPONSE-OPPOSITION TO
## APPELLEES' MOTION TO DISMISS FOR MOOTNESS

Appellees, hereafter collectively "DoD", have filed a motion to dismiss ("MTD"), ECF No. 10, erroneously claiming DoD and the Armed Services have implemented the 2023 National Defense Authorization Act ("NDAA")'s order to "rescind the Mandate" and remove "adverse actions" from Appellants' files rendering the chaplain Appellants' (hereafter the "Chaplains")' claims moot. Whatever DoD implemented, the Chaplains' injuries remain unresolved.

For the reasons set forth below, this Court must deny the MTD. The facts and the law show DoD's claims and arguments are misleading, deceptive, and evince more than just willful blindness, but reflect hostility and deceit. The Complaint, the Preliminary Injunction Motion ("PI") and the facts show how different the Chaplains'

1

claims and the precedent that supports them are from other Mandate challenges. The record and evidence presented here show DoD has not fixed the harms done to Chaplains and their careers by DoD's unlawful mandate. This is fueled by DoD's contempt for law and hostility to people of faith who believe they must follow their conscience, a constitutional and statutory right. These realities preclude mootness.

## THE LEGAL STANDARD FOR MOOTNESS

DoD bears the burden of showing that mootness applies. *West Virginia v. EPA*, 142. CT. 2587, 2607 (2022). A case is moot "only when it is **impossible** for court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 US 165, 172 (2013). *Id.* (emphasis added). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* (emphasis added). The case is also not moot if the "Collateral Consequences Exception applies where the challenged conduct continues to cause other harms that a court is capable of remedying. *See Connell v. Shoemaker*, 555 F.2d 483, 486-487 (5th Cir. 1977) (reversing dismissal of a challenge to Fort Hood commanding officer's order barring soldiers from renting from plaintiff due to the continuing collateral injury from the allegation of racial prejudice) (citing *Powell v. McCormack*, 395 U.S. 486, 497 (1969) and other authority).

A continuing dispute over violations of the law, discriminatory intent or authority of the government precludes a case from becoming moot. *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 240 (4th Cir. 2016) ("the burden rests on the State to prove that its proposed remedy completely cures the harm in this case"). Here, discriminatory intent is an issue. *Id.*

## FACTS

1.     "A [military] chaplain's role within the service is "unique," involving simultaneous service as clergy or a **"professional representative[]" of a particular religious denomination** and as a commissioned naval officer." *In re England*, 375 F.3d 1169, 1171) (D.C. Cir. 2004) (emphasis added), *cert denied sub nom, Chaplaincy of Full Gospel Churches v. England,* 543 U.S. 1152 (2005).

2.     On September 1, 2021, the Center for Disease Control ("CDC") approved a change in the definitions of "vaccine" and "vaccination" because commenters were pointing out that the experimental use COVID-19 vaccines CDC was investigating would not meet the long-standing definition of a vaccine, a process that produces immunity in the recipient from a disease. The CDC email chain at the Complaint's Exhibit 8 documents the non-scientific and non-rational reason for changing the definitions. Chaplains' Addendum 1 ("CA") 1-8.

3

Immunity was and still is defined as a condition where the recipient is protected from the disease and cannot transmit it. *Id.* at CA1-8. CDC's radical change made a "vaccine" something that stimulated the recipient's immune system and "vaccination" became the method for introducing the new vaccine into the recipient. *Id.*

3.    Secretary    Austin    adopted    this    perverted    definition    of vaccine/vaccinations and applied it in his Mandate even before CDC approved the definitional changes. DoD's deep and extensive involvement in the vaccine development through its funding and contract supervision suggests DoD was also keenly aware of the failure of the experimental vaccines to protect the recipient from COVID and thereby fail to meet the former definition of vaccine as a procedure that produced immunity.

4.    Secretary Austin claimed protection of the force was the compelling purpose for ordering the Mandate and justified the draconian punishments for those who refused. Austin August 24, 2021 Memorandum ordering COVID Mandate at1[1].

5.    COVID-19 infected Secretary Austin twice despite being fully vaccinated and boosted.[2] COVID-19 also infected the President, Vice President, and most, if not

---

[1]    https://www.defense.gov/News/Releases/Release/Article/2745742/Secretary-of-Defense-Austin-Issues-Guidance-for-Mandatory-Coronavirus-Disease-2/

[2]    https://www.defense.gov/News/Releases/Release/Article/3127969/statement-by-secretary-of-defense-lloyd-j-austin-iii-on-his-covid-status/

all, of DoD's leadership along with millions of Americans despite being fully vaccinated and boosted.

6.      President Biden and his Administration admitted everyone knew the vaccines would not protect recipients from being infected. A130-131 (PI Motion at pp 4-5 and n.2).

7.      All Appellants requested religious accommodation requests ("RARs") to avoid taking the COVID-19 vaccine either as an emergency use only vaccine or under Secretary Austin's Mandate. None were granted; 18 Appellants had their RAR denial appeals rejected before the Mandate's rescission.

8.      Sec 533 of the 2013 NDAA as amended by the 2014 NDAA provides specific rights and protections for military personnel to follow their conscience, § 533(a), and specific protections for chaplains who follow their conscience as formed by faith in making decisions, §533(b). A41-42 (Compl. at 41-42, ¶77).

9.      Section §533(b) States:

(b) PROTECTION OF CHAPLAIN DECISIONS RELAT1ING TO CONSCIENCE, MORAL PRINCIPLES, OR RELIGIOUS BELIEFS.—No member of the Armed Forces may—
(1) require a chaplain to perform any rite, ritual, or ceremony that is contrary to the conscience, moral principles, or religious beliefs of the chaplain; or
(2) discriminate or take any adverse personnel action against a chaplain, including denial of promotion, schooling, training, or assignment, on the basis of the refusal by the chaplain to comply with a requirement prohibited by paragraph (1).

5

10.     The Chaplains sued DoD challenging (a) the Secretary's authority to change the well-recognized definitions of vaccine and vaccination and Mandate military personnel receive COVID-19 vaccines under threat of court-martial and separation under the major policy doctrine; and (2), DoD's implementation of the RAR process which seemed to have a predetermined end, denial, as borne out by statistics and other evidence and appeared to be a vehicle to purge the military of those who believed in following their conscience as formed by their faith. This raised a number of constitutional and statutory religious liberty protection issues.

11.     The Chaplains raise the following claims:

A.     Constitutional claims. First, the Secretary exceeded his authority in ordering the Mandate and changing the definition of vaccine/vaccination in violation of the major policy doctrine, the Establishment, Free Exercise, Free Speech, and Due Process Clauses; unconstitutional Retaliation; and failure to follow DoD's own regulations.

Second, the Chaplains allege that DoD-individual Service RAR procedures as implemented were "theater", where the process and examination of their RARs was merely a show to disguise the fact that the outcome, denial, was already preordained. This was because the Secretary would not recognize any alternative to full vaccination.

B.     The Chaplains' statutory claims included violation of: § 533(b); the

Religious Freedom Restoration Act ("RFRA); 10 U.S.C. §§ 1107 and 1107a; and the Administrative Procedures Act ("APA").

C.    DoD failed to follow its regulations concerning immunizations, vaccinations, including natural immunity.

D.    For some chaplains, being asked by officials to take the vaccine and refusing a ceremony that § 533 protects. A164-66. (PI Motion at 38-40, ¶¶2-4).

12.    Chaplains challenged the absurdity of DoD's so-called logic behind the Mandate, that the less than 2% unvaccinated personnel were a danger to the 98% of the force that had been vaccinated and the 98% vaccinated were a danger to the small number of unvaccinated. This has no rational basis challenge given the Administration's "herd immunity" statements.

13.    The Assistant Secretaries of DoD and each Armed Forces testified to the House Armed Services Committee ("HASC") on 2/28/2023 concerning the impact of COVID and DoD's compliance with the NDAA's order to rescind the Mandate. CA70-80 (Excerpts from Transcript of HASC hearing (hereafter "HASC TR")).

A.    DoD showed no remorse for issuing the Mandate, identified no harms, and agreed DoD opposed and disagreed with the NDAA.[3]

---

[3]    https://www.cnn.com/2022/12/07/politics/biden-military-covid-mandate-

B.     DoD stated it was still considering whether to punish those who had refused the COVID vaccine; DoD's mantra in response to questions about fixing records and/or restoring service members and their careers who had refused the vaccine was they "violated a lawful order." CA71-72, 75 (HASC TR at timestamps 27:52, 28:34, 29:30, 29:46, 30:38:31:00, 44:58).

C.     DoD showed no repentance or acknowledgment that issuing the Mandate or changing the definitions of vaccine and vaccination were beyond DoD's authority and no concern for the damage done to the careers and lives of military personnel or exacerbating existing shortages of skilled personnel, including Chaplains who are below their authorized strength, or overseeing and participating in the destruction of the volunteer military service.

## **ARGUMENT**

## I.     **DoD's FAILURE TO PROVIDE THE RELIEF SATISFYING THE CHAPLAINS' CLAIMS PRECLUDES MOOTNESS**

### A.     **DoD Neither Addressed Nor Remedied Critical, Serious Injures to Chaplains' Records That Essentially Doom Their Careers for Exercising Their Constitutional and Statutory Rights**

DoD ignores the fact Chaplains asked for retroactive relief to remedy injuries from DoD's illegal actions. DoD also ignores the general rule that courts have a duty

---

ndaa/(last accessed 5/24/2023).   WH publicly calls Congress' mandate rescission direction a "mistake."

to make "the injured men 'whole'", restoring military personnel to the status quo before their military injuries. *See Dilley v. Alexander*, 627 F.2d 407, 413 (D.C. Cir. 1980); *id.* at 413-25 (giving Army specific remedy instructions to correct injury from illegal boards). To fully rescind the Mandate requires DoD to restore Chaplains to the status quo on ante, *see* III infra.

DoD acknowledges that chaplains "asked the court to order the military to 'repair and restore Plaintiffs' careers and personnel records." MTD at 7-8 (citing A124 (Complaint at p.124)). The Chaplains specifically ask for the following relief in their Complaint at pages 123-124:

> **(4)** Enjoin any adverse or retaliatory action against the Plaintiffs as a result of, arising from, or in conjunction with the Plaintiffs' RAR requests or denials, or for pursuing this action, or any other action for relief from Defendants' constitutional, statutory, or regulatory violations; **(5)** To order Defendants to take necessary actions to repair and restore Plaintiffs' careers and personnel records, and to provide effective guarantees against future retaliation for the exercise of their protected rights through the Services' assignment, promotion, and schooling systems;

A123-124 (Complaint at pp. 123-124).

DoD's argument the judiciary cannot affect this relief, MTD at 13, is willful blindness. Contrary to DoD's false assertion, *id.*, the Chaplains do not ask the judiciary to "dispense promotions and rewrite evaluations on behalf of military commanders", *id.*; the Chaplains ask the court to "enjoin ... retaliatory action" and "to

provide effective guarantees against future retaliation for the exercise of their protected rights through the Services' assignment, promotion, and schooling systems." A124 (Complaint at 124). These are the same protections § 533 establishes that DoD has ignored and violated.

The word "retaliation" appears 32 times in the Complaint. *See, e.g.*, A47 ("V. DEFENDANTS' PATTERN AND PRACTICE OF RETALIATION AGAINST AND HOSTILITY TO RELIGIOUS EXERCISE" and "Defendants actions resulted in unconstitutional retaliation", ), 83, 86, 89, and 90 (Compl. at pp. 47, 83, 86, 89, and 90). The individual chaplains' declarations and allegations identify numerous examples of retaliation, *see,* A73, ¶ 145, citing four chaplains' claims of retaliation.

The judiciary can enjoin the military to correct the damage from past retaliation because such correction is necessary to comply with the injunction not to retaliate in the future. Bad efficiency reports, missed schooling, lost assignments, are all bad things in chaplains' records. DOD and the Services have the ability and power to make those bad things good things, demonstrations of courage, integrity, leadership, etc.

Unless DoD does that, the Defendants/appellees will violate the injunction by allowing bad and/or prejudiced reports to continue to penalize the Chaplains for the exercise of their rights to request RARs and challenge DoD's clearly illegal abuse of

10

power and actions and assaults on their religious liberty. DoD caused the Chaplains' injuries; DoD and its Services can fix those injuries by readjusting DoD's attitude from hostility to recognition of its failure to follow the law and its duty to fix the injury DoD caused. DoD should recognize the personal integrity and courage these chaplains exhibited in requesting RARs despite DoD's leadership's hostility and thereafter pursuing litigation to protect the right of conscience is the very kind of character they want and need in military leaders. DoD and the Services have done such things in the past, *e.g.*, affirmative action. The resistance to doing it now is another example of DoD's hostility and bad faith against those who practice their faith in a serious matter, especially evangelical Christians and Orthodox Jewish chaplains who take their faith seriously.

This is another example of why the case is not moot. Chaplains have a "concrete interest ... in the outcome of the litigation" that is not small because it affects their careers. *Chafin*, 568 U.S. at 172. This is also an example of "the collateral Consequences exception to mootness" where "the challenged conduct continues to cause other harms that the court is capable of remedying", the continuing injury produced by DoD's illegal actions in pursuing the Covid mandate without authority. *See Sibron v. New York*, 392 U.S. 40, 53-59 (1968).

11

**B.    DoD Has Illegally Targeted Chaplains Contrary to its Assertions**

The 2023 NDAA ordering the Secretary to "rescind the Mandate," is a remedial statute; it must be interpreted broadly to achieve its remedial objective. It confirms and clarifies redress rights, *see* 2 Sutherland Statutory Construction §§ 41:3 (8th ed. Nov. 2022 Update). Service members may not be mandated COVID-19 vaccines nor punished for challenging the rescinded August 24, 2021, mandate.

Requesting an RAR immediately begins administrative procedures that destroy a chaplain's career if left unaddressed. This includes a "flag", denying favorable personal actions, travel, and schooling. It identifies RAR seekers as hostile to the Secretary's goal of hundred percent vaccination. That has an immediate effect in the area of promotions and performance reports. CA97-176 (Exhibit 4, Chaplains' declarations to Mot. for Recon.), CA192-208 (Declarations of Calgar and Shrader), and CA209-239 (Declaration of Shour) identify the continuing harms, fueled by official hostility to those who ask for RAR's. Indeed, the following chaplains have failed promotion because of DoD's actions prejudiced them before promotion boards: Calger (2X); Diltz (2X); Fussel (2X); Gentilehomme (2X); Harris (2X); and Hart. *Id.*

These promotion failures are punishment for seeking a RAR; they are adverse actions whose record remains in these appellant's files. CA97-176 (Ex. 4, Chaplains'

declarations to Mot. for Recon.) and CA177-191 (Ex. 5, Extracts from declarations to Mot. for Recon.) provide DoD's hostile and negative personnel actions against chaplains which DoD ask this Court to ignore.

With appellants and limited period of time to respond to the MTD it would be logistically impossible to coordinate declarations from all 40 chaplains. Chaplains have organized and specific injury narrative, e.g. failure of promotion. The declarations of Chaplains Calger and Schrader, CA192-208 (Declarations of Calgar and Shrader) are illustrative examples of being targeted by leadership because they exercised their religious liberty rights.

Army reservist Calger received notice he was being separated for twice failing selection to major. CA195-197 (Ex. 1 to Calgar Declaration). His accompanying declaration states he was not allowed to travel to the mandatory Chaplains Captain Career Course ("C4") due to COVID restrictions because he was unvaccinated. CA193 (Calgar Declaration). A chaplain's failure to attend C4 makes a chaplain ineligible for promotion. Calgar's promotion failure and his inability to attend school are all attributable to his RAR request, a "decision relating to [his] conscience, moral principles, [and] religious beliefs."

## II.   UNRESOLVED LEGAL DISPUTES BETWEEN THE CHAPLAINS AND DoD ALSO DEFEATS MOOTNESS

### A.     These Chaplains Challenge DoD's History of Religious Hostility

Chaplains specifically allege the Mandate's lack of authority and predetermined "no alternative" to vaccination appears as an attempt to purge from the services those who believe in following their faith formed conscience. DoD's treatment of vaccinated who became infected versus how they treated unvaccinated makes the point.

What is the compelling purpose for threatening to separate chaplains with a discharge characterization that effectively destroys their opportunity for continued ministry?   A history of religious hostility began at least in 2005-06 when patently unconstitutional new Air Force and Navy regulations barred chaplains from praying sectarian prayers. The Services resisted Congress's efforts to ensure chaplains represent their denominations in all aspects of their ministry. Congress directed the Air Force and Navy to withdraw the challenged regulations in the 2007 NDAA.  The 2013 NDAA's § 533 was passed to protect chaplains' religious beliefs concerning sexual conduct after Congress repealed the military ban on homosexual activities in December 2010. Despite those protections, Congress reminded DoD of chaplains' importance in subsequent NDAAs. A41-43 ¶¶ 77-80. The religious liberty instruction for chaplains, Judge Advocate Generals, and new commanders the 2018 NDAA ordered have yet to be developed.

14

### B.    DoD's Report That it Has Removed "Adverse Actions" from the Files of Those Who Requested RARs Is Misleading and Deceptive

DoD's assertion that "any plaintiff that had an adverse action in his or her file has had that adverse action removed from his or her records", MTD at 12, is deceptive and misleading. DoD uses the term "adverse action" to mean something related to disciplinary actions ignoring denied mandatory schools, assignments, or being double slotted resulting in a lowered fitness report because a plaintiff could not move.

DoD ignores § 533(b)'s clear prohibition against negative personnel actions:

Protection of chaplain decisions relating to conscience, moral principles and religious beliefs. No member of the Armed Forces may—

***

(2) discriminate or take any adverse personnel action against a chaplain, including denial of promotion, schooling, training, or assignment, on the basis of the refusal by the chaplain to comply with a requirement prohibited by paragraph (1).

Section I.B identifies chaplains not promoted following their RARs.

Appellants argue that a forbidden "negative personnel action" under §533 has the same effect as an "adverse action" against the chaplain, it destroys a chaplain's career. DoD will obviously argue otherwise because to admit the obvious shows the deceptive and misleading nature of their actions and representation. It also shows DoD's continuing hostility to people of faith by punishing them contrary to § 533's

15

specific protections. This is another example of DoD's unresolved hostile intent, which precludes mootness.

### C.    DoD Has Failed To Restore the Chaplains to their Pre-Mandate Status Quo

Restoring the Chaplains to their status before the challenged action, rescission's objective, means any injury or harm related to the Mandate was illegal and Chaplains are entitled to restoration to their pre-COVID status and the career success they had before the Mandate. DOD has not done this and its denial of its intentional and lasting injuries to the Chaplains' records and careers is continuing illegality, disobedience to Congress and bad faith.

DoD's actions openly violate RFRA, § 533 and the other constitutional and statutory provisions Chaplains raise, blatant violations of law. These ongoing disputes over the law have future consequences affecting the interests of these Chaplains. Consequently, Chaplains' claims are not moot.

### D.    These Chaplains' Establishment, Free Exercise, Free Speech and Due Process Clause Claims Have Not Been Resolved

No court has addressed the Chaplains' Establishment, Free Exercise, and Due Process claims. The District Court's PI Motion denial ignored the Chaplains' citation and argument that two Circuit cases specifically addressed constitutional issues controlling this case in the context of chaplains' unique role of chaplains. *See* Fact 1,

16

*infra.*, (chaplains are unique officers).

*Katcoff v. Marsh*, 755 F.2d 223 (2d Cir. 1985) rejected an Establishment Clause challenge to the Army Chaplain Corps. It held chaplaincy was Congress' appropriate accommodation of the Establishment and Free Exercise Clauses separate constitutional commands concerning religion. By removing soldiers "to areas where religious leaders of their persuasion and facilities were not available [the Army] could be accused of violating the Establishment Clause unless it provided them with a chaplaincy." *Id.* at 232 (citing *Everson v. Board of Education*, 330 U.S. 1, 15 (1947). In other words, absent a chaplaincy, military service realities would restrict or deny soldiers' ability to exercise their Free Exercise rights violating h the Establishment Clause's command that government neither hinder nor establish a religion.

> It is readily apparent that [the Free Exercise] Clause, like the Establishment Clause, obligates Congress, upon creating an Army, to make religion available to soldiers who have been moved by the Army to areas of the world where religion **of their own denomination are not available to them**. \*\*\*\* Unless the Army provided a chaplaincy it would deprive the soldier of his right under the Establishment Clause **not to have his religion inhibited** and of his right under the Free Exercise Clause **to practice his freely chosen religion**.

*Id.* 234. (Emphasis added); "The Establishment Clause, properly understood, is a shield against any attempt by government to inhibit religion as it has done here," *McDaniel v. Paty*, 435 U.S. 618, 642 (1978) (Brennan, J., concurring)

The Establishment Clause's neutrality mandate demands DoD not restrict,

deny or be hostile to religion. DoD's rejection of religious accommodation, inhibiting these Chaplains' religion in an apparent purge of those who honor conscience and obedience to their religion is an overt Establishment violation. *Katcoff* establishes that the Establishment and Free Exercise Clauses are two sides of the religious liberty coin resting on the common core of mandated neutrality; burdening, restricting, or hindering free exercise inevitability results in an Establishment issue because that neutrality mandate has been violated.

The second case is *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ("*CFGC*"). Like these chaplains, *CFGC's* chaplains pled Establishment Clause violations in their Complaint and PI Motion. CFGC held that such a claim satisfied the requirement for presumptive irreparable harm. *Id.* at 302. The Chaplains argue *CFGC*, which the Fourth Circuit has adopted, controls this case because it addresses chaplains seeking to hold a military agency accountable for religious discrimination. *CFGC's* court held that the alleged Establishment Clause violations presumptively cause the "irreparable harm" necessary to support an injunction. *CFGC* held that for purposes of establishing irreparable harm in the calculus for a preliminary injunction, the allegation of an establishment clause violation based on the complementary messages of unconstitutional preference and official hostility is sufficient to satisfy the PI's "irreparable harm" criteria.

> [T]he Establishment Clause is implicated as soon as the government
> engages in impermissible action. Where, as here, the charge is one of
> official preference of one religion over another, such governmental
> endorsement sends a message to nonadherents [of the favored
> denomination] that they are outsiders, not full members of the political
> community, and an accompanying message to adherents that they are
> insiders, favored members of the political community.

*CFGC*, *ibid.* (emphasis added). Further, the constitutional injury "occurs merely by

virtue of the government's purportedly unconstitutional policy or practice establishing

a religion." *Id.* Sending a forbidden message of preference or hostility is irreparable

harm, without the need for chaplains to make any further showing, including

administrative exhaustion.

The Fourth Circuit adopted *CFGC* in *Int'l Refugee Assistance Project v. Trump*, 857

F.3d 554, 602 (4th Cir.2017) ("*IRAP*"), *vacated and remanded sub nom.*, *Trump v. Int'l

Refugee Assistance Project,* 138 S.Ct. 353 (2017) ("*IRAP II*"). *IRAP*, adopting *CFCG's*

approach, also agreed with the Second, Fifth, and Seventh Circuits that "have

interpreted [*Elrod*] to apply equally to Establishment Clause violations." 857 F.3d at

602 (*citing CFGC*; *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996);

*Parents' Ass'n of P.S. 16 v. Quinones*, 803 F.2d 1235, 1242 (2d Cir. 1986); *ACLU of Ill. v.

City of St. Charles*, 794 F.2d 265, 274 (7th Cir. 1986)).

The Fourth Circuit has stated its agreement "with these courts that because of

'the inchoate, one-way nature of Establishment Clause violations,' they create the

19

same type of immediate, irreparable injury as do other types of First Amendment violations." *Id.* (*quoting CFGC*, 454 F.3d at 303; *see also id.* ("[W]hen an Establishment Clause violation is alleged, infringement occurs the moment the government action takes place . . . .").

The argument is also consistent with *U.S. ex rel. Brooks v. Clifford*, 409 F.2d 700, *reh'g denied* 412 F.2d 1137, 1141 (4th Cir. 1969), addressing a service member's claim for conscientious objection. The *Clifford* court emphasized that:

> [I]f petitioner's claim of conscientious objection is well-founded (and we have decided that it is), petitioner, and others similarly situated, will be required to litigate administratively during a period of which each hour of each day they are required to engage in conduct inimical to their consciences or be subject to court martial, with the added risk that in the ordinary course of the operations of the military, they may be ordered to a duty even more offensive to them.

*Id.* at 1141.

This is precisely the same rationale for finding irreparable harm from denial of RARs and facing a choice between vaccination or violating conscience that has been cited in the RFRA cases granting injunctions. Threatening or punishing these chaplains for following their conscience is irreparable harm based on hostility to their religious belief, *i.e.*, faith. The Mandate's recission has not ended threat for Chaplains following their conscience but the harms and injuries of the now illegal Mandate remain. The Chaplains' Establishment claims are still unaddressed. They "require []

20

careful examination of any law challenged on establishment grounds with a view to ascertaining whether it furthers any of the evils against which that Clause protects." *Comm. for Pub. Educ. v. Nyquist*, 413 U.S. 756, 794 (1973).

## III. THE NDAA'S TERM "RESCIND" MAKES DOD'S ACTIONS ILLEGAL AND PRECLUDES MOOTNESS

### A. "Rescission" Makes the Mandate Void from its Beginning

The 2013 NDAA chose "rescind" to address DoD's Mandate actions. Rescind has a well-recognized legal and common-law meaning to deny any legal authority or power from the challenged action, making that action's procedures void from the beginning.

In the Truth in Lending Act ("TILA"):

> [t]he effect of rescission of an agreement is to put the parties back in the same position they were in prior to the making of the contract. On rescission of a contract, the contract is declared nonexistent and rescission places the parties in the position they would have been in had the agreement never been executed.

*Baker v. Bank of Am., N.A.*, 2014 U.S. Dist. LEXIS 9578, *2, (E.D. NC) (Fourth Circuit citation omitted).

Congress has used "rescission" or "rescind" to deny a challenge procedure or activity any legal force or effect. *Clinton v. City of New York*, 524 U.S. 417, 437-438 (1998) addressed the Line Item Veto Act's constitutionality. That Act allowed the President to "cancel" specific legislative provisions. "The term 'cancel,' used in

21

connection with any dollar amount of discretionary budget authority, means to 'rescind.'" *Id.* at 438 (citing 2 U.S.C. § 691e(4)(A) (1994 ed., Supp. II)). "With respect to both an item of new direct spending and a limited tax benefit, the **cancellation prevents the item "from having legal force or effect."** *Id.* at 437 (emphasis added). This prevented the challenged sections "from having legal force or effect." *Id.* at 438. *Clinton* then provided the entire "cancel-rescind" definition related to the challenged statutory provisions, the common factor in three specific areas was the rescission prevented the "authority ... from having legal force or effect." A "rescinded" action-act is void from the beginning, restoring the parties to their status before the challenged action. *See Leicester Piano Co. v. Front Royal & R. Improv. Co.*, 55 F.4th 190, 186 (4th Cir. 2022) (TILA "rescission provision gives courts flexibility to ensure the parties are returned to their status quo ante").

Fourth Circuit president follows this rule. "In awarding equitable rescission, 'a court [ ] grants rescission or cancellation [of a contract], and its decree wipes out the instrument, and renders it as though it does not exist.'" *Nahigian v. Juno-Loudoun, LLC*, 677 F.3d 579, 591 (4th Cir. 2012) (citation omitted).

A.    **The Mandate's Rescission Makes DOD's Actions Illegal**

DoD completely ignores two results of Congress's rescission mandate that defeat mootness. First, it deprives the Secretary of any legal authority justifying his

22

Mandate related actions. Chaplains challenge the Secretary's authority to issue the Mandate and change the over 240 year well-established definition of vaccine and vaccination. A66-70, ¶¶ 131-140 (Compl. 66-70, ¶¶ 131-140), claiming that violates the "major Policy Doctrine", *see Nat'l Fed'n of Indep. Bus. v. DOL, OSHA*, 142 S. Ct. 661, 667 (2022) (Gorsuch, J., Concurring). As in the OSHA case, DoD's definition change affects thousands and millions of military and civilians and still threatens refusal with draconian civil and criminal sanctions without specific congressional authority. The judiciary expects Congress to speak with clarity on such major issues. *Id.*

Chaplains alleged that the Secretary committed fraud and deceit by using the new definition as if it were the same as the old definition. A5 at ¶3 (PI at p.5, ¶3); CA9-69 (Preliminary Injunction Hearing Transcript). DoD argues the military has had vaccines going back to the time of George Washington.  That is true, but those vaccines, *e.g.*, smallpox, measles, protected recipients from the targeted disease. *See* DoD Instruction 6205.02, RE60-6 at 17, "vaccine: A preparation that … induces a protective immune response against that agent[.]" DoD argues deceptively in the same breath that its new non- 5187 words, protective "vaccines" that allow transmission by infected people are the same as classic vaccines that prevented infection and transmission when in fact they are not. Chaplains term this deceitful practice "bait and

23

switch."

Second, the effect of Congress's order to **rescind** is clear, DoD's Mandate, without authority nor "legal force or effect", was void from the beginning. *See Clinton, op. cit; Nahigian, op. cit.* This supports Chaplains' claims DoD exceeded its authority and any Mandate so-called order was without "legal force or effect."

### B. DoD's Continued Hostility and Refusal to Completely Restore Chaplains Defeats Mootness

When a practice's legality is in contention, merely stopping it does not moot the case. *McCrory*, 831 F.3d at 240.  DoD's 2/28/23 HASC hearing testimony, CA70-80 (HASC TR), and Fact 13, *infra,* show DoD rejects the meaning of rescission. Like a petulant two-year-old, DoD continues to insist it was justified in threatening and destroying military personnel's lives and careers. It is continuing to look for ways to punish those who insisted on their rights and challenged what mounting evidence shows is a destructive medical procedure using an experimental use only product misnamed a vaccine. It is apparent that only a legally binding decision will change DoD's attitude and quash its bureaucratic insurgency.

### <u>CONCLUSION</u>

DoD has not fixed the Chaplains' ruined careers, left unaddressed adverse personnel actions abound with disputes over law violations, discriminatory intent and authority. This prevents the case from becoming moot.

24

In the alternative, if the finds this appeal moot due to events occurring after the District Court's entry of the challenged orders, Appellants request that the dismissal order vacate the District Court's orders under *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950).

Dated this 23rd day of May 2023.

Respectfully submitted,

/s/ *J. Andrew Meyer*
J. Andrew Meyer, Esq.
Florida Bar No.: 0056766
FINN LAW GROUP, P.A.
8380 Bay Pines Blvd.
St. Petersburg, Florida 33709
Telephone: (727) 709-7668
ameyer@finnlawgroup.com
pleadings@finnlawgroup.com

-and-

/s/ *Arthur A. Schulcz, Sr.*
Arthur A. Schulcz, Sr., Esq.
DC Bar No.: 453402
Chaplains Counsel, PLLC
21043 Honeycreeper Place
Leesburg, Virginia 20175
Telephone: (703) 645-4010
art@chaplainscounsel.com

-and-

/s/ *Brandon Johnson*
Brandon Johnson, Esq.
DC Bar No.: 491370

Defending the Republic
2911 Turtle Creek Blvd., Ste. 300
Dallas, Texas 75219
Telephone: (214) 707-1775
bcj@defendingtherepublic.org
*Counsel for Appellants-Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this Response is filed in compliance with the type-volume requirement under Federal Rule of Appellate Procedure 27(d)(2), as it contains 5,200 words. I further certify that this Response complies with the type-face and type-style requirements under Federal Rule of Appellate Procedure 27(d)(1)(E), as it was prepared utilizing Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ J. Andrew Meyer*
J. Andrew Meyer, Esq.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of May 2023, pursuant to this Court's Loc. R. 25(a), I electronically filed the foregoing Response-Opposition to Appellees' Motion to Dismiss for Mootness via the Appellate CM/ECF Portal, which will generate a Notice of Electronic Filing to all parties of record.

*/s/ J. Andrew Meyer*
J. Andrew Meyer, Esq.

# ADDENDUM

# EXHIBIT 8

| | |
|---|---|
| **From:** | Morelli, Valerie (CDC/DDID/NCIRD/ISD) |
| **Sent:** | Wed, 1 Sep 2021 17:06:14 +0000 |
| **To:** | Downs, Alycia E. (CDC/DDID/NCIRD/OD) |
| **Subject:** | RE: Need to update vaccine definition on website |

If this is for the general public I am good with the change

**From:** Downs, Alycia E. (CDC/DDID/NCIRD/OD) <gfy4@cdc.gov>
**Sent:** Wednesday, September 1, 2021 1:00 PM
**To:** Morelli, Valerie (CDC/DDID/NCIRD/ISD) <vxm4@cdc.gov>
**Subject:** RE: Need to update vaccine definition on website

Does this definition need to be updated as well?
> **Vaccination:** The act of introducing a vaccine into the body to produce immunity to a specific disease.

To something like:
> **Vaccination:** The act of introducing a vaccine into the body to produce protection from a specific disease.

**From:** Downs, Alycia E. (CDC/DDID/NCIRD/OD)
**Sent:** Tuesday, August 31, 2021 4:09 PM
**To:** Morelli, Valerie (CDC/DDID/NCIRD/ISD) <vxm4@cdc.gov>
**Subject:** RE: Need to update vaccine definition on website

Great. Thanks Valerie!

**From:** Morelli, Valerie (CDC/DDID/NCIRD/ISD) <vxm4@cdc.gov>
**Sent:** Tuesday, August 31, 2021 4:06 PM
**To:** Downs, Alycia E. (CDC/DDID/NCIRD/OD) <gfy4@cdc.gov>
**Subject:** FW: Need to update vaccine definition on website

This is good to go – waiting on a final answer on the other

**From:** Kroger, Andrew (CDC/DDID/NCIRD/ISD) <aok2@cdc.gov>
**Sent:** Tuesday, August 31, 2021 3:53 PM
**To:** Morelli, Valerie (CDC/DDID/NCIRD/ISD) <vxm4@cdc.gov>
**Subject:** RE: Need to update vaccine definition on website

Okay by me.

Andrew

CA2

Andrew Kroger MD, MPH
Communication and Education Branch
Immunization Services Division
National Center for Immunization and Respiratory Diseases
Centers for Disease Control and Prevention
Roybal Campus
1600 Clifton Road, M/S A-19
Atlanta, GA 30329-4027

**From:** Morelli, Valerie (CDC/DDID/NCIRD/ISD) <vxm4@cdc.gov>
**Sent:** Tuesday, August 31, 2021 2:46 PM
**To:** Kroger, Andrew (CDC/DDID/NCIRD/ISD) <aok2@cdc.gov>
**Subject:** FW: Need to update vaccine definition on website
**Importance:** High

Are you ok with this change – if you open the attachment you can click on the link to the page this is relevant to – it is a general public definition page

**From:** Downs, Alycia E. (CDC/DDID/NCIRD/OD) <gfy4@cdc.gov>
**Sent:** Wednesday, August 25, 2021 8:25 AM
**To:** Morelli, Valerie (CDC/DDID/NCIRD/ISD) <vxm4@cdc.gov>
**Subject:** RE: Need to update vaccine definition on website

Hi Valerie,

I know you are busy so I really appreciate your help. The definition of vaccine we have posted is problematic and people are using it to claim the COVID-19 vaccine is not a vaccine based on our own definition. Does the updated version look okay to you? Thank you!

Currently posted:

> **Vaccine:** A product that stimulates a person's immune system to produce immunity to a specific disease, protecting the person from that disease. Vaccines are usually administered through needle injections, but can also be administered by mouth or sprayed into the nose.

Update to:

> **Vaccine:** A preparation that is used to stimulate the body's immune response against diseases. Vaccines are usually administered through needle injections, but some can be administered by mouth or sprayed into the nose.

**From:** Downs, Alycia E. (CDC/DDID/NCIRD/OD)
**Sent:** Thursday, August 19, 2021 11:56 AM
**To:** Morelli, Valerie (CDC/DDID/NCIRD/ISD) <vxm4@cdc.gov>
**Subject:** Need to update vaccine definition on website

Hi Valerie,

I need to update this page Immunization Basics | CDC since these definitions are outdated and being used by some to say COVID-19 vaccines are not vaccines per CDC's own definition.

Could you take a look at the attached work doc and let me know if this looks okay to you? The mRNA language was pulled from the COVID-19 website.

Cynthia and Allison Fisher have both reviewed but I would really appreciate your help with this.

Alycia

**From:**      Lowndes, Andrew (CDC/DDID/NCIRD/OD) (CTR)
**Sent:**      Mon, 16 Aug 2021 17:45:24 +0000
**To:**        Downs, Alycia E. (CDC/DDID/NCIRD/OD);LaRocque, Marcie
(CDC/DDID/NCIRD/OD) (CTR);St James, Jacqueline N. (CDC/DDID/NCIRD/OD) (CTR)
**Cc:**        Ponder, Marilyn (CDC/DDID/NCIRD/OD) (CTR);Witbart, Lauren Ann
(CDC/DDID/NCIRD/OD)
**Subject:**   RE: Who owns this page?


Hi Alycia,

Speaking for just myself—I think (b)(5)
(b)(5)

I think (b)(5)
(b)(5)

Best,
Andrew

**From:** Downs, Alycia E. (CDC/DDID/NCIRD/OD) <gfy4@cdc.gov>
**Sent:** Friday, August 13, 2021 4:35 PM
**To:** Lowndes, Andrew (CDC/DDID/NCIRD/OD) (CTR) <llx2@cdc.gov>; LaRocque, Marcie
(CDC/DDID/NCIRD/OD) (CTR) <lox3@cdc.gov>; St James, Jacqueline N. (CDC/DDID/NCIRD/OD) (CTR)
<ibx9@cdc.gov>
**Cc:** Ponder, Marilyn (CDC/DDID/NCIRD/OD) (CTR) <qvl8@cdc.gov>; Witbart, Lauren Ann
(CDC/DDID/NCIRD/OD) <xap3@cdc.gov>
**Subject:** RE: Who owns this page?

Do you all have recommended updates for the content?

(b)(5)

Alycia

**From:** Lowndes, Andrew (CDC/DDID/NCIRD/OD) (CTR) <llx2@cdc.gov>
**Sent:** Friday, August 13, 2021 3:47 PM
**To:** Downs, Alycia E. (CDC/DDID/NCIRD/OD) <gfy4@cdc.gov>; LaRocque, Marcie (CDC/DDID/NCIRD/OD) (CTR) <lox3@cdc.gov>; St James, Jacqueline N. (CDC/DDID/NCIRD/OD) (CTR) <ibx9@cdc.gov>
**Cc:** Ponder, Marilyn (CDC/DDID/NCIRD/OD) (CTR) <qvl8@cdc.gov>; Witbart, Lauren Ann (CDC/DDID/NCIRD/OD) <xap3@cdc.gov>
**Subject:** RE: Who owns this page?

Hi Alycia,

People have been asking us if COVID-19 vaccines are not technically vaccines. They often cite that page as CDC's definition for what counts as a vaccine. Here are a few examples (more in the attached spreadsheets):

- Is it true that this shot for Covid is not actually a vaccine per your definition? Does this shot make you immune to the Covid virus? If not, why should I get the shot?
- Reading the CDC's definition of vaccine is says "...to produce immunity to a specific disease..." Everything you read today says this shot doesn't give you immunity but helps a person fight off the infection. Our question is how is the CDC and the rest of the world allowed to call the shot a vaccination when it doesn't even meet your own definition
- https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm The definition of the word vaccine used on this page states that a vaccine produces immunity. Further, immunity is defined as being exposed to it (the pathogen) without becoming infected. There are several vaccines, including the new COVID vaccines that do not produce immunity as defined. Would it be possible for you to update the page to be more clear on the definition of a vaccine? I was directed to this page by someone attempting to use it as proof that the EUA COVID vaccines are not really vaccines since they do not provide immunity as defined on the linked page. Hopefully this can help clear up some disinformation that has been spread during the pandemic.
- Please update the definition of vaccine on your website found at https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm People are citing this as proof that the mRNA vaccines are not really vaccines. The definition needs to include new technological advances (miriam webster has done this). Thanks
- Right-wing covid-19 pandemic deniers are using your "vaccine" definition to argue that mRNA vaccines are not vaccines: Here is the definition from the CDC website: Vaccine: A product that stimulates a person's immune system to produce immunity to a specific disease, protecting the person from that disease. Vaccines are usually administered through needle injections, but can also be administered by mouth or sprayed into the nose. The phrase "to produce immunity" was interpreted to mean "complete" or "perfect" immunity. This was twisted to claim that the existing covid-19 vaccines were not vaccines because they only prevented severe illness. I think it would be more accurate to say that a vaccine function is "to stimulate an immune response" to be clear that perfect immunity is not what defines a vaccine.

Best,
Andrew

**From:** Downs, Alycia E. (CDC/DDID/NCIRD/OD) <gfy4@cdc.gov>
**Sent:** Friday, August 13, 2021 3:29 PM

**To:** LaRocque, Marcie (CDC/DDID/NCIRD/OD) (CTR) <lox3@cdc.gov>; St James, Jacqueline N. (CDC/DDID/NCIRD/OD) (CTR) <ibx9@cdc.gov>
**Cc:** Ponder, Marilyn (CDC/DDID/NCIRD/OD) (CTR) <qvl8@cdc.gov>; Lowndes, Andrew (CDC/DDID/NCIRD/OD) (CTR) <llx2@cdc.gov>; Witbart, Lauren Ann (CDC/DDID/NCIRD/OD) <xap3@cdc.gov>
**Subject:** RE: Who owns this page?

Yes, there are a few of these pages we are reviewing.

What are the questions coming in?

Alycia

**From:** LaRocque, Marcie (CDC/DDID/NCIRD/OD) (CTR) <lox3@cdc.gov>
**Sent:** Friday, August 13, 2021 2:56 PM
**To:** St James, Jacqueline N. (CDC/DDID/NCIRD/OD) (CTR) <ibx9@cdc.gov>; Downs, Alycia E. (CDC/DDID/NCIRD/OD) <gfy4@cdc.gov>
**Cc:** Ponder, Marilyn (CDC/DDID/NCIRD/OD) (CTR) <qvl8@cdc.gov>; Lowndes, Andrew (CDC/DDID/NCIRD/OD) (CTR) <llx2@cdc.gov>; Witbart, Lauren Ann (CDC/DDID/NCIRD/OD) <xap3@cdc.gov>
**Subject:** RE: Who owns this page?

Adding Alycia – Alycia we've talked about this page/section of pages recently. See below.

**From:** St James, Jacqueline N. (CDC/DDID/NCIRD/OD) (CTR) <ibx9@cdc.gov>
**Sent:** Friday, August 13, 2021 2:53 PM
**To:** LaRocque, Marcie (CDC/DDID/NCIRD/OD) (CTR) <lox3@cdc.gov>
**Cc:** Ponder, Marilyn (CDC/DDID/NCIRD/OD) (CTR) <qvl8@cdc.gov>; Lowndes, Andrew (CDC/DDID/NCIRD/OD) (CTR) <llx2@cdc.gov>; Witbart, Lauren Ann (CDC/DDID/NCIRD/OD) <xap3@cdc.gov>
**Subject:** RE: Who owns this page?

Marcie, who own this page- Immunization Basics | CDC?

**JACQUIE** ST JAMES, MPH  |  Web Designer/ UX Writer
Peraton  |  Health Protection Solutions
Contractor for NCIRD
Centers for Disease Control and Prevention
O: 404-498-2683  |  C: 404-502-4231  |  ibx9@cdc.gov

**From:** Witbart, Lauren Ann (CDC/DDID/NCIRD/OD) <xap3@cdc.gov>
**Sent:** Friday, August 13, 2021 2:49 PM
**To:** St James, Jacqueline N. (CDC/DDID/NCIRD/OD) (CTR) <ibx9@cdc.gov>
**Cc:** Ponder, Marilyn (CDC/DDID/NCIRD/OD) (CTR) <qvl8@cdc.gov>; Lowndes, Andrew (CDC/DDID/NCIRD/OD) (CTR) <llx2@cdc.gov>
**Subject:** Who owns this page?

Hi Jacquie,

Does ISD/Valerie own this page: Immunization Basics | CDC? We need to work with them to update some of the content. This is causes a good number of questions to CDCINFO.

Thank you!
Lauren

Lauren Witbart   M.Ed. | Ed.S. | MPH
NCIRD   IICSO
VTF | Data Unit

1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF VIRGINIA
2              ALEXANDRIA DIVISION

3    ISRAEL ALVARADO, *et al.*,    )  Case 1:22-cv-876
                                   )
4              Plaintiffs,         )
                                   )
5          v.                      )  Alexandria, Virginia
                                   )  September 28, 2022
6    LLOYD AUSTIN, III, et al.,    )  10:43 a.m.
                                   )
7              Defendants.         )
     _____)  Pages 1 - 61
8

9          TRANSCRIPT OF PLAINTIFFS' MOTION FOR

10               PRELIMINARY INJUNCTION

11       BEFORE THE HONORABLE ANTHONY J. TRENGA

12          UNITED STATES DISTRICT COURT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25       COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

1  <u>APPEARANCES</u>:

2  FOR THE PLAINTIFFS:

3        ARTHUR A. SCHULCZ, SR., ESQUIRE, *PRO HAC VICE*
          CHAPLAINS COUNSEL, PLLC
4        21043 Honeycreeper Place
          Leesburg, Virginia  20175
5        (703) 645-4010

6        BRANDON JOHNSON, ESQUIRE, *PRO HAC VICE*
          DEFENDING THE REPUBLIC
7        2911 Turtle Creek Boulevard, Suite 300
          Dallas, Texas  75219
8        (214) 707-1775

9  FOR THE DEFENDANTS:

10       MICHAEL CLENDENEN, ESQUIRE
          UNITED STATES DEPARTMENT OF JUSTICE
11       Civil Division, Federal Programs Branch
          1100 L Street, N.W., Suite 12028
12       Washington, D.C.  20005
          (919) 856-4013
13
          DENNIS C. BARGHAAN, JR., ESQUIRE
14       OFFICE OF THE UNITED STATES ATTORNEY
          2100 Jamieson Avenue
15       Alexandria, Virginia  22314
          (703) 299-3700

16

17

18

19

20

21

22

23

24

25

CA10

3

```
 1              THE CLERK:  Civil Action 1:22-cv-876,
 2   Alvarado, et al. v. Austin, et al.
 3              Counsel, will you please note your
 4   appearances for the record.
 5              MR. BARGHAAN:  Good morning again, Your
 6   Honor.  Assistant United States Attorney Dennis
 7   Barghaan on behalf of the defendants.  With me today is
 8   Michael Clendenen from the Justice Department's Civil
 9   Division, and Mr. Clendenen will argue on behalf of the
10   government today.
11              THE COURT:  All right.  Thank you.
12              MR. SCHULCZ:  Good morning, Your Honor.
13   Arthur Schulcz.  I'm the lead counsel for the
14   plaintiffs.
15              THE COURT:  All right.  Welcome.
16              Hold on one moment.
17              MR. JOHNSON:  Brandon Johnson.  I will be
18   assisting as cocounsel today.
19              THE COURT:  All right.  We're here on
20   plaintiffs' motion for a preliminary injunction.  I've
21   reviewed the briefing and would be pleased to hear
22   further from counsel.
23              MR. SCHULCZ:  May it please the Court, Your
24   Honor.
25              THE COURT:  Yes.
```

CAII

4

1          MR. SCHULCZ:  We have many issues, and I
2     would like to provide the Court with the information as
3     to how we've divided the labor among us.
4          THE COURT:  All right.
5          MR. SCHULCZ:  I will be handling the
6     Establishment Clause, religious test, Section 533,
7     retaliation, and the Free Exercise Clause.  My
8     cocounsel will be handling justiciability, the *Mindes*
9     application, standing, the APA claims, public policy
10    doctrine, and the Religious Freedom Restoration Act.
11         THE COURT:  All right.
12         MR. SCHULCZ:  Your Honor, this is a very
13    simple case if we understand two things, and the
14    first --
15         THE COURT:  You can tell how simple it is by
16    the briefings.
17         MR. SCHULCZ:  Yes, Your Honor.  True.
18         Part of that is that the government's
19    argument depends on something we used to call bait and
20    switch.  It uses the term "vaccine" in two entirely
21    different contexts.
22         When it says that services have had vaccines
23    going back to the time of George Washington, they are
24    correct, but that vaccine was defined as something
25    which immunized the person from the disease in

5

1  question.  And immunization means protection from

2  exposure, and it also means that you don't catch it and

3  transmit it to others.

4          Now, that is true going back until

5  September 1, 2021, when the CDC changed the definition

6  of "vaccine" to mean something entirely different.  Now

7  it means something that stimulates.  And so it doesn't

8  protect.  It doesn't immunize.  So when the government

9  says, well, we had these historic vaccines -- I think

10  there's nine that they require -- they protected you,

11  measles, mumps, polio.

12          But this vaccine does not protect.  So when

13  it says this vaccine, which does not immunize, to this

14  historical use of "vaccine," it's attempting to switch

15  because it's providing something which has an entirely

16  new meaning and which does not meet the primary purpose

17  of the Department of Defense's own immunology and

18  immunization procedures.  They have a Department of

19  Defense instruction that talks about immunization.

20  It's designed to protect.

21          This does not protect, as evidenced by

22  Secretary Austin having been fully vaccinated, boosted,

23  and he's caught it twice, once in January and once

24  recently in June.  We've had President Biden, who not

25  only caught it, but he caught it twice or three times.

6

1  We have the joint chiefs have all had COVID. So it
2  does not protect.
3          So, first off, if the objective is to protect
4  the force, it fails to do that, and consequently, it
5  can't be a compelling purpose.
6          I would also like to point out, as we point
7  out in our reply brief on page 4, note 3, that on
8  August 31 of this year, they had emergency use
9  authorization to new MRNA treatments for the Pfizer
10  BioNTech and Moderna vaccines. What's significant
11  about that? It's an emergency use authorization. And
12  for them to do that, they have to find, quote, that
13  there is no adequate, available, approved alternative
14  for treating or preventing the disease.
15          So that means that the so-called description
16  or the claim that the vaccines that are available
17  protect or are authorized is, quite frankly, hooey
18  because otherwise, they would not have issued an EUA.
19  EUA says there's nothing out there that does this. And
20  I think that shows that their argument that this is an
21  approved vaccine -- or these vaccines -- are wrong.
22          The other point I would like to make is that
23  there are two circuit cases that specifically address
24  chaplains, and we believe that they address and should
25  control this --

7

1          Your Honor, may I get some water?  My mouth

2 has suddenly --

3          THE COURT:  What if the Court were to

4 conclude, based on what's before it, that there was a

5 reasonable factual basis for the defendants to conclude

6 that vaccinations, however you want to use that term,

7 does have a prophylactic medically based preventative

8 purpose?  What happens to your argument on this piece

9 of it?

10          MR. SCHULCZ:  If I understand your question,

11 Your Honor, it's if you conclude that there was a

12 legitimate basis for them to issue a mandate --

13          THE COURT:  A legitimate medically based

14 reason for this.

15          MR. SCHULCZ:  Well, Your Honor, the problem

16 is that if this is EUA, then by statute you must be

17 offered -- you must be provided the information that's

18 emergency use only, and you have the option to refuse

19 it.  So unless this is an approved FDA vaccine, which

20 it can't be, then you still run into the problem that

21 you can't mandate an emergency use only vaccine.

22          Let me apply this to a real fact situation.

23          THE COURT:  Well, it's now been approved,

24 correct?

25          MR. SCHULCZ:  I beg your pardon?

8

1              THE COURT: It's now been approved.

2              MR. SCHULCZ: Not been approved, Your Honor.

3              THE COURT: No, it has been approved.

4              MR. SCHULCZ: You're saying -- I'm

5 misunderstanding.

6              THE COURT: Right. I mean there was an

7 emergency authorized use, but hasn't there been formal

8 approval of some of these vaccinations?

9              MR. SCHULCZ: Your Honor, supposedly there

10 was something called comirnaty, which was a, quote, an

11 FDA approved toxin.

12              THE COURT: Right.

13              MR. SCHULCZ: The fact is that's never been

14 available for the United States.

15              THE COURT: All right.

16              MR. SCHULCZ: So to say we're mandating a

17 vaccine that is approved but is not available, then how

18 can it be?

19              THE COURT: All right.

20              MR. SCHULCZ: That's the problem. And so

21 what they're offering, Your Honor, is not the comirnaty

22 because there's specific lot numbers, and those lot

23 numbers have to be traced to FDA-approved laboratories

24 or facilities that produce it. That issue -- and my

25 cocounsel can probably address this in much more detail

9

1  than I have, but they're not available and have not

2  been available.  So this idea that somehow there's an

3  approved vaccine out there is, again, contrary to the

4  facts.

5            THE COURT:  All right.

6            MR. SCHULCZ:  One of my clients, who happens

7  to be here, Chaplain Lewis, his religious request was

8  denied on September 21.  So he had got this notice of

9  counseling, and he has been ordered to receive a

10  COVID-19 vaccination not later than 6 October.  It goes

11  on to say it's a lawful order and that if you don't do

12  this, then we're going to start separation procedures.

13  My client has 26 years of service.

14            Now, part of the religious accommodation

15  request is mandated by the Religious Freedom

16  Restoration Act, and it requires the government to

17  evaluate that and determine whether or not there is

18  some least restrictive means of accomplishing the

19  objective.

20            Well, we've had the Secretary of Defense, who

21  has COVID.  He sequestered himself for a couple of

22  days, and he returned to work.  So even if an

23  unvaccinated person gets COVID, he stays five days in

24  treatment.  They give him all kinds of new treatments,

25  and he's back on work.

CA17

1          And so what does it take to replace 26 years?
2    That on its face is irrational and wouldn't even pass
3    the -- and furthermore, it violates a long-standing
4    military procedure that came out in the cases dealing
5    with HIV because they have to -- in denying these
6    requests, they have to talk about the current state of
7    the treatment.  They have to talk about the reality of
8    the treatment.
9          For instance, the HIV was an automatic
10   discharge.  You have a precedent in the Fourth Circuit,
11   *Roe v. DoD*, and it said your cases go back way here.
12   You haven't talked about the advances of the science.
13   You haven't talked about the treatment.  Now, it may
14   have been way back when, when COVID hit, there wasn't
15   much treatment.
16         For HIV, the argument was, well, we can't
17   deploy them, and the Fourth Circuit pointed out that's
18   not true because the treatments now are such that you
19   can manage the disease.  You have treatments available.
20   You can send whatever it takes, whether the treatments
21   or the drugs, that are needed to maintain HIV below
22   certain viral levels.  And so deployability no longer
23   is an issue.
24         And it pointed out that by refusing to talk
25   about the current treatment levels, they violated the

1  ADA because it's arbitrary and capricious.  We make the

2  same argument here.  If you look through all of their

3  arguments, they don't talk about what is the current

4  treatment.

5          Another issue that I wanted --

6          THE COURT:  Go back to the emergency use

7  point just so I'm clear.  Your position is that they

8  simply can't require any vaccination that's not had

9  formal FDA approval, that emergency use approval in and

10 of itself precludes them from requiring vaccination?

11         MR. SCHULCZ:  Yes, Your Honor.

12         THE COURT:  All right.  And that's unrelated

13 to your Establishment Clause claim?

14         MR. SCHULCZ:  That's correct, Your Honor.

15         THE COURT:  That's a freestanding argument,

16 correct?

17         MR. SCHULCZ:  Except, Your Honor --

18         THE COURT:  That's a freestanding argument,

19 correct?

20         MR. SCHULCZ:  Except, Your Honor, what I

21 would say is that when you look at the process that

22 they are supposed to use, which is a valid evaluation

23 of a religious accommodation request, there has been no

24 such thing.  The answer has been predetermined.  In

25 fact, there are three class actions right now for the

1  Navy, the Air Force, and the Marine Corps.  Those

2  courts have determined that the religious accommodation

3  process is theater, and you can get that by looking at

4  the number that have applied and the number approved.

5  And how it fits into the Establishment Clause, there's

6  a case called *Katcoff v. Marsh*.

7           THE COURT:  All right.  But your initial

8  position is you don't even need to reach the

9  Establishment Clause; this case can begin and end with

10 the emergency use issue?  Is that right?

11          MR. SCHULCZ:  Yes, Your Honor.

12          THE COURT:  All right, just so I'm clear.

13          MR. SCHULCZ:  Except we would argue that all

14 of these things count, Your Honor.

15          THE COURT:  Okay.

16          MR. SCHULCZ:  Particularly, because when the

17 government is hostile to religion, which is this whole

18 RAR process shows a hostility to religion, that

19 violates the Establishment Clause.

20          There's a case called *Chaplaincy of Full*

21 *Gospel Churches* which said that when the government

22 violates the Establishment Clause, it causes

23 irreparable harm the minute the government takes the

24 action.  So from day one, when they issued this mandate

25 and they said, wow, we're not going to accept your

13

1   religious accommodation request, that was an

2   Establishment Clause violation and something that this

3   Court needs to enjoin.

4           There's another case that actually addresses

5   this same kind of issue.  It's called *Anderson v.*

6   *Laird*.  It's a 1972 case in which the D.C. Circuit

7   struck down mandatory chapel requirements for the

8   Military Service Academy cadets and midshipmen.

9           And the district court bought the

10  government's argument that this is something that they

11  should be deferred to the government, and the D.C.

12  Circuit roundly disagreed with that, and they said that

13  this action goes to the heart of the Establishment

14  Clause.  Requiring people to march and attend religious

15  services was something that violated a lot of the

16  Establishment Clause and that it must be stopped

17  immediately.  And we would make that same argument

18  here.

19          This is hostility.  The message that they

20  give is if you are following your conscience -- and

21  because of your faith, you don't belong here, you are

22  not welcome here, and you are not favored.  And that is

23  according to *Chaplaincy of Full Gospel Churches* an

24  Establishment Clause violation.  The message is

25  hostility.  They are telling Chaplain Lewis and all the

14

 1  others of our clients they're not welcome because they
 2  believe that their conscience is to determine what is
 3  right and what is wrong.
 4           THE COURT:  Let me ask you this.  You started
 5  out mentioning how this is different from the smallpox
 6  vaccination, for example, that was required by George
 7  Washington.  And it goes to, as I understand it, your
 8  view that those immunized people as opposed to simply
 9  providing perhaps some prophylactic protection.  Is
10  that the distinction?  And these arguments you make, I
11  take it, you wouldn't contend apply to all
12  immunizations or all vaccinations?
13           MR. SCHULCZ:  No.  Your Honor, the
14  vaccinations that they had talked to him about
15  historically all immunize the person.
16           THE COURT:  Right, and I understand.  None of
17  those arguments that you're advancing here would apply
18  to any of those arguments --
19           MR. SCHULCZ:  No, Your Honor --
20           THE COURT:  -- is that right?
21           MR. SCHULCZ:  Your Honor, yes, because --
22           THE COURT:  Okay.  All right.  And that
23  relates to the nature of this vaccination; is that
24  right?
25           MR. SCHULCZ:  Yes, Your Honor.

CA22

1          THE COURT:  Okay.  The medical nature of this

2  vaccination?

3          MR. SCHULCZ:  Yes, Your Honor.

4          THE COURT:  Okay.  All right.

5          MR. SCHULCZ:  In fact, the president has said

6  and his office has said, We knew it wasn't going to

7  work.  That COVID vaccine, we knew it wasn't going to

8  work.  Now, how can you be mandating something that you

9  know is not going to work?

10          In fact, right now the CDC has put out

11  guidance, they say there should be no distinction

12  between vaccinated and unvaccinated.  And so the

13  question ought to be, well, where is the Department of

14  Defense in relation to the other branches, and I

15  believe my cocounsel will cover that.

16          THE COURT:  All right.

17          MR. SCHULCZ:  We want to point out that the

18  religion clauses are both sides of the same coin called

19  religious liberty.  They depend on neutrality.  The

20  free exercise, the government must be neutral, and the

21  same thing with the Establishment Clause.  The

22  government must be neutral.

23          There is nothing neutral about these

24  policies.  They single out people with conscience.  And

25  the issue here is who determines who is your

16

1  conscience?  My clients believe that their conscience
2  is formed by what scripture tells them.  And so that
3  becomes important because their argument is that, no,
4  you must subvert that.  You must change that.  You must
5  allow some means of determination as to what is right
6  and what is wrong.
7          In fact, in a list of issues that we raise as
8  to why it impacts people, they're being told and they
9  have been told that they should not counsel people.  In
10 fact, many of them have been removed from the process
11 of counseling.  They have been treated discriminatorily
12 in the beginning.  We are a chief of chaplains for the
13 Army, for instance, who essentially said, "Get on board
14 or get out."  That is not neutrality.
15         THE COURT:  What if someone had a
16 religious-based conscientious objection to one of these
17 other vaccinations that we're talking about?
18         MR. SCHULCZ:  Your Honor, I did not hear you.
19         THE COURT:  Yes.  What if somebody had a
20 religious-based conscientious objection to one of these
21 other vaccinations that we're talking about?  I take it
22 these Establishment Clause provisions, you contend,
23 would not allow that person to evade that requirement;
24 is that right?
25         MR. SCHULCZ:  Your Honor, it depends on how

1  they treat him.  If they did it right and they look at

2  what is his basis, if he has a religious exemption --

3  and we're dealing with religious exemptions all the

4  time, Your Honor.  In fact, there is a policy --

5           THE COURT:  Well, are there religious

6  exemptions available or issued with respect to these

7  other vaccinations that you contend --

8           MR. SCHULCZ:  Your Honor, I believe there

9  are.  Yes, I believe there are.  I believe that there

10  have been religious exemptions.

11           I know of one chaplain in the Navy who has

12  had no vaccinations, and he has had -- at this point,

13  he's been allowed to do so.

14           THE COURT:  All right.

15           MR. SCHULCZ:  So it's not an issue that they

16  haven't had a policy.  The question is -- when he says,

17  well, I have a problem with this vaccination, the

18  question is, well, what is the disease?  You know,

19  there are a variety of reasons that we're supposed to

20  evaluate that individual, but this is, as they pointed

21  out in the *SEALs* case, there's the process -- the end

22  of the process was predetermined.  That's hostility

23  because you're saying we're not going to accept a

24  religious --

25           THE COURT:  Well, can you give me an example?

1  What's another required immunization?  What's a

2  required --

3           MR. SCHULCZ:  Measles.

4           THE COURT:  Measles, all right.

5           MR. SCHULCZ:  Or polio, Your Honor.

6           THE COURT:  Polio, all right.  They are

7  giving religious-based exemptions to the polio

8  vaccination?

9           MR. SCHULCZ:  Your Honor, I believe the

10 answer is yes.

11          THE COURT:  All right.

12          MR. SCHULCZ:  See, Your Honor, part of the

13 vaccination process, like immunization, builds up what

14 we call herd immunity.  I mean, if you'll remember back

15 when COVID came out, flatten the curve.  We'll build up

16 herd immunity.

17          But this vaccine doesn't do that.  It doesn't

18 protect people.  It doesn't build up herd immunity.

19 And as President Biden said in his office, "We never

20 expected it to."  Well, why didn't you tell us that in

21 the beginning?  That's a whole different issue.

22          My point is that they don't have a compelling

23 purpose; and therefore, it cannot be -- the question is

24 asked by the --

25          THE COURT:  When you say no compelling

1  purpose, based on what you contend is the lack of

2  efficacy?

3            MR. SCHULCZ:  Yes.

4            THE COURT:  All right.

5            MR. SCHULCZ:  Yes, Your Honor.

6            THE COURT:  All right.

7            MR. SCHULCZ:  A solution that doesn't work

8  doesn't -- in a case called *Capital Square Review and*

9  *Advisory Board v. Pinette*, the Supreme Court said the

10 Establishment Clause forbids the government to hide

11 behind an application of formally neutral criteria and

12 remain studiously oblivious to the effects of its

13 actions.

14           Here they have all of these procedures, but

15 they ignored -- the answer is no if you're asking for a

16 religious accommodation.

17           And that -- the other issue that I would

18 briefly like to comment on is something we call

19 Section 533 of the National Defense Authorization Act

20 of 2013.  Now, that is still good federal law.  And I

21 have talked to almost all of my clients and asked them

22 if they ever heard of Section 533, and the answer is

23 no, not until I mention it.  I mention it and I know

24 about it because I was involved in the process that

25 eventually led to it.

20

1          But it sets up specific protections for
2    chaplains and for a conscience.  It protects -- Section
3    (a) covers the right of conscience.  Section (b)
4    specifically has criteria for chaplains.  It protects
5    them from decisions that flow from their conscience.
6    It uses the term "ritual rite, or ceremony."  But those
7    terms have to be based on the context in which they are
8    provided, which is religious activities.
9          My clients say, "For me to take a COVID
10   vaccine" -- one said, "I am compelled by my conscience
11   not to take this for a variety of reasons.  For me to
12   now take this is, in fact, a rejection of the authority
13   by which I call upon to regulate my life, which is my
14   God."
15         God comes down to the authority by which you
16   regulate your everyday sins, and for my chaplains,
17   that's the scripture.  I mean, you have a choice.  You
18   either have a divine code or you have man.
19         THE COURT:  To what extent are these
20   arguments specific to chaplains and the statutory
21   protections that they have, or are they applicable to
22   any service member?
23         MR. SCHULCZ:  Your Honor, 533(a) covers every
24   service member.
25         THE COURT:  So you don't --

1            MR. SCHULCZ:  Section (b) covers chaplains.

2            THE COURT:  Right.  To what extent do you

3 specifically rely on Section (b) as opposed to

4 arguments or positions that would apply to any service

5 member?

6            MR. SCHULCZ:  Well, Your Honor, because once

7 it creates a right and protection -- this is federal

8 law, and it was required by the services to implement

9 and regulate its regulations.  In our complaint, we say

10 that that was never done properly.

11           And the reason I can say that it hasn't been

12 done properly is, you know, everybody wants to cite the

13 Supreme Court case that dealt with the mandate, but

14 nobody mentioned to the Supreme Court that the issue of

15 conscience had already been decided by Congress and

16 that there are protections for conscience.

17           And no one has yet to address the issue of

18 533, the protection specifically for chaplains, which

19 protects their decisions that are based on conscience

20 as formed by their faith.

21            THE COURT:  All right.

22            MR. SCHULCZ:  Have I made that clear, Your

23 Honor?

24            THE COURT:  Yes.

25            MR. SCHULCZ:  And the third part of Section

22

1  33 [sic] was they're supposed to promulgate the

2  regulations.  That's a whole different issue, but the

3  fact that nobody knows about it shows -- is, I think,

4  evidence that that has not been done.

5          Your Honor, I want to mention some of the

6  other issues here, like retaliation.  Retaliation is

7  the government negative response to the exercise of a

8  protected right.  My chaplains have a right to exercise

9  their right to seek religious accommodation.  That

10  right is also protected by Section 533, and they have

11  been retaliated against.  They've been denied

12  promotions.  They've been denied movement.  They've

13  been denied all sorts of things.  They've been

14  segregated and treated as pariahs, all of which is

15  forbidden not only by 533 but by the very act of the

16  Free Exercise Clause and the Establishment Clause.

17  They have exercised their rights to insist on their

18  constitutional rights.

19          Your Honor, at this point, if you have no

20  further questions for me, I'd like to turn this over to

21  my associate --

22          THE COURT:  All right. that would be fine.

23          MR. SCHULCZ:  -- to talk about some other

24  issues here.

25          THE COURT:  All right.  Good morning.

1          MR. JOHNSON:  Good morning, Your Honor.

2          Maybe I can just elaborate on a couple of

3  points that -- or a couple of my cocounsel's responses.

4  The significance of the FDA decision on August 31 is

5  tied to the CDC and the larger U.S. government decision

6  to no longer purchase the currently licensed monovalent

7  vaccines.  The government is effectively the sole buyer

8  or payer for all the vaccines.

9          What they determined in August was we will no

10  longer buy these; they don't work.  We are going to

11  instead buy 175 million doses of this new vaccine.

12          So Pfizer in January acknowledged that the

13  monovalent vaccines that are licensed or EUA provide no

14  protection against omicron.  It took CDC until August

15  to recognize that point.  But the entire U.S.

16  government is going in one direction to abandon as

17  obsolete the currently licensed vaccines that DoD seeks

18  to mandate and purchasing something else, whereas the

19  DoD is continuing to mandate vaccines that are known

20  not to work.

21          And our position is that it's not only

22  arbitrary; it's punitive.  They want to make examples

23  of people like our plaintiffs and other service members

24  who have religious objections.  That plays into the

25  religious discrimination, arbitrary and capricious, and

1  all of our claims.

2          The second larger point is -- Art explained

3  why Section 533 is unique to chaplains, but there's a

4  larger scope of issues here.  As we explained,

5  chaplains have a unique set of claims based on their

6  unique constitutional role.  As explained in *Katcoff*,

7  the Free Exercise and Establishment Clause are two

8  sides of the same coin.

9          The chaplain corps is necessary to preserve

10 the free exercise rights of service members because

11 they are frequently deployed abroad.  At the same

12 time -- or otherwise it said they would be defied their

13 free exercise of religion.  At the same time, they're

14 necessary under the Establishment Clause to ensure

15 government neutrality and show a lack of preference

16 among faiths or hostility and religion more generally.

17         So what's happening here is the government is

18 dictating to chaplains the messages they must send.  So

19 they are trying through intimidation, coercion,

20 retaliation -- they are either removing chaplains from

21 their role in the religious accommodation process and

22 trying to dictate to them -- to service members either

23 to not submit a religious accommodation request or that

24 their concerns aren't valid, their religious objections

25 are not valid.

1          They're also trying to get them to parrot or
2    speak from a script rather than from their conscience
3    or faith.  So, you know, they're compelling the
4    government-endorsed position rather than the position
5    that would be required by their faith and conscience.

6          At the same time, they're trying to
7    effectivity draft or coerce chaplains into sending this
8    message of hostility to religion, the institutionalized
9    hostility to religion that we've described here, and
10   also the message of futility.  There's no point in even
11   attempting to seek religious accommodation.  Your
12   religious values -- your religious beliefs have no
13   value, and there's no chance of success.  You will be
14   kicked out because you do not belong here.  There is no
15   place in this Army or other service for those with
16   religious objections to the vaccine.

17         So chaplains have unique claims because in
18   addition to their own religious accommodation requests,
19   which have been the subject of most of the other RFRA
20   cases, they have an integral role in the religious
21   accommodation process itself that the government has
22   tried to corrupt and co-opt to make them complicit in
23   the religious violations of other service members.

24         So it's almost as if -- and the Court -- in
25   the judicial system, if you just remove defense

1  counsel, you're removing anybody who might have any

2  sympathy who might be able to -- because several of

3  them have been removed from the process not only

4  because of their religious accommodations but because

5  they have assisted other service members in drafting

6  their religious accommodation request or expressed

7  sympathy with their position.  So, again, it's like

8  removing defense counsel from the judicial process.

9           You cannot have a fair outcome.  They have

10 been removed, or others have been intimidated into

11 self-censorship and not providing effective counseling

12 to service members because the Department of Defense

13 wants to assure their, you know, near perfect 100

14 percent denial rate.  There's a predetermined outcome,

15 and chaplains like our plaintiffs are an obstacle to

16 achieving that 100 percent denial result.

17          THE COURT:  Who is actually processing and

18 ruling on these accommodation requests?

19          MR. JOHNSON:  Okay.  So there's a lot of

20 people involved in the process, but in terms of who is

21 the final review authority and who is the final appeal

22 authority --

23          THE COURT:  Yes.

24          MR. JOHNSON:  -- they are three- or four-star

25 generals for the most part or admirals.  I believe in

1  one case, there's an assistant secretary of defense.

2  We do outline this in our brief, but in each case, it

3  is a three- or four-star flag officer who presumably

4  reports directly -- and particularly appeal authority

5  reports directly to the service secretary.

6              THE COURT:  All right.

7              MR. JOHNSON:  So that just finishes up the

8  points that I wanted to elaborate on, but if there's

9  additional questions you have regarding jurisdiction or

10 other matters, I'm happy to address those.

11             THE COURT:  No.

12             All right.  Thank you.

13             Counsel.

14             MR. CLENDENEN:  Your Honor, may it please the

15 Court.  Michael Clendenen for the defendants.

16             THE COURT:  Yes.

17        (Reporter clarification.)

18             MR. CLENDENEN:  So I'm happy to be directed

19 wherever the Court has questions, but I have some

20 introductory remarks.

21             THE COURT:  All right.  Why don't you start

22 in, and I'll just chime in as I need to.

23             MR. CLENDENEN:  Plaintiffs seek to enjoin the

24 United States military for mandating for its chaplain

25 service members around the globe a safe and effective

1  vaccine that the military has determined is critical to

2  force readiness, and they seek to enjoin military

3  discipline that is entirely hypothetical.

4          THE COURT:  Well, they challenge the premise

5  of that, correct?  They said this is not safe and

6  effective; it's worthless.

7          MR. CLENDENEN:  Yes, Your Honor.

8          So I will address that point first.  They say

9  that the COVID-19 vaccines are, quote, not vaccines at

10  all.  It seems as though their argument is that because

11  the vaccines are not as effective at preventing

12  transmission as opposed to preventing illness or death,

13  that it's not effective at all.  But that is simply not

14  correct for a number of reasons.

15          First, their own declarant, Dr. Bhattacharya

16  says --

17      (Reporter clarification.)

18          MR. CLENDENEN:  The declarant's name is

19  Bhattacharya.

20          His own declaration says that the vaccines

21  are effective against serious illness and death and

22  hospitalization, which is consistent with the newest

23  CDC guidance, which does say that the -- given the new

24  variance of COVID-19, that the vaccines prior to the

25  bivalent boosters are -- they all provide basically

29

1   transient periods of protection against transmission.

2   However, they are still effective at preventing serious

3   illness, hospitalization, and death.

4          THE COURT:  What about their point that the

5   military simply can't require a vaccination that has

6   only emergency use authorization as opposed to final

7   FDA approval?

8          MR. CLENDENEN:  So, Your Honor, none of the

9   plaintiffs or military members are being required to

10  get a vaccine that doesn't have full approval from the

11  FDA.  So what they've alluded to is the new bivalent

12  boosters that have been approved for emergency use

13  authorization, I believe, in the last couple months.

14  Those are not part of the Department of Defense

15  requirements.  The requirements are only that the

16  service members have the initial monovalent series, and

17  that's still true even though the boosters are

18  available.  But the boosters are essentially optional

19  at this point forward.  All the service members, they

20  only need to get the monovalent vaccines.

21         THE COURT:  Those have final, formal FDA

22  approval?

23         MR. CLENDENEN:  Two of them do, Your Honor.

24  The Pfizer vaccine and the Moderna vaccine have final

25  approval.  They have since last fall, right before the

1  DoD issued these requirements.  There's also the

2  Johnson & Johnson vaccine, which I believe is has an

3  emergency use authorization and then the recent Novavax

4  vaccine, which is also under emergency use

5  authorization.

6         But the two that have full approval are

7  available, contrary to what plaintiffs say, comirnaty,

8  which is the label basically given to the Pfizer

9  vaccine after it received full approval, is available.

10  And we've made clear to plaintiffs' counsel that the

11  plaintiffs can get that, and they'll be considered

12  complete with those requirements.

13         THE COURT:  So all that's required is that

14  they receive one of the approved FDA vaccinations?

15         MR. CLENDENEN:  That is correct, Your Honor.

16         THE COURT:  All right.  I take it that their

17  point is that at this point, they're not effective

18  because they're not protecting against what the current

19  threat is.  Is that your understanding of their

20  position?

21         MR. CLENDENEN:  It seems to be, yes, Your

22  Honor.

23         A couple of things, though.  First of all,

24  the whole issue of the emergency use authorization does

25  not appear anywhere in plaintiffs' complaint or in

31

1   their motion for preliminary injunction.  So if this is

2   something that the plaintiffs wish to pursue, they

3   should file either an amended complaint or a new

4   preliminary injunction motion or something.  So we

5   haven't had an opportunity to respond to this issue.

6          Back on the point about whether or not the

7   vaccines are effective, again, all resources suggest

8   that they are still very -- even the monovalent series

9   is still very effective against preventing serious

10  illness and death, and that's not different at all from

11  some of the other vaccines that have been required by

12  the military.

13         For example, one of the nine required

14  vaccines is for tetanus.  Tetanus is not transmitted

15  from person to person.  It's not contagious.  So the

16  vaccine is really just to prevent the person receiving

17  the vaccine from becoming seriously ill, and that's the

18  same as here.

19         So the idea that the COVID-19 vaccines are

20  somehow not vaccines by definition just doesn't square

21  with the history of treating things like tetanus

22  vaccines.

23         THE COURT:  Well, is there a religious

24  accommodation request available as to tetanus, for

25  example?

1            MR. CLENDENEN:   The process is available,
2   yes, Your Honor.   I don't believe there's been a lot of
3   service members availing themselves of that.   I don't
4   think there's anything in the complaint or the motion
5   saying that any of these plaintiffs have requested
6   accommodation from the tetanus vaccine.   The process is
7   the same.
8            THE COURT:   All right.
9            MR. CLENDENEN:   And then one other thing to
10  note is that the Supreme Court in the *CMS* case already
11  ruled that the COVID-19 vaccine is effective as a
12  vaccine.   That was back in January.   So, yes, the
13  science has changed a bit, but the idea that it's
14  somehow definitionally not a vaccine has basically
15  already been rejected by the Supreme Court.
16           THE COURT:   All right.
17           MR. CLENDENEN:   I would like to move on to
18  the jurisdictional barriers.   These claims are not
19  ripe, and the plaintiffs have not exhausted their
20  claims.   Basically, there are four steps that the
21  plaintiffs would have to do before they have a ripe and
22  exhausted claim.   First, they would have to submit a
23  religious accommodation request, or RAR, and have that
24  RAR denied initially.   Then they would have to appeal
25  that denial and have the appeal be denied.   Then they

33

1  would have to undergo a separation board and have the

2  separation board ultimately decide to separate a

3  member.  And then even after that, they would have

4  remedies, such as a board for the correction of

5  military records, or BCMR.  The name varies a little

6  bit from service to service.

7         All the plaintiffs here, all 42 of them, have

8  done somewhere between one and two of those four steps.

9  There are, I believe, 11 plaintiffs who have had their

10 RAR appeal denied but haven't actually started or

11 haven't been, you know, told to start separation

12 proceedings.  And there are some plaintiffs who have

13 had their initial RAR denied but haven't had a final

14 decision on appeal yet.  There's some who have

15 submitted an RAR but haven't even had it initially

16 denied yet.  So it's not possible to say at this point

17 what exactly the military is going to do as far as --

18 well, for most of the plaintiffs, whether or not their

19 RAR will be granted or not, and for all of the

20 plaintiffs, whether or not they will actually be

21 separated.

22         So it's a little too early at this point for

23 the Court to step in and halt something that the

24 military might still make a decision that's in their

25 favor on.

34

1        THE COURT:  All right.

2        MR. CLENDENEN:  I will also address one of

3   the plaintiffs, Plaintiff Lewis, he is the only

4   plaintiff who has had an RAR appeal denied who is in

5   the Army, which is significant because the other

6   branches are all currently under preliminary

7   injunctions from other courts.  So Colonel Lewis, as

8   plaintiffs' counsel mentioned, his RAR appeal was

9   denied last week.  Plaintiffs' counsel makes it seem as

10  though that means he's facing imminent separation, but

11  that's simply not the case.

12        What's happened is he's been given an order

13  that he has 14 days to either receive the vaccination,

14  or he can accept retirement because he already has over

15  20 years of service.  Or if he chooses neither of those

16  options, then the military -- or the Army might

17  initiate separation proceedings.  But even if he goes

18  with option C, the timeline for that is -- it takes a

19  while basically.  It could be months before a

20  separation board is even convened, and then it might

21  take months more for them actually to reach a decision.

22  Again, they might decide to retain him, especially

23  since he has over 20 years of service and is eligible

24  for retirement.  So one of the outcomes might be that

25  the board decides to retain him.

1         THE COURT:  You're saying that all the other

2   plaintiffs are currently under the protection of an

3   existing injunction order?

4         MR. CLENDENEN:  So all of the other Army

5   plaintiffs --

6         THE COURT:  All the other Army plaintiffs,

7   okay.

8         MR. CLENDENEN:  All of the other Army

9   plaintiffs have not even had an RAR appeal denied.  And

10  as long as they're still going through that process,

11  they have basically a de facto exemption.  The Army

12  does not consider them --

13        THE COURT:  There's no outstanding

14  preliminary injunction?

15        MR. CLENDENEN:  Not for the Army --

16        THE COURT:  Right.

17        MR. CLENDENEN:  -- but for all the other

18  service members, they're already protected by either

19  the class action PI in the *Navy SEALs* case in the

20  Northern District of Texas or the *Doster* case in Ohio.

21        THE COURT:  Right.

22        MR. CLENDENEN:  And then there's also the

23  preliminary injunction in the Middle District of

24  Florida for the Marines, which none of these plaintiffs

25  are Marines, but some of them are navy plaintiffs

36

1    serving in Marine Corps units.  So they effectively are

2    doubly protected by injunction.

3              THE COURT:  All right.

4              MR. CLENDENEN:  Then also, just to finish up

5    the exhaustion points, the Mindes test first says that

6    exhaustion is a threshold requirement, but even if any

7    of the plaintiffs had satisfied that, the Court could

8    nevertheless decide to decline jurisdiction since this

9    is a review of a military policy under certain

10   conditions, which basically map out to the same as the

11   preliminary injunction factors.

12             THE COURT:  Right.

13             MR. CLENDENEN:  So moving on to the compliant

14   interest analysis, which primarily applies to the --

15        (Reporter clarification.)

16             MR. CLENDENEN:  -- the RFRA, Religious

17   Freedom Restoration Act, claims.

18             The military's compliant interest here is in

19   preventing service members from becoming seriously ill,

20   including hospitalized and dying from COVID-19,

21   particularly in forward operating environments, if a

22   service member, including a chaplain, who do need to

23   deploy -- their job is to deploy and to provide

24   religious services to service members in different

25   parts of the world where they might not be available.

1          But if a service member or chaplain is in a
2     forward operating environment and they come down with
3     COVID-19 and become seriously ill, not only are they no
4     longer part of the fight, but they're also potentially
5     taking away resources from medical personnel who would
6     otherwise be able to treat preventable illnesses and --
7     sorry, nonpreventable illnesses and injuries.

8          As such, the military considers any service
9     member who doesn't have the COVID-19 vaccine to be
10    basically nondeployable, and having a significant
11    number of nondeployable chaplains, or any service
12    members for that matter, places a higher burden on
13    other members, other chaplains who are vaccinated.
14    They would have to basically fill that gap by deploying
15    more often.

16         So that's the military's compliant interest.
17    Vaccination is the least restrictive means of achieving
18    this -- of achieving the prevention of serious illness
19    or death.

20         Plaintiffs have suggested that things like
21    masking or testing would be alternatives.  However,
22    those do not meet the interests equally as well under
23    the Supreme Court's standard in *Hobby Lobby*.  Those
24    basically only are effective against spreading the
25    disease.  But once a service member already has the

38

1  disease, a mask isn't going to help them not require

2  medical attention, for example.

3          Plaintiffs also talked about the HIV cases

4  from this circuit.

5          THE COURT:  Where do you think the courts

6  that have issued preliminary injunctions have gone

7  wrong?

8          MR. CLENDENEN:  A few places, Your Honor.

9  But first and foremost, I'm -- a lot of places, Your

10  Honor.  But we've raised basically the same arguments

11  here --

12          THE COURT:  Right.

13          MR. CLENDENEN:  -- and the courts have

14  rejected -- to be clear, only a handful of district

15  courts have --

16          THE COURT:  No.  I understand.  There are a

17  lot that have gone the other way as well.

18          MR. CLENDENEN:  Right, but the three district

19  courts that have issued classwide injunctions against

20  the military have disagreed with the military on

21  basically all of the points that we've raised here.

22          THE COURT:  Right.  I understand.

23          It comes down to the core judgment of whether

24  this mandate sufficiently relates and is supported to a

25  compelling military interest in force readiness,

1  correct?

2          MR. CLENDENEN:  It is, Your Honor.

3          I would also note that there's, you know, a

4  long line of cases in the Supreme Court and the Fourth

5  Circuit saying that the courts are to give great

6  deference to the military determination here.

7          THE COURT:  Right.

8          MR. CLENDENEN:  So even if RFRA is

9  essentially a strict scrutiny analysis, overlaid with

10 that is the deference to the military decisions.

11         THE COURT:  Right.  I understand.

12         MR. CLENDENEN:  But I do want to distinguish

13 the HIV cases because with HIV, what the courts have

14 said is that when a service member who is HIV positive

15 is receiving the treatment, which is basically just a

16 once-a-day pill, they reach a point where they're

17 undetectable, as it's called, at which point they have

18 no risk of showing symptoms themselves of the disease,

19 and they actually can't even transmit it to other

20 service members.

21         That's very different from COVID-19, where

22 although it's true there are some treatments, they are

23 very different treatments in the sense that they are

24 only -- they basically just stop you from dying if you

25 already have COVID-19 and you're seriously ill.

40

```
1              THE COURT:  Right.
2              MR. CLENDENEN:  They don't prevent you from
3  having no symptoms at all.
4              So if someone reaches a point where they have
5  COVID-19 and they need medical attention, they are
6  already out of the fight.  The fact that there's
7  treatments that can be given to them at that point is
8  just not the same as the HIV treatments that make it so
9  that you have no risk at all basically.
10             THE COURT:  All right.
11             MR. CLENDENEN:  On the Establishment Clause
12 claims, plaintiffs cited a case where the service
13 academy had required the members to attend chapel
14 services.  That's totally different from this.
15 COVID-19 vaccines do not have any denominational
16 preferences.  They are totally neutrally applied.  They
17 don't single out anyone based on religion.  It is not a
18 religious requirement basically.
19             On the Section 533(b) claims --
20             THE COURT:  Yes.
21             MR. CLENDENEN:  -- so, first of all, there is
22 no cause of action in that section, which we pointed
23 out in our briefs.
24             But also on the merits of the claim, the
25 statute uses the terms "rite," "ritual," and
```

41

1   "ceremony."  Telling a service member to get a COVID-19

2   vaccine is clearly not a rite, ritual, or ceremony.

3   Plaintiffs' counter basically is that those words mean

4   whatever the chaplains say they mean, which simply

5   can't be right.  That would mean that they could get

6   out of any requirement they wanted to.  They could say

7   that a physical fitness test is a ceremony; and

8   therefore, they should be exempt from that requirement.

9         That's just not how the Court should review

10   the statute.  The Court should just apply ordinary

11   tools of statutory construction, such as dictionary

12   definitions, which we've provided.  And under any, you

13   know, reasonable interpretation, rite, ritual, and

14   ceremony does not encompass COVID-19 vaccines or other

15   vaccines.

16         Then also, as we noted in our brief, the

17   legislative history of Section 533(b) shows that it was

18   really passed in response to things such as same sex

19   marriage.

20         THE COURT:  Right.

21         MR. CLENDENEN:  It's just not the same as

22   vaccines.

23         THE COURT:  What about the fetal tissue-based

24   objection?

25         MR. CLENDENEN:  So, Your Honor, we haven't in

42

1    any of our briefs suggested that the plaintiffs' claim
2    to sincerely held religious beliefs are not sincere or
3    not true.  It's really just even assuming that they
4    have these sincerely held objections to what they think
5    are, you know, fetal cell lines, there's still a
6    compelling interest in the military to require the
7    vaccination.

8         Again, the military is not holding down these
9    service members and sticking a needle in their arm
10   without their consent.  If they refuse to get the
11   vaccine, then, at most, the consequence will be
12   separation from the military.  But they're not -- the
13   military isn't forcing the service members to violate
14   their religious beliefs.

15        THE COURT:  All right.

16        MR. CLENDENEN:  I will say on the fetal
17   tissue line, the recently approved Novavax, it was
18   developed -- at least all of those sources suggest it
19   was developed without any relation to fetal cell lines.
20   And even though it is only an emergency use
21   authorization, if the plaintiffs or any other service
22   member who isn't vaccinated wants to get the Novavax
23   vaccine, the military will consider them to be
24   compliant with the requirement.

25        THE COURT:  All right.

1          MR. CLENDENEN:  And then just on the point of
2  retaliation, Your Honor, to the extent that the
3  plaintiffs have had any negative consequences, such as
4  restrictions on travel, those are because the
5  plaintiffs are not vaccinated.  It's not because they
6  submitted a religious accommodation request.  So it's
7  not retaliation for their religious beliefs or for
8  their submission of religious accommodation requests.
9          Also, to just finish out the preliminary
10 injunction factors -- unless the Court has other
11 questions on the merits.
12          THE COURT:  No.
13          MR. CLENDENEN:  -- the plaintiffs can't show
14 irreparable harm here.  For one, as we've discussed in
15 the exhaustion and ripeness points, there's no imminent
16 harm because none of the plaintiffs are facing a
17 separation board right now, let alone is one of those
18 separation boards going to be complete anywhere near in
19 the future.
20          Also, the vast majority of the plaintiffs are
21 already subject to injunctions in other districts and
22 unbeknownst of harm.  The COVID-19 continues to be a
23 major health -- a public health crisis, and it has to
24 date resulted in the deaths of 96 active duty service
25 members.  So it is a very serious problem, and the

44

1   military's requirement to have service members be
2   vaccinated is in the public interest.  A court order
3   saying otherwise would not support that interest.
4           THE COURT:  All right.
5           MR. CLENDENEN:  I'm happy to answer any
6   questions.
7           THE COURT:  Thank you.
8           MR. CLENDENEN:  Thank you.
9           THE COURT:  I'll give you the last word.
10          MR. JOHNSON:  Sure.  Okay.
11          THE COURT:  Let me just raise a couple of
12  issues that I'd like you to address.  Given that the
13  mandate is only for the monovalent vaccine, which, as I
14  understand it, has received formal final FDA approval,
15  what's the relevance of this emergency use issue that
16  counsel raised?
17          MR. JOHNSON:  I just want to be clear.
18  Plaintiffs object to the mRNA vaccines based on their
19  sincerely held religious beliefs, whether they are
20  licensed or not.
21          THE COURT:  I understand that, but I
22  understood counsel to argue there was a freestanding
23  argument that the mandate is unenforceable or should be
24  disregarded because it requires a vaccine that's only
25  received emergency use authorization.  As I understand

 1  it, that's not the case.  The mandate requires only

 2  vaccines that have gotten formal FDA approval.  If

 3  that's the beginning of the argument, what's the

 4  relevance of the emergency use point?

 5          MR. JOHNSON:  Okay.  So I am counsel.  I

 6  represent a number of service members --

 7          THE COURT:  Right.

 8          MR. JOHNSON:  -- challenging based on

 9  precisely that issue because the military has been

10  mandating unlicensed EUA vaccines.  They don't have the

11  licensed vaccine, and that's being litigated in other

12  courts.  But our military chaplain plaintiffs, they

13  object to it whether it's licensed or not, and there is

14  the fact that --

15          THE COURT:  On religious grounds.

16          MR. JOHNSON:  On religious grounds.

17          THE COURT:  Right.

18          MR. JOHNSON:  So even if they show up with a

19  licensed version, that would not eliminate the

20  religious objections, but it is relevant to showing

21  that the DoD is implementing a program that is illegal

22  for many distinct reasons.  And also, they don't have

23  the licensed vaccine, and the U.S. government --

24          THE COURT:  When you say "licensed vaccine,"

25  I'm confused on the terminology.  Licensed vaccine is

1  something separate and apart from whether it's received

2  final FDA approval?

3          MR. JOHNSON:  No, no.  They are one in the

4  same.

5          THE COURT:  All right.

6          MR. JOHNSON:  So there is an emergency use

7  authorization that is approved under the Public Health

8  Safety Act, and there's a number --

9          THE COURT:  At this point in time, all that's

10  being mandated is a licensed, final FDA-approved

11  vaccine; is that right?

12          MR. JOHNSON:  They have mandated and punished

13  emergency use authorization vaccines.  At the earliest,

14  they got them in June, but they have punished and

15  discharged people based upon their refusal to take an

16  unlicensed vaccine.

17          THE COURT:  I understand.  But at this point

18  in time --

19          MR. JOHNSON:  Yes.

20          THE COURT:  -- the only thing that's required

21  is a licensed, final FDA-approved vaccine.  Is that

22  accurate or not?

23          MR. JOHNSON:  I don't mean to be difficult.

24  There are public -- there's -- for example, a

25  September 14, 2021, memo from Terry Dearum (phonetic)

1  which mandates e-vaccines.  It says, "We consider EUA

2  and licensed vaccines to be legally interchangeable.

3  Therefore, we're going to mandate it whether or not

4  this particular vial is licensed."

5           THE COURT:  Right.  But events have

6  subsequently caused those emergency use vaccines to

7  receive final approval, correct?

8           MR. JOHNSON:  No.

9           THE COURT:  No?

10           MR. JOHNSON:  I will be as brief as possible,

11  I promise.

12           THE COURT:  All right.

13           MR. JOHNSON:  The Public Health Safety Act

14  has very stringent requirements.  One of them is, for

15  example, the approval of each manufacturing location.

16  EUA does not require approval of the manufacturing

17  location.  So the 99 -- we think it's 100 percent;

18  maybe it's 99.5 percent of the vaccines they've

19  acquired have been EUA products.  And it says it on the

20  label.

21           THE COURT:  I see.

22           MR. JOHNSON:  They were not produced in

23  FDA-licensed facilities.

24           THE COURT:  I see.  So they purchased them at

25  a time when they only had emergency use authorization

1  even though those same vaccines may now have received

2  formal FDA approval.  Is that the issue?

3              MR. JOHNSON:  If I understand correctly, yes.

4              THE COURT:  Right.  So if they destroyed

5  their batch of vaccines purchased at a time when they

6  only had emergency use authorization, went out and

7  bought new vaccines that have now been approved, then

8  this is no longer an issue.  I understand you have

9  other religious-based issues, but in terms of their

10  using a licensed product, that would solve that

11  problem; is that right?

12             MR. JOHNSON:  So the DoD has claimed they

13  bought at least 8 million vaccines.  At most, 35,000 of

14  the doses were the FDA-licensed comirnaty.  We contest

15  whether they were produced -- whether they are

16  licensed.  But at most, they have 35,000, and then the

17  government is going out and buying another 175 million

18  of the bivalent vaccines.  So -- and the comirnaty

19  labels say that they expire this Friday, September 30.

20             THE COURT:  Okay.  I think I understand.

21             MR. JOHNSON:  So this issue is about to be

22  moot very soon.

23             THE COURT:  Okay.  All right.

24             MR. JOHNSON:  But for separate reasons.

25             THE COURT:  Speak to the exhaustion issue.

```
1            MR. JOHNSON:  Yes.  So first off, it's
2   related to the ripeness and injury question.
3            THE COURT:  Right.
4            MR. JOHNSON:  So the government's position is
5   that the only harm we're complaining about is an
6   involuntary discharge.  That's not correct.
7            We are complaining about religious liberty
8   violations that have occurred, are ongoing, and are the
9   basis for separation.  But the injury and irreparable
10  harm is ultimately the religious liberty violations.
11           So the exhaustion -- there is a single
12  process through a religious accommodation request
13  process.  I believe, as of today, 13 or 14 of the 42
14  plaintiffs had their RAR appeal denied, and I think 28
15  have had their initial religious accommodation request
16  denied.
17           Separation boards -- several of them would
18  have been separated absent these preliminary
19  injunctions.  So this is not voluntary cessation.  This
20  is a court order stopping the separation boards.
21           But, most importantly, the apex of this
22  process, the board for correction of military records
23  absolutely cannot provide the relief that they request.
24  It is not a basis for challenging the constitutionality
25  or legality of a generally applicable policy or
```

1    regulation.  It is what's called a clemency board that

2    can correct on an individual basis an injustice or an

3    error.  A board for correction of military records

4    makes recommendations, but the service secretary always

5    has final say on whether to accept that.

6            THE COURT:  All right.

7            MR. JOHNSON:  So we have a mandate issued by

8    the service secretary to everyone to get vaccinated

9    and, two, to deny all religious accommodation requests.

10   He is not going to turn around and reverse himself and

11   say, "Oh, I made an error," or, "This is an injustice."

12   The board has clear marching orders.  Even if they did

13   recommend --

14           THE COURT:  It's basically a futility

15   argument; is that right?

16           MR. JOHNSON:  It's a futility argument.  It's

17   also an inadequacy argument because that board cannot

18   provide the relief requested.

19           THE COURT:  All right.  How many plaintiffs

20   are not under the protection of an existing preliminary

21   injunction at this point?

22           MR. JOHNSON:  There's at least -- I think

23   there's at least 14 in the Army.

24           THE COURT:  All right.  With respect to the

25   religious-based objections and the fetal tissue

1  objection, I take it that that's the sole objection for

2  some of these plaintiffs; is that right?

3          MR. JOHNSON:  I believe every single

4  plaintiff objects upon the grounds of abortion and the

5  sanctity of life.

6          THE COURT:  Right.

7          MR. JOHNSON:  There are other objections

8  regarding, you know, the sanctity of the body and not

9  destroying God's creation or altering its -- some

10  people would see it as, you know, Book of

11  Revelations --

12          THE COURT:  Right.  I understand.

13          With respect to the fetal tissue objection --

14          MR. JOHNSON:  Yes.

15          THE COURT:  -- why doesn't the availability

16  of the Novavax vaccination resolve that issue?

17          MR. JOHNSON:  We have done research both as

18  counsel and our plaintiffs, and we have concluded that

19  Novavax did use -- that's a misrepresentation, that

20  Novavax used fetal -- aborted fetal cells in several

21  stages of the development.  I don't know if it was

22  identical to how it was used with mRNA, but it was a

23  critical step for the development and testing.  So the

24  religious objections apply to --

25          THE COURT:  So it's a factual dispute about

1   whether that, in fact, is the case, I take it.

2            MR. JOHNSON:  Yes.

3            THE COURT:  Okay.  All right.

4            MR. JOHNSON:  Correct.  But there is a

5   factual dispute, yes.

6            THE COURT:  All right.  Those were my

7   specific questions.  I'm happy to hear further on

8   anything else you would like to respond to.

9            MR. JOHNSON:  Yes.  Okay.  Just a couple more

10  points.  I just do want to return to sort of -- so

11  there are religious objections, but there's also -- you

12  know, a key issue here, as the government has pointed

13  out, is deference.  And part of the reason we led with

14  our discussion of the major policy decision cases is

15  because it is a threshold question.

16           The major policy decision or major question

17  doctrine is relevant here because what the DoD has done

18  is they have usurped major policy decisions that should

19  be made by Congress.  This isn't just a routine health

20  and welfare measure.

21           For example, there was a letter -- two

22  letters in the past week from, I think, something like

23  50 congress members who have pointed out that these

24  policies would result in the loss of at least 75,000

25  people from the Army, 75,000 soldiers in the Army, Army

1  Reserve, Army National Guard, and 100,000 across the

2  services.  At the same time, it disqualifies 40 to

3  50 percent of potential recruits.  This is resulting in

4  the Armed Services falling below their congressionally

5  mandated levels, and I think congress members described

6  it as a self-inflicted military readiness crisis.

7           In any case, it affects all service members.

8  It's resulting in huge costs in military readiness.  At

9  the same time, it's directly contrary to what the

10 statute requires, just like in the HIV and transgender

11 cases.  They addressed regulations.  Here we're

12 addressing RFRA, DoD Instruction 1300.17, and other

13 regulations that require individualized determinations.

14          So a military or any agency cannot be given

15 discretion or deference -- given deference where

16 they're acting directly contrary to what the statute

17 requires, an individualized determination.

18          Going to the compelling interest factors,

19 again, part of the reason we've -- we emphasize the

20 fact this is not a vaccine and that the scientific

21 consensus has clearly shifted to where you have the CDC

22 and the FDA saying, "This is ineffective.  We're not

23 going to buy it anymore.  We're not going to use it

24 anymore."  Then you have the military continuing to

25 mandate it.  What it cannot further a compelling

54

1 purpose, but at the same time, these restrictions are
2 used in an arbitrary way.  They're only applied against
3 those unvaccinated.

4      (Reporter clarification.)

5      MR. JOHNSON:  Okay.  So a number of
6 plaintiffs have identified travel and change of duty
7 restrictions and deployability restrictions where
8 they're only applied for coercive or punitive purposes.
9 But if the service needs them to deploy or travel,
10 well, they will ignore those restrictions.

11      So -- and this has led a number of plaintiffs
12 to believe and testify that they're applied for
13 arbitrary and punitive purposes rather than any
14 military purpose.  This is buttressed by the fact that
15 it's acknowledged by the CDC and the FDA in effect they
16 don't work.  They've replaced them.

17      THE COURT:  I'm sorry.  What doesn't work?
18 The initial round of monovalent --

19      MR. JOHNSON:  Yes.  Yes.  They've also
20 said -- the CDC has said you should not differentiate
21 based on vaccination status.  So we have, you know, the
22 scientific agencies going one way and the military
23 going another, and that provides further support for
24 the fact that these restrictions, which essentially are
25 limited to those who are not vaccinated for religious

reasons, are being applied on the basis of their
religious objections because they're the only ones
facing discharge, and many of them would have been
discharged in the absence of these preliminary
injunctions.

Of course, I don't want to distract from the
fact that, again, the primary injury and irreparable
harm that has occurred has been the violations of
religious liberties and then the discharges that are as
a result of the religious liberty violations and
necessarily intertwined with those violations.

THE COURT:  All right.

MR. JOHNSON:  One more reason I just would --
I would like to add.  The Court should consider the
military and the United States' compelling interest in
retaining loyal, highly experienced, highly trained
service members.  Now, this may be an argument that
applies not just to chaplains.  I think it does apply
to every service member.  But chaplains do play a
unique role in having, you know, the corps of -- the
chaplain corps discharged will have serious and
long-term impacts on military readiness.  And these
people cannot be easily replaced, as shown by the
current recruiting crisis.  Who would want to come in
as a chaplain after seeing the hostility to religion

1   and to chaplains in particular that has been shown by

2   this policy?

3           THE COURT:  All right.

4           MR. SCHULCZ:  Your Honor, may I add

5   something --

6           THE COURT:  Yes, go ahead.

7           MR. SCHULCZ:  -- because it deals with the

8   issue that you asked about --

9           THE COURT:  All right, please.

10          MR. SCHULCZ:  Let me start by citing an

11  authority here, which is DODI6205.02, and that is their

12  immunization policy.  The Department of Defense defines

13  vaccination as administration of a vaccine to an

14  individual for inducing immunity, and vaccine is a

15  preparation that contains one or more components of a

16  biological agent or toxin and, two, induces a

17  protective immune response against that agent when

18  administered to an individual.  That's the Department

19  of Defense regulation which they are required to

20  follow.

21          Now, part of the religious exemption -- or

22  the religious objection is that this is in mRNA and

23  different than any other of those vaccines that they've

24  talked about.  MRNA does not contain any element of a

25  toxin.  If you look at measles, there's something that

57

1  relates to that.  It protects you.  That's why you used
2  to have -- the original vaccination for smallpox was
3  you'd go and you'd get this smallpox --
4            THE COURT:  All right.
5            MR. SCHULCZ:  How they induced it --
6            THE COURT:  Right.
7            MR. SCHULCZ:  That's not in mRNA.
8            THE COURT:  No, I understand.  You're not
9  going to get --
10           MR. SCHULCZ:  This is a whole new thing.
11           THE COURT:  You're not going to go COVID from
12  a COVID shot.
13           MR. SCHULCZ:  Now they have a finding that it
14  actually changes your -- evidence it changes your DNA.
15  Now, they say, "Oh, gosh, no, it doesn't."  But it's a
16  question, and they have the right to understand and
17  have evidence that it's not going to do it.
18           Their objection is that they are required by
19  the scripture to say, "I've been given a body, a unique
20  thing -- we were fearfully and wonderfully made, as
21  it's described in Psalm 128 -- and to preserve it and
22  not allow things that I don't know if they're going to
23  change it."  So that's a wholly separate issue other
24  than just this --
25           THE COURT:  I understand.

1          MR. SCHULCZ:  I just want to make sure you

2    understand that.  So this -- and my point is that they

3    are not following their own regulation.  They're

4    required to do that.  So they're saying, "Oh, God,

5    here, take this stuff."  And that goes back to the

6    major policy doctrine.  In the *OSHA* case, the Supreme

7    Court said, "You don't have the authority to do that."

8    Same mandate, same kind of stuff.  And we're saying

9    they don't have the authority.  Some clerk or some guy

10   in the CDC -- you'll find it in Exhibit 8 of the

11   complaint -- is an email chain where they say, "We have

12   to change the definition of a vaccine because they're

13   telling us these things that we're working on won't

14   meet the definition.  It won't produce immunity."  So

15   in September, they knew it wasn't going to immunize

16   you.

17          Now, that's available to the Department of

18   Defense, and as my cocounsel has said, everybody else

19   is going one way, and here's the Department of Defense

20   saying, "Oh, no, you must do this."

21          And I just also want to talk about how --

22   well, not separation.  This says the commanders will

23   begin separation.  That's the instruction that Chaplain

24   Lewis received.  Now -- and so the separation will

25   include, according to their own policy, a general

1  discharge.  That's a discharge that's associated with
2  misconduct.
3         So 20 years goes out the window -- or 26
4  years.  And so that's not something that just passes
5  by.  If you go to ask an employer for -- one of the
6  chaplains goes to ask for an employer, they'll say,
7  "What kind of discharge did you get?"  It's a standard
8  form on employment.  "Well, it's a general discharge."
9  Automatically that precludes them from pursuing what
10 the very administrative -- and why is that?  Because
11 it's punitive.  It's designed to coerce.  So the idea
12 that somehow this is, you know, fair or not irreparable
13 harm is, again, bologna.
14        I just want to -- it goes back to we have
15 evidence of hostility to religion.  All of these people
16 believe that they are compelled by their conscience.
17 You'll find in there the declarations by Chaplain
18 Brown, who is an endorser, who explains how a chaplain
19 changes an issue.  A conversation can start out in the
20 hallway.  As he said, it winds up in a classroom or
21 something where a life-changing event takes place.
22        It was not just the issue -- now I will say
23 this.  There are also exhibits in there, I believe
24 Exhibits 5 and 6, again, talking about -- again, one of
25 those was a declaration by the Associated Gospel

1  Churches about conditions for a 2014 hearing by
2  Congress dealing with the issues of chaplains having
3  run into problems because people didn't like what they
4  said.  So it's more than just a ceremony.
5         I would also point out that there's a
6  declaration in there, again, going back to Chaplain
7  Muehler, who is currently the president of the Chaplain
8  Alliance for Religious Liberty plus an endorser for the
9  Missouri Lutheran Church, who talks about how that
10 decision to say, "I reject my counsel.  I reject the
11 counsel of my conscience" -- and that's what happens
12 when he takes that vaccine.
13         THE COURT:  All right.
14         MR. SCHULCZ:  So this is not just -- oh, it's
15 just the flu.
16         THE COURT:  No, I understand.
17         MR. SCHULCZ:  First off, and the vaccine --
18 you can't revoke it.  So you have all of these other
19 issues that provide legitimate reasons to say no.
20         Your Honor, this is a very simple case when
21 you understand that this is a vaccine that's not a
22 vaccine.  And when they say, "Oh, it important," it's
23 not important because they have relied on you biting on
24 the bait because they've switched it.
25         And that goes back to the issue about the

1   major policy doctrine.  That's a thing that affects

2   millions of people.  That belongs with Congress.  You

3   don't have to reach that issue yet.  I'm just saying

4   they don't have the authority to change a definition

5   that affects a lot of these people just to preserve

6   somebody from embarrassment because they weren't going

7   to get it.  That shows they knew that this was not

8   going to work at all.

9           THE COURT:  All right.  Thank you.

10          MR. SCHULCZ:  Thank you, Your Honor.

11          THE COURT:  Thank you.  This argument has

12  been helpful to the Court.  I commend all counsel for

13  it.  I'm going to take it under advisement, and I'll

14  get you a decision just as soon as I can.

15          Thank you.

16          All right.  Counsel is excused.

17          The Court will stand in recess.

18          -----------------------------------

                       Time:  11:58 a.m.

19

20

21

        I certify that the foregoing is a true and

22

    accurate transcription of my stenographic notes.

23

24
                                _____
                                        /s/
25                              Rhonda F. Montgomery, CCR, RPR

**Excerpts from February 28, 2023, House Armed Services Committee Hearing Transcript: Impact of COVID-19 on DOD and Its Service Members**

**Source:** https://www.youtube.com/watch?v=TRSZsKt5j_0

**Official Source (without timestamps):** https://www.navy.mil/Press-Office/Testimony/display-testimony/Article/3315887/house-armed-services-subcommittee-on-military-personnel-holds-hearing-on-covid/

0:34 (Chairman Banks) The hearing will now come to order I want to welcome everyone to our first hearing of the military personnel subcommittee of the 118th Congress today's hearing is focused on COVID-19's impact on the Department of Defense and its service members I want to thank our Witnesses for being with us today and for their service and support of the DOD and the military departments.

0:56 I also want to thank the thousands of service members active duty reservists and guard members who answered the call and put service in front of self to support covid-19 operations throughout the United States let alone those Services serving in our VA and civilian Health Care Facilities who were on the front lines in the battle against covet 19. and of course the men and women serving as emergency responders whether they were police firefighters or in any other capacity we could not have beaten covid-19 without your efforts thank you although not the focus of today's hearing.

1:38 I would be remiss if I did not mention the need to understand the origins of covid-19 and the role that China played in a pandemic that killed over 1.1 million innocent Americans to include 96 military service members there is no doubt that China must be held accountable for its actions in the covid-19 pandemic now for this hearing.

1:58 I understand there was a flurry of activity late on Friday afternoon and through the weekend within DOD and the services releasing implementing guidance on the covid-19 vaccination rescission. This is good news for our service members and their families however the timing of these of the release of these policies essentially two business days before this hearing is awfully curious. I think this committee's aggressive oversight was instrumental in getting the implementing guidance released. There is nothing like the threat of a hearing and the potential to be called to task for not complying with with a statute to prompt action while I'm glad to see DOD and the services now implementing the rescission note.

2:45 The ndaa was signed into law on December 23 2022 the SECDEFs initial guidance was issued on January 10 2023. All of the rescission guidance should have been completed within 30 days of signing the ndaa yet here we are at the end of February almost March before this this guidance was promulgated.

3:11 I'm also disappointed in the lack of responsiveness of DOD in the military department to get back to the committee on questions that are important to our oversight responsibilities and also to

1

our service members so much so that chairman Rogers and I found it necessary necessary to write a letter to secretary Austin with a whole host of questions on covid-19.

3:31 I note that OSD chose to send their reply to this letter last night giving us a little time to review their responses. I also have to mention that many of our committee members are disappointed with dod's issuance of its reproductive Health Care policy or as many call it the dod abortion travel policy while this will not be the focus of today's hearing the release of this policy was ruled out with no Advanced discussion with the committee and serves as another example of the Biden Administration using the Department of Defense as a social reform Laboratory.

4:06 Finally because this is our first Hearing in 2023 I would like to acknowledge that this year marks the 50th anniversary of our transition to an all-volunteer Force. Fiscal year 2022 was the single worst year for military recruiting since that transition and it's important for this subcommittee to figure out why as far as our hearing today I am looking forward to this discussion and affording our members the opportunity to ask their questions on DoD's response to covid-19.

4:38 I want to welcome all of our Witnesses first The Honorable uh Gilbert Cisneros Jr the under secretary of defense for personnel and Readiness Department of Defense. Secondly The Honorable Gabe Camarillo under Secretary of the army Department of the army and The Honorable Frank Raven under Secretary of the Navy Department of the Navy and The Honorable Gina Jones under Secretary of the Air Force Department of the Air Force before hearing from them uh and our Witnesses let me offer ranking member Kim an opportunity to make his opening remarks as well

***************

27:52 (Chairman Banks) Uh thank you to each of you. I'll begin with questions um Mr Cisneros last night OSD reply to a February 12th letter from me and chairman Rogers regarding dod's covet policies. I'm going to quote a few lines from the response military service "Services officials are determining quote appropriate action for service members who did not submit an exemption or accommodation request remained unvaccinated and refused a lawful order to take the vaccine" [end quote]. My first question is why are officials in the services still reviewing these cases if the covid-19 vaccine mandate was rescinded?

28:34 (Cisneros) Thank you for the question there uh Mr chairman uh you know this is a situation we've never really been in before where we've actually had to go through a process of of repealing a vaccine that we've mandated uh in Congress initiating a a statute to make us take it back this is a new process for us it's something that we're trying to figure out and we've been working on it um the situation that you just described was members who refused the vaccine who disobeyed a lawful order the services are going through a process to look at that and and evaluate what needs to be done in those situations and if for more information I can turn it over the services to kind of have them reflected …

29:19 (Chairman Banks)  So your answer is that the reason that we're still reviewing cases after the vaccine mandate was rescinded is because they disobeyed a lawful order is that what I heard you say?

29:30 (Cisneros) Those who refuse the vaccine and did not put in a request for accommodation refused a lawful order. That is correct.

29:37 (Banks) But expand for a minute for a minute just what's the point if we rescinded the Mandate what's the point of continuing to review the cases.

29:46 (Cisneros) Well the reviewing the cases because as I said they re they disobeyed a lawful order and in order to maintain good order and discipline it's very important that our service members go and follow orders when they are lawful and and there were several or thousands that did not and so their services are going through a process to review those cases to make a determination what needs to be done.

30:13 (Chairman Banks) All right then there was this statement quote "no service members currently serving will be separated based solely on their refusal to receive the covid-19 vaccination if they sought an accommodation based on religious administrative or medical grounds" end quote. So if service members did not receive or seek an accommodation for the covid-19 vaccination are you still planning to separate those service members?

30:38 (Cisneros) That is up to the services but no as the statement said no individual is being separated for refusing the covid-19 vaccine if individuals have been separated there have been were separated because they disobeyed a lawful order.

30:53 (Chairman Banks) Any of you able to respond to that? Mr. Camarillo?

31:00 (Camarillo) Mr Chairman there are a number of cases that we still have yet to review for individual soldiers that as secretary Cisneros said chose to no not comply with a lawful order I would just add that each of these cases has to be evaluated on its own individual merits because they're highly fact specific. There may be in any instance numerous uh violations of the UCMJ or other uh you know other areas in which there might be circumstances in which to to look at disciplinary procedures so we'd have to look at them all individually on a case-by-case basis.

31:31 (Chairman Bnaks) Mr Raven?

31:34 (Raven) Uh that that's exactly right we are we are determined to look at each of these cases on the merits of the facts of each case and we will conduct an individualized review of each one of these cases.

31:44 (Chairman Banks) Miss Jones?

31:44 (Jones) Yeah let me just say I mean we have implemented um guidance to rescind uh the Mandate we're not reviewing any further exemptions those have been referred to the returned to the service members without action. Um the uh you know as captured by my colleagues we're doing this expeditiously and look forward to working toward the 17-4 17 March um uh deadline that PNR has put in place to make sure all these things are are fully rescinded yeah.

3

CA72

32:12 (Chairman Banks) I know you're going to hear from a lot of my colleagues today who are infuriated but the double um standard and message that you're sending to our troops we're sending a policy and then still punishing them for um the for not taking the vaccine but I'm gonna move on and leave that up to some of my colleagues. In his opening statement under secretary Cisneros said that many vaccines are quote "required for all military personnel who do not already have immunity" end quote.

32:50 Last week the Lancet medical journal published a study showing that natural immunity is as effective as two doses of the covid-19 vaccine at preventing severe illness and death thousands of service members were discharged and tens of thousands of potential recruits were barred from enlisting because they had not been vaccinated against covid 19. However a significant portion of them did have immunity due to a prior covid infection. Uh secretary Cisneros does the dod acknowledge the lancet's conclusion that natural immunity is a is as effective as a vaccination?

33:22 (Cisneros) Mr chairman I believe we're still kind of evaluating uh the results of the COVID and the research it's going through. It's not like chickenpox where if you get it once and you're good there have been people who have gotten covered numerous times and so we don't know about natural immunity there as far as you know how it works and how effective it is and so we are going based on the research that we have and we've continued to update and change our policies as the research has has progressed and we've gone through this process but right now there is no more COVID 19 vaccine although we do still encourage our members to get the vaccination as well as the boosters when they come out.

34:03 (Chairman Banks) So recruits can be exempt from chickenpox and measles vaccines if they have natural immunity. Is the dod considering natural natural immunity while reviewing cases of service members who refuse the covid-19 vaccine or is that off the table?

34:18 (Cisneros) You know again Mr chairman as the the research gets better and we learn more about this disease it's still very relatively young it's only been since 2020 that this has been around there's no there's no good evidence in the research that's still going on as to how we need to progress with this but as of right now national natural National natural immunity is not something that we believe in for this and so we are still moving forward but again right now there is no coveted 19 mandate there is no coveted 19 requirement for service members to enter the military or to be in the military.

34:59 (Chairman Banks) All right I'll yield to the ranking member yeah

********

40:25 (Gaetz) Under secretary Cisneros is there a plan to reinstate the roughly 8,600 service members across active duty reserves in the guard back to their point of service?

40:39 (Cisneros) Thanks for the question there representative Gates. Um service members that have been separated there is a policy uh procedure for that they can apply to the board of Corrections if they have discovered they think there's a discrepancy in their discharge they can go and do that procedure.

4

40:55 (Gaetz) I didn't ask about their options as far as your specific plan like do you have a plan to go get these folks back into service in our military?

41:02 (Cisneros) Well the the policy is the same that has always been right? If service members are discharged and they want to come back into the service they can apply they can go talk to recruiters.

41:12 (Gaetz) No active plan to do proactive Outreach to these individuals to get them back in the military?

41:16 (Cisneros) Our plan is the same as it's always been.

41:18 (Gaetz) But it doesn't include that active Outreach to get people back?

41:23 (Gaetz) It seems like I wanted to ask under secretary Raven did the Navy send out form letters in response to people's requests for religious exemptions?

41:32 (Raven) Sir I'd have to get back to you on that.

41:33 (Gaetz) Really important though because the law requires an individualized assessment of people's requests for in for a religious exemption right?

41:41 (Raven) Uh yes sir whatever initial Outreach maybe I'll get back to you on that but in terms of the process we followed it was individualized review at multiple levels.

41:50 (Gaetz) You you believe there was that individualized review?

41:52 (Raven) Uh yes sir well it …

41:57 (Gaetz) I mean the Inspector General disagrees with you. The the Inspector General issued a report in June of 2022 I'm quoting directly from it "the denial memorandum random we reviewed generally did not reflect an individualized analysis" and the IG's report goes on say that the average amount of time that each package was considered was 12 minutes. Does 12 minutes seem like a sufficient amount of time to make an individual review on someone's deeply held religious basis for an exemption?

42:24 (Raven) Sir the process that was followed included multiple reviews at the medical chaplaincy and legal reviews. Senior commanders going all the way up to uh to headquarters. The Marine Corps established a board with senior level reviews outside the chain of command for each one of these reviews that amounted to in many cases more than 10 hours of review of each cases.

42:46 (Gaetz) That's not what the Inspector General says. That seems like a self-assessment not not a reflection on the assessment and you know for to hear you say that is concerning because it would it would seem to suggest that you guys haven't really taken to the advice into the findings of the IG. And it also doesn't really comport with what I saw with my own two eyes because I went

5

CA74

to Naval installations and met with service members who could point to letter memorandum they'd received that were exactly identical. You could have held them up to a lamp back to back and it was these people had poured out their faith basis to seek an exemption and then they got a form letter back. And it sort of goes back to my my question to Mr Cisneros like are we stronger or weaker as a country because there are 8 600 people that used to wear the uniform but because of the vax Mandate now they don't?

43:38 (Raven) Congressman I would say we're as strong as ever we are still a lethal Force we are already our retention has been at record high levels and we are ready to defend the nation today.

43:49 (Gaetz) I think that you'll find in a lot of military communities they feel like they're not as strong because they see instructor Pilots that have been separated. People involved in critical test mission that now are not part of the Fighting Force. Like um Ms Jones how many Pilots did we lose because of the vax mandate?

44:06 (Jones) Representative I have to follow up with you on that.

44:08 (Gaetz) I I've got a report here from The Epoch Times I don't know if it's true or not but it talks about over 700 does that number sound about right?

44:15 (Jones) That does not sound right but I'd have to follow up with you I'm not familiar with the public.

44:19 (Gaetz) It strikes me something we should really know Mr chairman. I mean you know right now we've got an Air Force that faces a pilot shortage and we we should know at this hearing and I hope we'll get for the record how many Pilots we lost because I think that if you lost hundreds of Pilots it would be really hard to make the argument that you made that we're a stronger country because of it how about special operators. I know how much money we put into special operators. Do we lose any of them because of the vax mandate?

44:43 (Cisneros) I'm sorry I didn't hear the last part of your question.

44:47 (Gaetz) Do we lose any special operators because of the vax Mandate?

44:51 (Cisneros) You would have to ask the services to that for their specific the amount. I'd have to take that for the record.

44:54 (Gaetz) Mr. Camarillo did we lose any Green Berets?

44:56 (Camarillo) I don't have the breakout Gaetz may I follow up with you.

44:58 (Jones) Mr. Gaetz may I follow up with you? We actually did not discharge any officers as a result of them uh Department of the Air Force officers as a result of them failing to obey the lawful order. For those that opted to voluntarily separate or volunteer or retire or in lieu of um then that was they they voluntarily did that and …

45:16 (Gaetz) Do we know that number because I think they

45:18 (Jones) I do actually do you like it yes yes so those folks that opted to um the chart … But let me um … There were 610 folks that were that were um that were separated um and just a small amount of those folks that were uh

45:42 (Gaetz) I sure hope I would hope provided for the record great and Mr chairman just as I yield back my time to you. I think the breakdown of some of these folks who we invest so much time into training and to see how many of those we lost and to be able to assess Readiness would be important work for our committee going forward I appreciate your Indulgence and I yield back thank you.

45:50 (Jones) It was that I agree 40 office Air Force officers separation and separated in lieu of 14 officers separated retired in lieu of but it can provide that formulation.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

51:22 (Alford) Thank you Mr chairman ranking member Kim. Appreciate you uh having these Witnesses here before us thank you for being here taking your time out I'm honored to uh represent two vital military installations in the fourth congressional district of the great state of Missouri that being Fort Leonard Wood and Whiteman Air Force Base some of the B-2 stealth bomber um Fort Leonard Wood of course is a critical asset to our military we train more than 80 000 Personnel each year there you know our military has incredible capabilities and we're all very proud of that but Readiness is an issue. I think that's one of the things we're really going to concentrate in this subcommittee the Readiness for our personnel. This this vaccine mandate which ended up you know kicking out 8,400 service members I don't think it did much for the morale for the military, the morale for America. The Army has really missed its uh recruitment goals 25 percent last year 15 000 soldiers and we live in an increasingly dangerous world where communist Chinese government is the number one threat to our national security we've got to be ready we cannot afford the loss of any more soldiers So I want to start with under secretary uh Cisneros and your response to Congressman Gaetz earlier I was a little bit shocked when you when he asked you are we stronger and you think we are stronger how are we stronger after losing 8 400 service members.

52:51 (Cisneros) Congressman thanks for the question. Um we've had over 2 million service members who received the vaccine that's allowed us to remain operational. It's allowed us to deploy forces. It's allowed us to continue training. Ot has allowed us to do the mission and carry out the national defense strategy. Our retention is is at record levels so I would argue that the vaccine has been an intro part of keeping the force ready and played a big part in ensuring our Readiness of our Force.

53:24 (Alford) But we now know that the the vaccine does not completely prohibit the spread of covid-19 so uh you know looking back it's a little bit easier to do that. But how are we Stronger by losing 8 400 people when this vaccine may not have prevented the spread of it in the first place ?

53:42 (Cisneros) Congressman what we do know what the vaccine has been effective as is keeping people alive and keeping them out of the hospital and there's been good data and research on that.

7

CA76

53:52 (Alford) All right next question for uh under secretary Jones. The Department of Air Force recently issued guidelines on removal of adverse actions related to refusal of covid-19 vaccinations. Can you explain exactly what the Air Force is doing now to remove adverse service records?

54:10 (Jones) Representative thank you for the question. Thanks for your support uh for for Whiteman Air Force Base. I was able to visit last year and it's a great Mission uh total Force Mission at the support out of the base. So in terms of adverse action uh we are doing a couple of things based on the bucket that you are in um. So you if you are currently serving and you followed the um the uh excuse me you submitted an accommodation request and if the adverse action is tied solely to your refusal of the vaccine then the Air Force personnel Center is taking steps now to remove that adverse paperwork from your file and ...

54:48 (Alford) So there'll be nothing left on that file? It'll be totally expunged?

54:52 (Jones) Well uh so I want to be clear about the caveat if the only reason is the refusal to vaccinate then afpc the Air Force personnel Center is going to remove that if there are aggregate aggravating factors such as other misconduct okay right other misconduct then that'll have to be reviewed for what may be appropriate. Right so for those that are currently serving that did not submit a religious accommodation request or avail themselves of of any of the exemption processes they have to initiate the process with the Air Force board for Correctional military records? For those that have already separated and would still like to for example update their their file they would have to go through the discharge review board and... So this has been well laid out in the in the memo that secretary Kendall uh put out.

55:46 (Alford) Got 30 seconds left let's go to uh under secretary Camarillo. Maybe you can answer the this. Will there be any tags markers codes associated with any service Personnel that has been dismissed that will be recognizable by anyone bringing these service members back? Will they will anyone know that these people left because and then brought back because of the Mandate?

56:07 (Camarillo) Their discharge Congressman will be consistent with the ndaa and as secretary Jones just explained the Army's following a very similar process if it's only related to refusal to comply with the COVID vaccine mandate those will be removed.

56:21 (Alford) Thank you again Witnesses I yield back Mr Horsford.

                    ******************

1:01:35 (Chairman Banks) Thank you I'll remind the gentleman there is a readiness subcommittee and chairman Rogers is setting up a quality of life task force within the armed services committee I'm sure he would be glad to hear about your interests in that task force as well Mr Mills.

1:01:44 (Mills) Thank you Mr chairman thank you to this team colleague. I'd ask that you keep it very brief because I want to get through this and I have a lot of questions first Mr chairman I'd like to be entered into record DD Form 3176 DD Form 3177 for qualifications Mr chairman. Thank

you so much with that also just want to note something that my colleague Mr Gaetz had followed through on was the idea that these packages that were actually being submitted for a request medical exemption or delay was being reviewed in a time span of about 12 minutes per to vet these to ensure the actual qualifications of whether they are qualified or not qualified. Now have you seen these forms by Chance the DD 3176 or 3177?

1:02:30 (Cisneros) Um I'm not familiar with that form that you're referring to but I have looked at some of the packets that have gone through the process of being evaluated.

1:02:42 (Mills) Okay well let me go ahead and explain really quickly some of the questions on here which is kind of lengthy but I'll talk about the ideas of medical conditions and circumstances. It talks about your circumstance for being vaccinated why you would you'd feel that you need to be exempt from it. It talks about your religious Liberties things like that. Do you think that any anyone on this panel can answer that you have the qualifications and or the vetting process to be able to do this within 12 minutes which is exactly what the DOD IG said the average time is?

1:03:09 (Cisneros) Representative I would agree with my colleague here Mr Camarillo when he stated earlier that these these packages were giving a link …

1:03:15 (Mills) That's not what I asked. I asked do you think they can be done in 12 minutes

1:03:20 (Cisneros) And I am one of … my response is that they were given over a lengthy view and looked over

1:03:25 (Mills) 12 minutes is a lengthy view in your opinion?

1:03:28 (Cisneros) I don't think it was done in 12 minutes I think they were …

1:03:34 (Mills) So the DOD IG is wrong is what you're saying then you're on record for saying that the DOD Inspector General is incorrect in this?

1:03:40 (Cisneros) I think that the DOD Inspector General looked at some kind of numbers and kind of did it and did some math and wrote a letter to the Secretary of his opinion uh. It's my understanding there's still an IG report on this topic that is coming out later this year.

1:03:50 (Mills) So staying with you under secretary Cisneros. You said in your statements a moment ago that the United States military is as strong now as ever even with the 8400 purged out of our military and the 25,000 and were shortage in our recruitment so you're saying that we don't need those additional 30 plus thousand troops is what you're saying to maintain strength

1:04:10 (Cisneros) My statement was congressman is that the the vax the vaccine the covid-19 vaccine allowed us to go out and to train it allowed us to operate allow us to deploy around the world and and keep up our mission and Def and carry out the national defense strategy and defend the nation …

9

1:04:30 (Mills) By increasing battle fatigue, Sir? Because I can tell you I spent over seven years in Iraq over three years in Afghanistan Kosovo Pakistan. Was blown up twice in 2006. There is a such thing as battle fatigue maybe you haven't experienced it because there wasn't recruitment shortages to the level they are right now but they do exist let me move on to my next question which is simply this. Are you familiar with the DOD defense casualty analysis system foreign has a defense casualty analysis system. Are you aware of it?

1:05:00 (Cisneros) Yes sir so

1:05:00 (Mills) Then you should be aware that from the time period of 2000 to 2021 that the actual number of deaths due to illness has not changed and in fact the highest year was in 2009 with 277 and meanwhile it says as a result of due to illnesses you have and I'll read these off quickly but from 2010 through 2021 you had 238 252 246 214 195 196 173 171 actually starts coming down 2019 174 2020 154 2020 190. Relatively unchanged in the last 22 years can you tell me again how the COVID vaccine contributed to that?

1:05:50 (Cisneros) What I would tell you sir is the COVID vaccine allowed us to operate and to to be able to deploy our forces around the world and make sure that we continue training that we're able to carry out the national defense strategy and defend the nation.

1:06:02 (Mills) Okay and just a quick question I noted that it was very simple that said that administrative exemptions were typically granted for service members who were within six months of separation or retirement. You know this is almost like the arbitrary thing where COVID only exists when you stand up you have to wear your mask but when you sit down it magically goes away. So are you saying then that members who had six months or less had less risk of actually spreading the virus as those who have a year or more? This is your policies by the way.

1:06:26 (Cisneors) Sir, that is what we were saying is when that was carried out uh when people were allowed to go they were still required to meet certain the force Health protection guidance that was put out by the Department of Defense while they were still serving. And that was at times wearing their mask and doing what needed to be done in order to protect themselves and others from the covid-19 what was granted and what the services did and … I'll let them explain it further but if a member was was getting out and they had made the decision to get out and they were within six months of Separation they were given the administrative economy.

1:07:00 (Mills) The last question what actual re-entry code was everyone given who was force separated?

1:07:06 (Cisneros) You'd have to ask the services that but I know there wasn't one specific each service has a different culture and they did it on their own depending their service and their culture as to what they did.

1:07:16 (Mills) Well I can tell you this sir as a military combat veteran a proud service member I will be pushing as well as I'm sure that our our chairman as well as for the armed services chairman to allow these individuals who are unlawfully purged in my opinion to be re-entered into the

military with their full benefits their back pay and be granted what they should have been given which is a chance to serve a United States military. With that I yield back Mr Davis

\*\*\*\*\*\*\*\*\*\*\*

1:11:50 (Davis) I'm just making a note there but moving back now to a person that wants to re in enter I mean we've talked a little bit about that process but I guess my question would be do we know not necessarily how many have re-entered but how many are actually now going through that process?

1:12:10 (Cisneros) I'll yield to the services on that if if they know how many um have actually asked to come back into the service. But as I stated earlier we already have a procedure for this those that have left the military and want to come back in we have a procedure for those that think there's a discrepancy in their discharge and want to have it corrected that they can go forward and do and that's at the board of corrections but we will uh you know we are going to continue to follow the procedures that we already have in place

1:12:44 (David) I'd love to hear from refer to the services the services.

1:12:46 (Camarillo) Congressman just to be clear there's two paths by which anybody who is separated come back one is to talk to a recruiter and just re-enlist the second is as secretary Cisneros said to go through the board of Correction and military records. I don't have data on how many people were prior separations related to this but we can get that for the record.

1:13:00 (Raven) Sir for the Department of the Navy exactly the same process uh individual can talk to a recruiter or the board for correction of Naval records. We've had single digits uh in terms of numbers of uh individuals who've uh explored the option of returning to service.

1:13:15 (Jones) Representative thanks for the question. Uh for those Department of the Air Force veterans that received a general discharge if they are interested in being reinstated they'd have to first meet the the discharge review board to have their their discharge characterization upgraded and once they were able to do that if they did that successfully then they could talk to a recruiter assuming they met a ascession standards would be able to apply to gentlemen.

11

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ISRAEL ALVARADO, et al.,    :
    :
    *Plaintiffs,*    :
    :
    v.    :    **Case No.: 8:22-CV-1149-WFJ-CPT**
    :
LLOYD AUSTIN, III, et al.,    :
    :
    *Defendants.*    :
_____:

## PLAINTIFFS' REPLY BRIEF

Defendants' Opposition to Plaintiffs' preliminary injunction ("PI") motion (the "Opp."), ECF 37, is a smokescreen designed to obscure the real legal issues and mislead the Court. They misstate Plaintiffs' arguments and fail to address important points that clearly tip the balance of factors in favor of granting an injunction to enforce Plaintiffs' constitutional rights.

## I.    DEFENDANTS' MISLEADING USE OF THE TERM "VACCINE"

Defendants do not deny that they changed, or ignored, the pre-Mandate definition of "vaccine." Defendants cite the military's long history of using vaccines to *immunize* the Services from diseases, *i.e.*, to prevent infection and transmission. *See, e.g.,* Opp. at 1, 25. Defendants deceptively assert "DOD added" COVID-19 vaccinations which do not immunize "to this long list of immunizations [that do immunize] already required for service members." *Id.*

CA81

at 1. Defendants refer to the COVID treatments as "vaccines" without acknowledging that the CDC radically expanded the definition of "vaccine" on September 1, 2021, just days the Mandate was issued on August 24, 2021, *see* Compl., ¶¶ 131-140, to enable the unlawful Mandates and to deceive the public.[1] Yet the mandated COVID-19 vaccines do not immunize, and as such, they are treatments that may not be mandated.

Defendants have not provided any scientific justification, or any explanation at all, for changing or ignoring their own pre-Mandate definitions in their response. But the reason is obvious: the COVID treatments do not make recipients immune or prevent transmission.[2] The mandated two-dose regimen provides "little, if any, protection" to the currently prevalent Omicron variant. ECF 39-2, ¶ 20; *see also* Ex. 1, Decl. of Dr. Jayanta Bhattacharaya,

---

[1] The Pfizer/BioNTech and Moderna COVID mRNA vaccines also do not satisfy the Department of Defense's ("DoD") own definition of "vaccine" and "vaccination" in the DoD regulation governing vaccinations, DoD Instruction 6205.02, "DoD Immunization Program" (July 23, 2019) ("DoDI 6205.02"). *See* Opp. at 3. DoDI 6205.02 defines "vaccination" as "[t]he administration of a vaccine to an individual for inducing ***immunity***," and "vaccine" as a preparation that (1) "contains one or more components of a ***biological agent*** or toxin," and (2) "induces a protective immune response ***against that agent*** when administered to an individual." *Id.* (emphasis added). The first and second clause establish an identity relationship between the "biological agent" administered (*i.e.*, mRNA) and "that agent" against which the vaccine "induces a protective immune response." The mRNA shots do not "contain" a single molecule of the COVID-19 virus; they are not the same as COVID-19 and therefore the mRNA shots are not vaccines under the DoD's own regulations.

[2] Like their definitions of "vaccine," "fully vaccinated" is a fluid term that changes as evidence piles up that the mandated two-dose regimen "offer[s] little if any protection" to the currently prevalent Omicron variant and sub-variants. ECF 39-2, ¶ 20. It is presumably for this reason that the more recent studies cited by Defendants on vaccine efficacy compared the protection against (not immunity to) Omicron for those who had received one or more boosters, rather than the mandated two-dose regimen. *See, e.g.,* ECF 39-1, ¶¶ 17-18, 20; 39-2, ¶¶ 17, 32, 39.

¶¶ 48-60 (discussing studies finding vaccines ineffective against Omicron). Thus, the Mandate cannot further a compelling government interest and is not the least restrictive means for furthering that interest.[3] *See infra* Section III.B.

## II.    THIS COURT HAS JURISDICTION.

### A.    Venue Is Proper in this District and Division.

Defendants incorrectly claim that venue is not proper. Opp at 11. First, Defendants are sued in their official capacity and reside in this Division. Two of the largest DoD Commands—Central Command and Special Operations Command—are headquartered at MacDill Air Base, in the Tampa Division. Second, two plaintiffs' homes of record are in this District. *See* Compl., ¶ 70 (Plaintiff Calger in Charlotte County and Hirko in St. John's County). This is a class action, and Rule 23 encourages citizens to consolidate claims against the same defendants for judicial efficiency. Third, the Tampa Division is the division "in which the action is most conveniently advanced," Local Rule 1.04(b), as several related actions were filed or are pending in this Division.[4]

### B.    The Court Has Subject Matter Jurisdiction.

This Court has jurisdiction under 28 U.S.C. §§1331 and 1346 and 42

---

[3] As discussed in the Complaint and PI Motion, Secretary Austin and other fully vaccinated and boosted senior military leaders caught COVID, isolated for a few days, were treated with highly effective therapeutics Defendants do not address and returned to work a few days later with no adverse effects to the Services. *See* ECF 38, ¶ 8.

[4] These actions include not just the *Navy SEAL 1* Proceeding before Judge Merryday, but also several additional individual and putative class actions before Judge Merryday, as well as cases filed with, or transferred to, Judge Barber.

CA83

U.S.C. § 2000-bb (the Religious Freedom Restoration Act). The Constitution itself provides a cause of action for Plaintiff chaplains' religious liberty claims.[5]

Defendants' argument about exhausting administrative remedies ignores the fact that, at the highest level, the DoD and Armed Services have adopted a policy of refusing to grant any religious accommodation requests ("RARs"). *See* Compl. ¶¶ 94-114 & *infra* Section III.B. Several courts have confirmed that service members are exempt from exhausting a sham RAR process that amounts to little more than "theater."[6] For the same reasons, Plaintiffs claims are ripe, *see* ECF 31 at 23-26, and Defendants' claims that they have not suffered any harms are erroneous, as set forth in Plaintiffs' supplemental declarations.[7]

## C.    Plaintiffs' Claims Are Justiciable.

Defendants claim courts cannot review decisions "challenging military assignment, training, schooling, promotion and other operational decisions ... are nonjusticable," Opp. at 16, is contrary to the very citations they quote.[8]

---

[5] *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 295 (D.C. Cir. 2006) ("*CFGC*") (listing over a dozen cases where military chaplains raised Free Exercise and/or Establishment Clause claims were deemed justiciable).

[6] *U.S. Navy SEALs 1-26 v. Biden*, 2022 WL 34443, at * 1 & *6 (N.D. Tex. Jan. 3, 2022) ("*Navy SEALs 1-26*") (finding RAR process futile) *stay denied*, 27 F.4th 346, 349 (5th Cir. Feb. 28, 2022) (Where a service has "effectively stacked the deck against … exemptions," this is "sufficiently probative of futility").

[7] *See generally* Ex. 2 & Ex. 3 (table summarizing Plaintiff injuries and disciplinary actions).

[8] Defendants' claims regarding the non-justiciability of these issues instead rely Justice Kavanaugh's lone concurrence in *Austin v. Navy SEALs 1-26*, 142 S.Ct. 1301 (2022). There, the Supreme Court, in a three-sentence opinion simply limited the scope of the preliminary

CA84

*Orloff v Willoughby*, 345, U.S. 83 (1953) addressed a petition by a doctor drafted under the "Doctors Draft Act" claim he was entitled to a commission and assignment to a doctor's position. Orloff's refusal to fill out security clearance forms precluded his commissioning.[9] The Court held that failure to assign Orloff duties for which he was drafted, *i.e.*, a doctor, "would raise questions not only of bad faith but of unlawful discrimination." *Id.* at 88. The Court's admonition about judicial noninterference specifically referred to "*legitimate* Army matters", *id.* at 94 (emphasis added); operating contrary to the Constitution or law is not a *legitimate* matter, and it is in the Court's power to address constitutional violations in assignments and promotions.[10]

### D.    Plaintiffs Have Standing for § 533 Claims.

---

injunction granted but left in place the district court and the Fifth Circuit's findings that the plaintiffs' RFRA and First Amendment claims were justiciable, ripe, had a substantial likelihood of success and satisfied all other factors for a preliminary injunction.

[9] He lost at the district and circuit court levels who said the Army could do with him as they wished. *Id.* at 86-87. When the Court granted certiorari, "the parties changed positions as nimbly as if dancing a quadrille." *Id.* at 87. The Army confessed its error and assigned him "to medical duties in the treatment of patients within the psychiatric field" but, because he was a private, he was barred from "commissioned officers function[s],", and other restrictions relating to drugs due to "doubts about his loyalty[.]" *Id.* at 93.

[10] *See, e.g., Emory v. Secretary of Navy*, 819 F.2d 291, 294 (D.C. Cir.1987) ("Where it is alleged, as it is here, that the armed forces have trenched upon constitutionally guaranteed rights through the promotion and selection process, the courts are not powerless to act. The military has not been exempted from constitutional provisions that protect the rights of individuals. It is precisely the role of the courts to determine whether those rights have been violated.")(citation omitted). Moreover, the long line of military chaplain cases discussed in *CFGC* consistently treated as justiciable chaplains' claims that chaplain selection and promotion processes were unconstitutional.

CA85

Defendants erroneously claim that Plaintiffs lack standing to enforce § 533 and that § 533 does not create a private right of action. Opp. at 17-19.

Plaintiffs have constitutional standing for their § 533 claims for the same reason they have standing to bring their First Amendment claims, namely, they have been injured through Defendants' actions depriving them of constitutionally and statutorily protected religious liberties. First, Congress created § 533 to define and enforce Chaplains' constitutional rights to religious liberty and expressly directed Defendants to implement these regulations. Plaintiffs simply ask the Court to require DoD to enforce the statute and its regulations thereunder protecting Plaintiffs' First Amendment rights. Second, § 533 is a remedial statute that must be interpreted to achieve its remedial purpose. The Secretary's negative personnel actions against Plaintiffs violate the Free Exercise Clause, the Establishment Clause, and § 533's express prohibitions. DoD's unconstitutional message of hostility results in irreparable harm. *See infra* Section IV. This is an injury directly traceable to Defendants' actions, and inactions, that are redressable by this Court.[11]

---

[11] Plaintiffs also seek an order compelling Defendants to complete the DoD wide training of all levels of leadership through a training program on religious liberty issues for military leadership and chaplains. Plaintiffs have never received any training, nor were they informed that § 533 existed. *See, e.g.,* Ex. 2, Brown Decl., ¶ 8, Calger Decl., ¶ 6; Harris Decl., ¶ 8. If Defendants had complied with the congressional directive and issued regulations implementing these protections and required comprehensive training prior to the Mandate, it could have prevented Defendants' systematic violations of Plaintiffs' and other service members' religious liberties, as well as the dozens of similar lawsuits filed Nation-wide.

CA86

Section 533(b) creates a right of action because it simply defines and enforces military chaplains' First Amendment rights, consistent with their unique constitutional role. As such, the right of action is provided by the First Amendment. Defendants' retaliatory actions against Plaintiffs for exercising those rights results are also First Amendment violations. ECF 31 at 30-31. Defendants cannot rely on their defiance of Congress's commands and repeated failure to issue regulations fully protecting the rights for chaplains set forth in § 533. Plaintiffs sue to force DoD to follow its regulations.[12] Section 533, which is partly reflected in DoDI 1300.17, ¶¶ 1.2.b-c, "safeguard [Plaintiffs'] individual interests" which the requested injunction will protect.

## III.   PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS.

### A.       Section 533 Claims

Defendants' arguments that the Mandate and their retaliatory actions against Plaintiffs do not violate § 533, Opp at 19-23, depend on defining "rite," "ritual," and "ceremony" in terms that fail to recognize the situations Congress sought to address, which was not limited to marriage. That context and binding First Amendment precedent make it clear that it is the chaplains, rather than the government, who define the scope of religious rites, rituals, or ceremonies.

---

[12] *See, e.g., Ft. Stewart Schs. v. FLRA,* 495 U.S. 641, 654 (1990) ("[T]he Army, no less than any other federal agency, is obligated to follow its own regulations"). When Defendants own regulations afford significant procedural protections, courts "have insisted on compliance." *U.S. v. Caceres*, 440 U.S. 741, 760 (1979); *id*. at 759 ("This Court has consistently demanded governmental compliance with regulations designed to safeguard individual interests").

CA87

Several Plaintiffs view the Mandate of this vaccine, developed using aborted babies, as a religious rite equivalent to child sacrifice.[13]

Defendants' speculation that there are major differences between the House, Ex. 4, and the Senate versions, Ex. 5, of the 2013 NDAA is incorrect. The Senate bill, S. 3526, was titled the "Military Religious Freedom Act of 2012"; Section 2 of the Senate bill, "Protection of Rights of Conscience of Members of the Armed Forces and Chaplains of Such Members" is the same title as Sec. 536 of House Report 4310. The language is almost identical, including the definition of a chaplain. While Congress's removal of the ban on homosexual activities in the military produced great turmoil, there were other issues causing division and friction in the military Chaplain Corps that the NDAA was supposed to fix.[14]

---

[13] *See, e.g.,* Ex. 2, Alvarado Decl., ¶ 8 ("this pandemic has created a new religious sect," where "receiving the COVID-19 'jab' has become some sort of ceremony or an initiation rite or ritual."); Brown Decl., ¶ 9 ("the compulsion to take the Covid shot is equal to a religious rite. Given the reliance on child murder for the development and existence of these Covid shots, they are little more than child sacrifice for a benefit, a heinous practice of human sacrifice akin to the worship of Moloch abhorred by God in the Old Testament.); Shour Decl., ¶ 9 (discussing the "branch covidian" cult led by "Lord Fauci, the High Priest of covid," accompanied by hostility to traditional religion in favor "a new denomination of scientism."); Wine Decl., ¶ 8 (vaccination amounts to "public renunciation of … God" and "a religious rite or ritual being undertaken in allegiance to a false god.").

[14] The Associated Gospel Churches Perspective on Religious Liberty, *see* Compl., Ex. 5, identified some of those long simmering problems. This included the Air Force and Navy issuing regulations prohibiting "sectarian" prayers, chaplains being censured and punished for what they spoke or prayed, and having a Baptist service suppressed in Iraq in 2007. Defining a chaplain as a denominational representative was supposed to resolve many of those issues. *See* Ex. 6, Decl. of Arthur A. Schulcz. Section 533 has some components of the earlier NDAA draft language, but it is not limited to issues of human sexuality and its removal clearly shows the focus was on "religious liberty" including speaking at ceremonies or other functions.

CA88

First Amendment protections against compelled participation apply even for routine activities that the government considers wholly secular. Cases like *W. VA. State Board of Education v. Barnette,* 319 U.S. 624 (1943), address those with religious objections to a common secular ceremony like reciting the Pledge of Allegiance. Like this case, "Failure to conform is 'insubordination' dealt with by expulsion." *Id.* at 629. Jehovah Witnesses successfully challenged the rule under the First Amendments as burdening their religion.

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts.

*Id.* at 639. There is no doubt Defendants have punished Plaintiffs in a manner that § 533 specifically prohibits. The Bible provides numerous examples where individuals are required to do something in public that becomes a test of their conscience and is thus prohibited by the First Amendment. *See* ECF 31 at 28-30. To decide what is an appropriate ceremony from a religious perspective requires DoD to take sides on religious issues, which is forbidden. Defendants forget the chaplain is the religious expert addressing a religious issue.

## B.    RFRA and Free Exercise Claims

First, Defendants have substantially burdened Plaintiffs' free exercise not only through the denial of RARs using a sham process that amounts to little more than "theater," *see generally* Opp at 32-34 & cases cited therein, but

CA89

also through removing them from the RAR process and religious review teams; reassignment or duty restrictions; and censoring their ministry and/or pressuring them to advise service members with religious objections in a manner contrary to their conscience. *See* Compl., ¶¶ 103 & 117.[15] Defendants' have not responded to, much less rebutted, these allegations, which are at the core of the unique free exercise claims that Plaintiffs chaplains assert.

Second, Defendants have unquestionably favored comparable secular activities over Plaintiffs' free exercise. Defendants cite to more updated statistics, *see* Opp at 5 (reproduced in Ex. 7-10), that are summarized below.

| Service | RARs Submitted | RARs Approved | % RAR Approved | Med/Admin Approved | Secular vs. RAR |
|---------|------|------|------|------|------|
| Air Force | 9,139 | 109 | 1.2% | 1,608 | 14.8:1 |
| Army | 7,701 | 19 | 0.25% | 17,338 | 913:1 |
| USMC | 3,733 | 7 | 0.19% | 602 | 86:1 |
| Navy | 4,235 | 43 | 1.0% | 273 | 6.3:1 |
| **Total** | **24,808** | **178** | **0.7%** | **19,821** | **111:1** |

This data is even more damning than previous data provided in the Complaint. Even making the counter-factual assumption that the RARs are religious accommodations rather than disguised administrative exemptions, *see* Compl., ¶ 109, the Armed Services have granted ***more than 100 times more*** secular exemptions than RARs, and for the Army the ratio approaches 1000 times.

---

[15] This immediate retaliation triggered by the submission of an RAR, expression or religious objections or advising those with religious objections is similar to the conduct that the Court in *Navy SEALs 1-26* found to constitute violations of RFRA and First Amendment, namely, treating a service member as non-deployable upon submission of an RAR. *See Navy SEALs 1-26*, 2022 WL 34443, at *9-11.

CA90

Defendants also erroneously assert that religious accommodations are necessarily permanent, while medical exemptions are temporary. Opp at 27-28. All religious accommodations are time-limited.[16] Moreover, nearly all secular exemptions are temporary medical exemptions that are vaccine-specific and may be renewed until "an updated or new vaccine has been approved" that "the member can safely take." ECF 39-12, ¶ 13. Most Plaintiffs' religious objections are similarly vaccine-specific, in whole or in part, and several are willing to take an alternative FDA-approved vaccine to which they do not have religious objections. *See* Compl., ¶ 127.

Third, Defendants' have failed to meet their burdens of proof and persuasion to establish that their actions satisfy strict scrutiny.[17] Plaintiffs wish to highlight three points that are undisputed. First, no active-duty service

---

[16] *See, e.g.,* ECF 1-5, DOD Instruction 1300.17, ¶ 3.2.g.1(Sept. 1, 2020) ("an approved accommodation may be subject to review and recission, in whole or in part, at any time" based on change in circumstances). Each of the Armed Services contains similar time limitations in the service regulations implementing DODI 1300.17.

[17] Defendants appear to acknowledge, as they must, that their actions trigger strict scrutiny by their decision to devote the largest sections of their brief to this discussion. *See* ECF 39 at 23-32. Nearly all of the discussion in the brief and the attached declarations summarizes or cites to various studies or statistics that have no bearing on the salient issues here, namely, what are the relative risks posed or faced by vaccinated vs. unvaccinated service members due to the Omicron variant or sub-variants, and how are those risks mitigated by a two-dose regimen of the mRNA "vaccines" and/or natural immunity. The studies suffer from one or more of the following defects: (1) they address the past 2.5 year period, consider periods prior to the development of vaccines or vaccine deadlines, and/or the emergence of Omicron; (2) they are not limited to service members; (3) the time series statistics provided do not provide a breakdown of vaccinated vs. unvaccinated service members, in particular the Rans Declaration Table, *see* ECF 39-3 at 12-13 & Table; and/or (4) for nearly all recent studies that do address Omicron they consider the addition of one or more boosters, rather than the mandated two-dose regimen.

CA91

member, whether vaccinated or not, has died since November 2021 when the Omicron variant became prevalent. *See* ECF 39-3 at 12-13 & Table. This is the same time that mandate deadlines kicked in and active-duty vaccination rates reached or exceeded 98%. Second, the military has approved nearly 20,000 secular exemptions and less than 200 (or zero) religious accommodations, refuting any purported compelling interest in 100% vaccination. Third, the Pfizer CEO, the *New England Journal of Medicine*, and apparently Defendants acknowledge that, for the Omicron variant, natural immunity provides 50% protection, while the mandated two-dose regimen "offer[s] little, if any protection against [Omicron] infection."[18] demonstrating that the Mandate cannot further a compelling government interest.

## C.    Establishment Clause and No Religious Test Clause Claims.

Plaintiffs have shown DoD's retaliatory actions against Plaintiffs are a direct response to their objections to the Mandate. *See* ECF 31, Ex. 6 (Table summarizing § 533 Violations). Defendants' violations of § 533 are also violations of the Establishment Clause's foundational principle: "No person can be punished for entertaining or professing religious beliefs or disbeliefs."

---

[18] ECF 39-1, ¶ 20. *See also New COVID-19 Vaccine That Covers Omicron 'Will Be Ready in March,' Pfizer CEO Says* Yahoo!Finance (Jan. 10, 2022) (same from transcript of video interview with Pfizer CEO Albert Bourla), available at: https://finance.yahoo.com/video/covid-19-vaccine-covers-omicron-144553437.html(last visited July 17, 2022). *See also* Ex. 1, Dr. Bhattacharya Decl., ¶¶ 17-34 (discussing studies finding that natural immunity provides stronger and more durable protection against Delta and Omicron variants than vaccination); *id.*, ¶ 35 (noting that the United States government is an outlier in its refusal to recognize or consider the efficacy of natural immunity).

CA92

*Everson v. Board of Ed.*, 330 U.S. 1, 16 (1947). Defendants' creation of a categorical RAR bar shows they are hostile to those who raise religiously based objections to the Mandate. It is also proof they have created a religious test violating the No Religious Test Clause[19] and well-established Establishment Clause precedent. Government must "be a neutral in its relations with groups of religious believers and non-believers; … State power is no more to be used so as to handicap religions than it is to favor them." *Id.* at 18. Defendants have not addressed the impact of granting zero RARs (or at best less than 1%), while granting more than 100 times more secular exemptions. This shows that religion is being treated differently, and the government's hostility to, and discrimination against, religious exercise violates the Establishment Clause just as much as the Free Exercise Clause.

## III.   PLAINTIFFS FACE IRREPARABLE HARM.

Several courts have already found that Defendants' No Accommodation Policy violates services members' free exercise rights under RFRA and the First Amendment, including two that have issued service-wide injunctions.[20]

---

[19] Defendants erroneously assert that the No Religious Test Clause applies only to oaths. *See* Opp at 36 n.7. This clause applies wherever there is a religious test (not an oath) for federal or state public service that prohibits one from serving based on their religion (or non-religion). *See generally McDaniel v. Paty*, 435 U.S. 618, 632 (Brennan, J., concurring).

[20] *See Navy SEAL 1 v. Austin,* 2022 WL 534459, at *19 (M.D. Fla. Feb. 18, 2022); *Air Force Officer*, 2022 WL 468799, at *12; *Navy SEALs 1-26*, 2022 WL 34443, at *18 (subsequently expanded to Navy-wide injunction March 28, 2022; *Doster v. Kendall*, 2022 WL 982299 (S.D. Ohio Mar. 31, 2022) (subsequently expanded to Air Force-wide TRO July 14, 2022).

CA93

The irreparable harm requirement is satisfied by alleging a violation of the Establishment Clause, and Section 533 because it enforces these rights, because the harm "occurs merely by virtue of the governments purported unconstitutional policy or practice," "governmental endorsement," or hostility, and it "occurs the moment the government action takes place." *CFGC*, 454 F.3d at 302. Involuntary injection of an unlicensed vaccine (or non-vaccine) is an irreparable harm. *See Doe v. Rumsfeld*, 297 F.Supp.2d 119, 135 (D.D.C. 2003).

## IV.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR ISSUANCE OF A PRELIMINARY INJUNCTION.

While Defendants may characterize it as "interference from the judiciary," Opp. at 39, Plaintiffs simply ask that this Court perform its assigned role, and duty, to interpret and enforce constitutional rights and "to determine whether those rights have been violated." *Emory*, 819 F.2d at 294. Here, there is no conflict between the public's "exceptionally strong interest in national defense," Opp. at 38, which we all share, and Plaintiffs' constitutional rights. The most effective way to promote the public interest generally and the specific interest in strong national security is by requiring Defendants to respect the Constitutionally protected religious liberties.

Defendants' systematic violations of religious liberties are one of the greatest internal threats to national security this Nation has ever faced. Defendants' imposition and enforcement of an unlawful vaccine mandate, and

its arbitrary and selectively enforced No Accommodation Policy, threaten to purge hundreds of thousands of service members.[21] Every branch of the Armed Services is facing massive recruiting shortfalls, with the Army having reached only 40% of its FY22 target with less than three months left.[22] The purging of hundreds of thousands of highly trained, experienced, patriotic, and religious service members, and the massive, across-the-board recruiting shortfalls, are a direct result of Defendants' hostility to religion and violations of Constitutionally-protected religious liberties. The loss of current personnel and future recruits are so great that they many worry that they create a "long-term threat to the all-volunteer force,"[23] the foundation for our national defense.

## IV.  CONCLUSION

This Court should grant the relief requested in the Proposed Order.

---

[21] The Armed Services have already separated over 6,000 service members (before the Air Force and Navy were enjoined from doing so), and their RAR policies almost certainly result in discharge of at least 25,000 who have submitted RARs. Just this month the Army has barred over 60,000 in the Army Reserve and National Guard from service or pay. *See* Allie Griffin, *Army Bars More Than 60K National Guards, Reservists from Service, Cutting Off Pay*, NY Post (July 8, 2022), available at: https://nypost.com/2022/07/08/army-cuts-pay-from-over-60k-unvaccinated-national-guard-reserves/ (last visited July 17, 2022).

[22] *See* Courtney Kube & Molly Boigon, *Every Branch of the Military is Struggling to Make its 2022 Recruiting Goals, Official Say*, NBCNews (June 27, 2022), available at: https://www.nbcnews.com/news/military/every-branch-us-military-struggling-meet-2022-recruiting-goals-officia-rcna35078 (last visited July 17, 2022).

[23] Tom Jurkowsky, *The Military Has a Serious Recruiting Problem – Congress Must Fix it*, The Hill (June 21, 2022) (*quoting* Sen. Thom Tillis (R-N.C.)), available at: https://thehill.com/opinion/national-security/3527921-the-military-has-a-serious-recruiting-problem-congress-must-fix-it/ (last visited July 17, 2022). *See also supra* note 22, Kube & Boigon ("2022 is the year we question the sustainability of the all-volunteer force").

CA95

Dated: July 18, 2022

Respectfully Submitted,

*/s/ J. Andrew Meyer*
J. Andrew Meyer, Esq.
Fla Bar No. 0056766
FINN LAW GROUP, P.A.
8380 Bay Pines Blvd
St. Petersburg, Florida 33709
Tel.: 727-709-7668
Email: ameyer@finnlawgroup.com

*/s/ Arthur A. Schulcz, Sr.*
Arthur A. Schulcz, Sr.
DC Bar No. 453402
Chaplains Counsel, PLLC
21043 Honeycreeper Place Leesburg, VA
20175
Tel. (703) 645-4010
Email: art@chaplainscounsel.com

*/s/ Brandon Johnson*
Brandon Johnson, DC Bar No. 491370
Defending the Republic
2911 Turtle Creek Blvd., Suite 300
Tel. (214) 707-1775
Email: bcj@defendingtherepublic.org
Motion for Special Admission Pending

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

This is to certify that on this 18th day of July, 2022, the foregoing

Plaintiffs' Reply Brief was e-filed using the CM/ECF system.

Respectfully Submitted,

*/s/ Arthur A. Schulcz*
Arthur A. Schulcz

CA96

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| ISRAEL ALVARADO, et al., | : | |
| | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | Case No. 1:22-cv-0876- ATF-JFA |
| | : | |
| LLOYD AUSTIN, III, et al., | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

## SUPPLEMENTAL DECLARATION OF CHAPLAIN (CPT) JORDAN P. BALLARD

Pursuant to 28 U.S.C. §1746, I, JORDAN PETER BALLARD declare as follows:

1.      My name is JORDAN PETER BALLARD. I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

2.       I make this Supplemental Declaration to support my challenge to the Department of Defense and Department of Army mandates requiring that I be vaccinated against COVID-19. All statements made in this Declaration are true to the best of my own personal knowledge.

3.       This declaration specifically addresses negative personnel actions I have experienced after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate and refusal to take it.

4.      These retaliatory actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.

5.      I was also forbidden to deploy with my battalion, resulting in a second chaplain deploying with my battalion while I was moved to another battalion. The second battalion is also

scheduled to deploy later this year, and I am still considered non-deployable. This makes me uncompetitive in the competitive Army promotion environment.

I make this declaration under penalty of perjury. It is true and accurate to the best of my ability, and it represents the testimony I would give if called upon to testify in a court of law.

January 16, 2023

**/S/ Jordan P. Ballard**
**Jordan Peter Ballard**

CA99

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

ISRAEL ALVARADO, et al.,              :
                                      :
        *Plaintiffs,*                 :
                                      :
                v.                    :        Case No. 1:22-cv-0876- ATF-JFA
                                      :
LLOYD AUSTIN, III, et al.,            :
                                      :
        *Defendants.*                 :
                                      :

**SUPPLEMENTAL DECLARATION OF CHAPLAIN LT COL STEVEN BARFIELD**

Pursuant to 28 U.S.C. §1746, I, Steven Barfield declare as follows:

1.      My name is Steven Barfield. I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

2.      I make this Supplemental Declaration to support my challenge to the Department of Defense and Department of Air Force mandates requiring that I be vaccinated against COVID-19. All statements made in this Declaration are true to the best of my own personal knowledge.

3.      This declaration specifically addresses negative personnel actions I have experienced after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate and refusal to take it.

4.      These retaliatory actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.

5.      Due to my RAR status, I was denied, and continue to be denied by AFRC   C, the opportunity to have a duty title upgrade to   IMA to the     ing Chaplain   at 88 AB      C.  This title has been vacant since Sept 2021 due to the retirement of Ch, Lt Col St. Rose.  Although my

CA100

supervisor, Ch, Col   im Bowen requested for me to fill this title in January 2022, Ch Ellis at

AFRC   C stated to me on 4 March 2022 that AFRC   C was waiting to   see what happens   with

my RAR before deciding on my duty title change.    e also stated that my lack of PME was a

concern, in that they prefer chaplains to have that, but that the promotion could not be given due

to my RAR status.  I personally took this to mean that they did not want to give me the title if I

was going to be discharged soon due to my RAR.  I felt this was discrimination and expressed

this to Ch Ellis.    e told me it wasn t discrimination, and they were just waiting to see what

happens with my RAR.    istorically, a lack of PME may keep IMA Chaplains from being

promoted to Lt Col, but in my year group four of us were promoted to Lt Col without PME.  The

chaplain who retired in Sept 2021 and thus vacated the duty title I seek was a Lt Col and held

that title for eight years and never completed his PME.  Thus because of my RAR status, my

duty title on my June 2022 OPR, was simply   Chaplain   and as of now will be the same on my

June 2023 OPR.  The lack of progressive leadership duty titles weakens my OPRs because it

projects to the promotion board that even though I am a Lt Col there must be incompetency since

my duty title is the same as an entry level chaplain.  AFRC   C s handling of my RAR status

makes me less competitive for promotion against other chaplains who have that title in their

OPR.  My RAR did impact AFRC   C s decision to withhold a duty title that was given to others

in the past with similar credentials.  My supervisor has given me all the responsibilities this title

brings, and I appreciate the confidence and professionalism he has shown me.    owever,

AFRC   C s decision has yet to be reversed, and even if it were reversed and I was now given

the duty title, it would not change the damage done to my career because of opportunities

withheld from me.

6.      Another way that AFRC has damaged my career progression is that they will not allow

some RAR reservists to travel to their base to perform duty.  If you live beyond 150 miles of the

CA101

base, the only option for us is telework.  I live 154 miles away and was denied the opportunity to

perform my annual tour in January 2023 because of my RAR status.  Ironically, I was allowed to

travel up until January 2023, but the policy was in place for 2022 yet not enforced by AFRC

until now.  The Det 5 commander at AFRC told me that this policy was put in place to protect

people against unvaccinated people who could not commute to work daily.  AFRC s travel ban

denies me tactical opportunities to perform my mission on base and weakens my OPR, making

me less competitive for my next promotion board.  Overall, the RAR process has ended with the

mandate s removal, but the damage to my career continues and cannot be undone.  It is as if I am

in a race with other chaplains and the officials made me stop running while the other chaplains

without a RAR kept running.  Now it appears we will soon be allowed to run, but the other

chaplains have already lapped us and we will never catch them.  My Colonel promotion board is

soon, but I believe it is evident that I will not have a fair opportunity to compete against fellow

Lt Col s who did not have a RAR.


       I make this declaration under penalty of perjury, it is true and accurate to the best of my

ability, and it represents the testimony I would give if called upon to testify in a court of law.


January 18, 2023                          **/S/ Ste en  . Bar eld**
                                          **Ste en  e   an Bar eld**

CA102

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| ISRAEL ALVARADO, et al., | : | |
| | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | Case No. 1:22-cv-0876- ATF-JFA |
| | : | |
| LLOYD AUSTIN, III, et al., | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

<u>**SUPPLEMENTAL DECLARATION OF CHAPLAIN (CPT) CHAD BOOTH**</u>

Pursuant to 28 U.S.C. §1746, I, Chad Booth declare as follows:

1.     My name is Chad Booth. I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

2.      I make this Supplemental Declaration to support my challenge to the recently rescinded Department of Defense and Department of the Army mandates requiring that I be vaccinated against COVID-19.  All statements made in this Declaration are true to the best of my own personal knowledge.

3.      This declaration specifically addresses negative personnel actions I have experienced after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate.

4.     These retaliatory actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.

5.     Beginning of July I was forbidden to PCS and attend Chaplain Captain Career Course (C4).  C4 is a pivotal milestone in the career of a Chaplain. This denial caused me to be double

slotted with my replacement who was not deferred to a different assignment.  My leadership put

in a 4187 to move me up to Brigade as an extra Soldier.     owever, according to the TDA I am

still double slotted with another Chaplain. This is exceedingly damaging to my career as my

Major board meets next year and my in the   one look for major is scheduled for 2025.  The

Officer Evaluation Reports (OER) I receive annually have a direct correlation to how successful

I am as my documents go before the board.  Since I am double slotted and due to the 4187 I have

no official rating scheme.  This means that whoever evaluates me as an extra Soldiers will do so

with me having no job description as I no longer am a battalion Chaplain.  Practically, I have

been moved to Brigade and I assist the Brigade Unit Ministry Team covering down for them as

they PCS or get sick.  Also, I am the Senior Pastor of the Chapel who ministers to the Advanced

Individual Training population.  The work I do is meaningful and keeps me actively employed.

   owever, as I have no official rating scheme when I do receive my OER it will not be as

competitive as my colleagues when going before the board. This is devastating and negatively

impacts how competitive I can be with my colleagues. If this happened with the first one or two

of my OERs that obstacle could be overcome but now that I am so close to the board the several

top blocks (highest rating) I received early on in my career will be overlooked and the latest ones

will determine the outcome of my promotion.

6.      As a Soldier it is my duty to live out the Army values of Loyalty, Duty, Respect, Selfless

service,    onor, Integrity and Personal courage. As a result of my personal courage and integrity

to do what    OD has told me to do fulfilling my Oath to the Constitution which ends with   SO

   ELP ME    OD   I have been irreparably harmed.  Unless all negative paperwork (OERs) are

accompanied with an explanation and met with an immediate promotion as advised by previous

senior raters when they said,   Promote immediately   I will be negatively impacted because I was

bold enough to live out the values I swore to live out.  Exercising my conscience and living out

CA104

what I know to be true has cost me immeasurable stress, stress to my family, and stress to my

children.  I would do it all over again in order to continue to serve with a clear conscience and

know that I was fulfilling the Chaplain Corps motto    For    OD and Country

      I make this declaration under penalty of perjury, it is true and accurate to the best of my

ability, and it represents the testimony I would give if called upon to testify in a court of law.


January 16, 2023                     S  Chad M. Booth
                                     Chad Mason Booth

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

ISRAEL ALVARADO, et al.,                          :
                                                   :
       *Plaintiffs,*                      :
                                                   :
               v.                          :        Case No. 1:22-cv-0876-
       ATF-JFA
                                                   :
LLOYD AUSTIN, III, et al.,                         :
                                                   :
       *Defendants.*                      :
                                                   :

## SUPPLEMENTAL DECLARATION OF CHAPLAIN LT JUSTIN E. BRON

Pursuant to 28 U.S.C. §1746, I, Justin Elisha Brown declare as follows:

1.     My name is Justin Elisha Brown. I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

2.     I make this Supplemental Declaration to support my challenge to the Department of Defense and Department of Navy mandates requiring that I be vaccinated against COVID-19. All statements made in this Declaration are true to the best of my own personal knowledge.

3.     This declaration specifically addresses negative personnel actions I have experienced after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate and refusal to take it.

4.     These retaliatory actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.

5.     My supplemental declaration to this honorable court dated 1 September 2022, delineates the extensive abuses by the Coast uard in adjudicating my RAR. The exhibits clearly

CA106

demonstrate an intent to deny all RAR s, from the  optional questions  that are highly prejudiced given to Chaplains to use in interviews, the conversations detailing an intent to discharge members even if RAR s were approved, and numerous communications from the Chaplain of the Coast  uard, Chaplain  alcott, that it is unlikely any RAR s would be approved. The bad faith with which the Coast  uard and Navy adjudicated my RAR is the most grievous of all injuries. The religious liberty I have and  od given convictions I hold were summarily dismissed in a form letter virtually identical to every other denial in the Coast  uard.  iven that I have not failed to complete my duties, have completed 4 deployments to the Southwest border, and have not had Covid since March of 2020 there is no reason my RAR cannot be approved permanently. Medical exemptions for Covid and a myriad of other issues are given regularly, the Coast  uard has raised the age to enlist to 42, and suspended high year tenure in order to retain members. None of those accommodations have the foundation in Constitutional Rights that my faith affords me. The contempt which RAR s and religion are treated has not been addressed.

6.      On June 22nd 2022 I received adverse paperwork (3307 P&D-41D) in my record stating I was in violation of article 90 and 92 of the UCMJ. At this time and to my knowledge no Coast  uard guidance or policy has been implemented to remove that negative paperwork, in spite of the rescinding of the mandate to take the Covid shot. Further exacerbating my harm are the numerous errors and false official statements contained in this paperwork, from nonsensical dates to the blatantly false statement that I failed to show up at the appointed place and time I was ordered[1]. The mishandling of simple documentation demonstrates a contempt for the RAR process and I have very little confidence a remedy will be reached without the aid of this honorable court. Rescinding the mandate itself has been riddled with folly, on 9 January 2023

---

1    These false statements and errors are extensively documented in my supplemental declaration dated 1 September 2022.

ALCOAST 09 23 came out canceling the Covid shot mandate, only to be rescinded a few hours later by ALCOAST 011 23 re-instituting the Covid shot mandate. ALCOAST 012 23 was then released on 11 January 2023 once again rescinding the mandate, if such simple operations invite such errors it seems improbable I and others similarly situated will be made whole without this honorable court s intervention.

7.      I was and continue to be denied an Administrative exemption for legal proceedings in accordance with COMDINST M6230.4

8.      RADM Jones declaration to the court dated July 12 2022, stated no administrative or disciplinary action would be taken against me, yet I received the negative 3307 in my record. Further he stated I would be sent back to the Navy for corrective action. The military term for sent back is dismissed for cause, a disciplinary action, and would be a career killer. I believe the injunctive relief given to the Navy has prevented this action from occurring.

9.      I am a second generation Navy Chaplain, it is an honor and joy to serve the Navy and Coast   uard these are institutions I love dearly. I am thankful for the support from my fellow Chaplains, Captain Smith, and Captain Donahue, it is an honor to serve them. The best interest of the Coast   uard, Navy, and Nation is approving the RAR s, honoring our goals of diversity and inclusion, and treating religion with the dignity and protection our Constitution recogni es. It breaks my heart to see our noble institutions degraded by these actions. In the words of Frederick Douglas   The soul that is within me no man can degrade. I am not the one that is being degraded on account of this treatment, but those who are inflicting it upon me.

      I make this declaration under penalty of perjury, it is true and accurate to the best of my ability, and it represents the testimony I would give if called upon to testify in a court of law.

January 18, 2023                    S/ J   t n E. Bro   n
                                    Justin E Brown

CA108

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| ISRAEL ALVARADO, et al., | : |
| | : |
| *Plaintiffs,* | : |
| | : |
| v. | :     Case No. 1:22-cv-0876- ATF-JFA |
| | : |
| LLOYD AUSTIN, III, et al., | : |
| | : |
| *Defendants.* | : |
| | : |

<u>**SUPPLEMENTAL DECLARATION OF CHAPLAIN CPT Da_d Cal_er**</u>

Pursuant to 28 U.S.C. §1746, I, David Calger declare as follows:

1.      My name is David Andrew Calger. I am over 18 years of age and have personal

knowledge of and am competent to testify on the matters stated herein.

2.      I make this Supplemental Declaration to support my challenge to the Department of

Defense and Department of U.S. Army mandates requiring that I be vaccinated against COVID-

19.  All statements made in this Declaration are true to the best of my own personal knowledge.

3.      This declaration specifically addresses negative personnel actions I have experienced

after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a

result of my submitting a religious accommodation request (RAR) to be excused from the now

illegal COVID Mandate and refusal to take it.

4.      These retaliatory actions and incidents degraded and continue to affect my future career

in a negative manner and have and will prejudice me when competing for promotions, schools,

important assignments, and other opportunities associated with having a successful career.

5.      I was not allowed to attend training outside of 50 miles from my home. As an Army

Reservist this policy effectively ended my ability to minister to my soldiers and isolated me from

my peers as my command and all but one of my companies fall outside of the 50 miles. I was not

CA109

allowed to attend Annual Training with the bulk of my Battalion, I was not allowed to attend

mandatory Battle Focus training with my Chaplain peers, and I have not been allowed to attend

my Chaplain Career Course which means I won t be allowed to promote to Major which means

I ll be separated for not promoting. The 50 mile policy has practically ended my career and has

the real potential to literally end my career.

I make this declaration under penalty of perjury, it is true and accurate to the best of my

ability, and it represents the testimony I would give if called upon to testify in a court of law.

January 18, 2023

S  David A. Calger
**Da   d A. Cal  er**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

ISRAEL ALVARADO, et al.,                           :
                                                                          :
             *Plaintiffs,*                                    :
                                                                          :
                                          v.                        :        Case No. 1:22-cv-0876-
             ATF-JFA                                      :
                                                                          :
LLOYD AUSTIN, III, et al.,                          :
                                                                          :
             *Defendants.*                                  :
                                                                          :

**SUPPLEMENTAL DECLARATION OF CHAPLAIN MAJOR CLA   TON B. DILT**

Pursuant to 28 U.S.C. §1746, I, Clayton B. Dilt  , declare as follows:

1.        My name is Clayton B. Dilt  . I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

2.        I make this Supplemental Declaration to support my challenge to the Department of Defense and Department of  your service  mandates requiring that I be vaccinated against COVID-19.  All statements made in this Declaration are true to the best of my own personal knowledge.

3.        This declaration specifically addresses negative personnel actions I have experienced after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate and refusal to take it.

4.        These retaliatory actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.

CA111

5.      Personal     Shared Experiences. Despite an overall perception of neutral support from leadership, as a Reservist in the Air National    uard, my negative experiences have been those of a general malaise, perceived ire, passive hostility, body-language and verbal disapproval, speechless incredulity, etc., but not actions as such that fill the Unfavorable Information File (UIF). Although I was spared bold-faced confrontation, enlisted Airmen have confided in me the aggressive hostility displayed toward them. Moreover, after addressing key issues on the free exercise of religion, a commander conveyed to me that some had lost confidence in   their chaplain   (me) because I had connected the dots (via historicity and court cases) that the vaccine mandate and protocols abrogate constitutional rights, and violate autonomy and dignity. This raises concerns as to whether constitutional liberties, dissenting viewpoints, and factual pursuit of the truth are welcomed for discussion. At times, the unvaccinated were required to mask and test when the vaccinated were not, and the N95 could not be adjusted (i.e., loop around the ears) to prevent headaches and ease breathing restrictions.     ithout a doubt, trust has been eroded and relationships soured  many unvaccinated no longer want to serve or have already departed because they do not feel supported or respected.

6.      Speculation. One year and half ago, a lieutenant colonel called to let me know that my name appeared in a system for the RCP2 deployment cycle for FY 2023.    owever, I have not been selected or scheduled for deployment. I have not deployed with the AN    which hinders professional growth and promotion selection.

        I make this declaration under penalty of perjury, it is true and accurate to the best of my ability, and it represents the testimony I would give if called upon to testify in a court of law.


January 18, 2023                           S  Clayton B. Dilt
                                          Clayton Bradley Dilt


Page 2 of  2

CA112

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| ISRAEL ALVARADO, et al., | : |
| | : |
| *Plaintiffs,* | : |
| | : |
| v. | :    Case No. 1:22-cv-0876- ATF-JFA |
| | : |
| LLOYD AUSTIN, III, et al., | : |
| | : |
| *Defendants.* | : |
| | : |

**SUPPLEMENTAL DECLARATION OF CHAPLAIN CDR JOHN J.I. EASTMAN**

Pursuant to 28 U.S.C. §1746, I, CDR John J.I. Eastman declare as follows:

1.     My name is John J.I. Eastman. I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

2.      I make this Supplemental Declaration to support my challenge to the Department of Defense and Department of the Navy mandates requiring that I be vaccinated against COVID-19. All statements made in this Declaration are true to the best of my own personal knowledge.

3.      This declaration specifically addresses negative personnel actions I have experienced after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate and refusal to take it.

4.     These retaliatory actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.

5.     I was not offered another opportunity to deploy in an operational setting.

6.     I was forbidden to PCS and told I would be separated with no benefits after 18 yrs of service June 2022.   This action caused severe stress and anxiety to our family.  My trust in Navy

Page 1 of  2

CA113

leadership therefore has also been gravely affected and the scarlet letter placed on me and my

fellow chaplains over this matter has affected my overall well-being and ability to serve

wholeheartedly.

     I make this declaration under penalty of perjury, it is true and accurate to the best of my

ability, and it represents the testimony I would give if called upon to testify in a court of law.

January 16, 2023

**/S/ Jo n J. I. Ea t  an**
**Jo  n Ja o  Ea t  an**

CA114

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

ISRAEL ALVARADO, et al.,                    :
                                            :
         *Plaintiffs,*                      :
                                            :
         v.                                 :         Case No. 1:22-cv-0876- ATF-JFA
                                            :
LLOYD AUSTIN, III, et al.,                  :
                                            :
         *Defendants.*                      :
                                            :

**SUPPLEMENTAL DECLARATION OF CHAPLAIN (CPT) DO⬛LE HARRIS**

Pursuant to 28 U.S.C. §1746, I, Doyle ⬛arris declare as follows:

1.      My name is Doyle ⬛arris. I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

2.      I make this Supplemental Declaration to support my challenge to the Department of Defense and Department of Army mandates requiring that I be vaccinated against COVID-19. All statements made in this Declaration are true to the best of my own personal knowledge.

3.      This declaration specifically addresses negative personnel actions I have experienced after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate and refusal to take it.

4.      Revocation of Orders: My original orders for July 2022 were revoked, as I was forbidden to PCS, while my replacement received orders to report. This situation means I have been double slotted for 6 months, always attempting to justify to command how we are to split and divide this single battalion Chaplain slot into one integrated ministry. As all chaplains do, we come from different theological backgrounds which allows battalion sources to simply see which one of us is willing to perform any particular task, potentially setting us against each other. As the

CA115

leaving-though-not-left-yet  Chaplain, my predecessor was named  primary  by the battalion commander and battalion   O in multiple phone and personal conversations. Being relegated to the  secondary  chaplain has negatively impacted my ability to fully engage in the battalion ministry, and has hurt not only my OER ratings but my reputation with regard to my command as well. In addition, command had me move offices to an out of the way office, allowing the  primary  chaplain to have the high profile office so that he was the chaplain readily accessible to Soldiers. I was also ordered to give the unit ministry cell phone, which Soldiers contact in emergency situations, to him. It was made emotionally and abundantly clear to me that the battalion would put up with me until I was allowed to secure orders, but the new chaplain is primary while I am utili ed as secondary.

5.      Mission Training and Travel: My replacement was allowed to travel TDY to visit our troops in our outlying locations while I was, and still am, currently disallowed from any TDY travel. There are currently no restrictions on personal vacation leave or medical travel (my dependent son and I have completed 2 medical trips from Japan back to the United States), but when it comes to traveling within Japan (to our Soldiers     families stationed at Camp   ama) or   uam to provide ministry to 78th Signal Battalion Soldiers, I am not allowed. This is something that has, and will, continue to damage my performance rating from my commander while elevating the performance of my peer replacement since he is given these travel assignments. I was also denied the opportunity to travel and participate in the Change of Responsibility for our CSM, hurting my reputation as a team player.

6.      Annual Officer Evaluation Reports: My yearly OER evaluations have suffered due to this entire vaccine and religious accommodation issue. Prior to any mandates, I had received back to back  Most   ualified  (M  ) rankings (the highest my rank can receive). If this mandate, and the subsequent negative  administrative actions  had not happened, there is no reason to believe that

CA116

my next OER ranking would not have also been an M . This would have shown on my record at

the promotion board as 4 out of 5 M s, which according to promotion matrixes for recent years

is exactly what is needed for promotion to Major. owever, due to negative consequences of

filing my RAR, my last two consecutive OER s fell a step below M . hile this affect may

seem negligible, it is impossible to get promoted to Major without the needed number of M s.

These last two lower ratings, and the subsequent one that is expected to also be lower in

February 2022, have not only hurt my reputation as a chaplain, but have effectively ended my

chance at promotion. And without that promotion to Major, I will be mandatorily removed from

the Army on May 1, 2024 (Up or Out policy), unable to continue service through to retirement.

In addition to the lower rankings I have received, are the accompanying comments on those

OERs. In the Army there is a system of key words to be included in the comments section for

any promotion board to read in order to weed out officers they deem not worthy of promotion.

In my case, the comments reflected a ranking even lower than the physical rank I was given, and

when my last OER was due my commander e-mailed me his initial OER with comments

hoping I would just sign. Reali ing the disconnect, I appealed for certain wording to be

improved. Some of that written comment was improved, however, some of it was not. I have the

email from my commander stating he has changed my OER comments if the court needs to see

it.

7.        eekly Nasal Swab Testing: From roughly December 2021 through roughly September

2022, I was ordered to undergo weekly nasal swab tests on every first day of the week before I

could entertain doing my job. It was arranged that I would arrive a few minutes early and my

battalion supervisor ( O) and I would go into the public bathroom until the test was taken and

confirmed (the nasal swab had to sit in the gel for 10 minutes). During this time, multiple people

would walk in the restroom to use the facilities while my nose swab was sitting in the gel. It did

not matter that I never ran a fever, never felt ill or had symptoms, or never tested positive on

those tests. I, as an unvaccinated individual, had to test because the faulty logic used was that this

was an illness of the unvaccinated. Recently, the CDC has confirmed that the vaccinated are both

carriers and spreaders of the disease, but I as one of the few who filed a RAR had to test while

others could come and go as pleased. This is a definitive definition of discrimination.

8.      Summary: These retaliatory actions and incidents damaged not only my actual career, but

if not rectified in current time will continue to degrade and affect my current and future career in

a negative manner, and have     will prejudice me when competing for promotions, schools,

important assignments, and other opportunities associated with having a successful career. If not

explicitly corrected, these actions will continue to degrade the ability of every future chaplain to

stand upon their constitutionally guaranteed right to freely exercise the dictates of their own

religious beliefs, and to support the free exercise rights of their Soldiers.

9.      List of Actions: I was passed over by the FY 2022 Chaplain Major Promotion board as a

result of lackluster OER s. My next promotion board is in March 2023, and I expect to be passed

over yet again due to these negative   administrative actions.  I have been denied TDY for

training, ministry, and team building events. I have been double slotted and relegated as the

 secondary  chaplain for 6 months, and my ORB duty description was changed from  Battalion

Chaplain  to  Extra Soldier.  I have also been humiliated and coerced in public and had

relationships with command     senior ranking chaplains turn negative because I stood for my

free exercise of religion, resulting in damage to my reputation. I also had PCS orders revoked.

All of these negative effects have made me uncompetitive in the competitive Army promotion

environment.

CA118

I make this declaration under penalty of perjury, it is true and accurate to the best of my

ability, and it represents the testimony I would give if called upon to testify in a court of law.

January 18, 2023                          <u>S Doyle  .  arris</u>
                                          Doyle   eoffrey   arris

CA119

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

ISRAEL ALVARADO, et al.,                  :
                                          :
        *Plaintiffs,*                     :
                                          :
               v.                         :        Case No. 1:22-cv-0876- ATF-JFA
                                          :
LLOYD AUSTIN, III, et al.,                :
                                          :
        *Defendants.*                     :
                                          :

**SUPPLEMENTAL DECLARATION OF CHAPLAIN (LTC) MICHAEL J. HART**

Pursuant to 28 U.S.C. §1746, I, Michael J.   art, declare as follows:

1.      My name is Michael J.   art. I am over 18 years of age and have personal knowledge of

and am competent to testify on the matters stated herein.

 2.       I make this Supplemental Declaration to support my challenge to the Department of

Defense and Department of  your service  mandates requiring that I be vaccinated against

COVID-19.  All statements made in this Declaration are true to the best of my own personal

knowledge.

3.       This declaration specifically addresses negative personnel actions I have experienced

after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a

result of my submitting a religious accommodation request (RAR) to be excused from the now

illegal COVID Mandate and refusal to take it.

4.      These retaliatory actions and incidents degraded and continue to affect my future career

in a negative manner and have and will prejudice me when competing for promotions, schools,

important assignments, and other opportunities associated with having a successful career.

5.      I was passed over by the FY 2022 Chaplain Colonel promotion board and received an

conspicuously bland Officer Evaluation Report (OER) on August 26, 2022. In what was my

CA120

Primary Promotion   one, my Senior Rater s narrative completely omitted any recommendation whatsoever to promote. An officer s OER typically contains language recommending promotion, such  Promote below- one,  Promote now,  or even simply  Promote,  as have every one of my OERS over my over-20 year career. My most recent OER s Senior Rater Narrative did not even mention the word  promote  once. In a competitive environment in which an officer s OER is noticed for what it does not say as much as what it does say, this last OER assured that I had no chance of promotion. I was an outspoken opponent of the Covid vaccine mandate among Command leadership, and I actively advocated for Soldiers who submitted RARs of their own.

6.      I have been denied attendance at three performance- and career-enhancing trainings due to my non-vaccinated status.

7.      I was tasked as the project officer to plan, coordinate and execute the annual Fort   ood Installation Prayer Breakfast On May 4, 2022, yet I was not permitted to actually attend the event because of my non-vaccinated status.

8.      I was denied PCS due to my non-vaccinated status, which has created a family hardship due to our geographical separation.

9.      On May 13, 2022 I was removed from my assignment at 13th Expeditionary Sustainment Command (Fort   ood) and reassigned to U.S. Army   arrison Fort   ood because the 13th ESC was under a Prepare-To-Deploy-Order (PTDO). As I was deemed  non-deployable  due to my vaccination status I was reassigned to the Fort   ood   arrison Chaplain s Office. This was career-damaging because (a) it is not a broadening assignment, and (b) I have already served a rotation as a   arrison Chaplain (in Alaska), and now I am serving as a Deputy   arrison Chaplain, effectively a demotion in position and overtly a  putting out to pasture  of a qualified chaplain because he refused the vaccine.

CA121

I make this declaration under penalty of perjury, it is true and accurate to the best of my

ability, and it represents the testimony I would give if called upon to testify in a court of law.

January 18, 2023

_S  Michael J.   art_
**MICHAEL J. HART**

CA122

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

ISRAEL ALVARADO, et al., :
  :
*Plaintiffs,* :
  :
                           **v. : Case No. 1:22-cv-0876-ATF-JFA**
  :
LLOYD AUSTIN, III, et al., :
  :
*Defendants.* :
_____ :

## DECLARATION OF CHAPLAIN (CAPTAIN) ANDREW HIRKO

 Pursuant to 28 U.S.C. §1746, I, Andrew Michael Hirko declare as follows: 1. My name is
Andrew Hirko. I am over 18 years of age and have personal knowledge of  and am competent to
testify on the matters stated herein. All statements made in this Declaration  are true to the best
of my own personal knowledge.

 2. I make this declaration in support of my challenge to the Department of Defense and
Department of the Army mandates requiring that I be vaccinated against COVID-19 and to show
that the Army, despite its personnel shortages, is intent on retaliation against me for filing a
religious accommodation request (RAR) by discharging me and destroying my opportunity to
continue as a minister by the false characterization of my service.

3. This declaration specifically addresses the Defendants' misleading and false "exhaustion"
argument on page 17 of its Opposition to the Plaintiffs' Preliminary Injunction Motion, ECF 65.

> In *Mark Short*, the court concluded that a Marine Corps officer whose appeal had been
> denied failed to exhaust administrative remedies because "he still must undergo separation
> proceedings before any permanent adverse consequences are imposed." 2022 WL 1051852,
> at *4. Moreover, the officer would have the opportunity to submit a "written rebuttal" during
> separation proceedings, and four different individuals would consider his separation, "any

1

> one of which could decide to close the process upon review of Plaintiff's written
> submissions." *Id.*

4. The Defendants are referring to a separation board but failed to inform the Court that all
military personnel are **not** entitled to such a separation proceeding. I and others like me do not

qualify for a Separation Board because I have less than two years of service. I do **not** "have the opportunity to submit a "written rebuttal" during separation proceedings, and four different individuals [will not] consider [my] separation." *Id*. I have exhausted **all** of my Army administrative means of relief. Absent the Court's intervention my separation from the Army is guaranteed and predetermined.

5. I am denied the opportunity and process Defendants describe in their Opposition at 17 in support of their claim administrative remedies would not be futile, and separation proceedings are not always decided against the appealing servicemember. *Id*. The administrative remedies in my case are futile as shown herein.

6. My Religious Accommodation Request (RAR) was submitted on August 23, 2021 and was denied on Feb 23, 2022 but I wasn't notified until March 15, 2022. I submitted my RAR appeal on March 17, 2022. I was informed by my leadership that my RAR appeal was denied on October 3, 2022, after Plaintiffs filed their Motion for a Preliminary Injunction August 15, 2022, ECF No. 59.

7. When my CPT Bob McNamara informed me that my appeal was denied, he told me that I had 72 hours to get vaccinated or they would start the separation process from the Army. After the 72 hours passed and I did not get vaccinated, my CPT McNamara gave me a formal written counseling stating that I would be given a General Officer Memorandum of Reprimand (GOMOR). The counseling threatened that I could also be separated from the Army with a "Less Than Honorable Discharge." Exhibit 1.

2

8. CPT McNamara then talked to our Brigade JAG office and they said that "they would be shocked if I am still in the Army at the end of the 2022 calendar year." My leadership, specifically, my commander LTC David Williams, has been pushing forward to separate me as quick as possible (See Email Chain – Exhibit 2) As I said, my separation is predetermined and for a religious reason, *see* ¶ 12, contrary to the Establishment Clause.

9. The Army has made following my conscience as formed by my faith a crime, despite the

First Amendment; the specific protections of Section 533(b) of the 2013 NDAA; the fact following my conscience is an integral part of who I am as an officer and a chaplain, a representative of my denomination to the Army and its personnel; and an expectation as shown by exhortations and reminders to speak "prophetically" and be the conscience and/or moral compass for the unit.

10. Further, ADP 6-22 says that when a soldier is faced with an order that is unlawful or immoral, they have an obligation to disobey the order. This order is clearly immoral. The Inspector General Sean W. O'Donnell stated in his inspection of the Religious Accommodation Process that "review of the requests did not individual analysis" of each of the accommodation requests. The blanket and predetermined denial of requests in highly immoral. (IG Memo – June 2, 2022).

11. I also point out the Defendants' claim "that even if [I] were separated, that harm could be redressed with back pay and reinstatement into the military", *id*. is false and/or misleading; it does not reflect the reality of the military. Back pay does not compensate me or my family for the fear, anxiety and stress the Army's hostility to my "free exercise" of faith has cost me and my family, nor can it compensate for the burdening or crippling of my career through lowered or missing efficiency reports because of my perceived failure to be a team player, nor make up for missed "key"

3

assignments that are often the difference between promotion and failure of selection in the competitive promotion selection system, nor will it repay the cost of obtaining such relief. The  stress of not knowing my future in the Army because of my sincerely held religious belief has cause  great damage to my marriage and my family. If I were illegally separated from a civil business, the  civil legal process would compensate for those insults and wrongs, *e.g.*, emotional distress and actual damages, and where egregious enough, can include punitive damages and attorney fees. Those remedies are not options in the military.

12. The leadership at the 101st Airborne Division (Air Assault) has continued the separation process with me and others despite the impending vaccine mandate being lifted because of the  NDAA (See Exhibit 3). The JAG at the division legal office said that division leadership is "hell bent' on getting all unvaccinated soldiers separated. He added that he was told that the mandate being  lifted won't

make a difference to stop involuntary separations because "soldiers disobeyed a lawful order while the mandate was in place." Even after the Secretary of Defense released his memo on January 10, 2023 division legal will not lift my adverse action flag. My commander LTC Todd Haralson told me that he was told from division leadership that "in spite of the SECDEF memo no flags will be lifted and GOMORs (General Officer Memorandum of Reprimand) will still be processed."

13.. Finally, the issue in this case is under the Constitution, who controls a chaplain's conscience, especially in determining what is good and evil. There are only two options, (a) the God the chaplain represents through his/her Endorsing Agency or church, or (b) a government bureaucrat or politician who exercise temporary civil power. The Religious Liberty clauses decided that question at our founding, Defendants argue otherwise despite Section 533.

4

I make this declaration under penalty of perjury, it is true and accurate to the best of my ability, and it represents the testimony I would give if called upon to testify in a court of law.

January 17, 2023.

**/S/ Andrew Hirko**
**Andrew M. Hirko**

**DATA REQUIRED BY THE PRIVACY ACT OF 1974**
5 USC 301, Departmental Regulations; 10 USC 3013, Secretary of the Army.

To assist leaders in conducting and recording counseling data pertaining to subordinates. The DoD Blanket Routine Uses set forth at the beginning of the Army's compilation of systems or records notices also apply to this system.

Disclosure is voluntary.

**AUTHORITY:**

**PRINCIPAL PURPOSE: ROUTINE USES:**

**DISCLOSURE:**
Exhibit 1

**PART I - ADMINISTRATIVE DATA**

| Rank/Grade |
|---|
| CPT/0-3 |

# DEVELOPMENTAL COUNSELING FORM
For use of this form, see ATP 6-22.1; the proponent agency is TRADOC.

Name *(Last, First, MI)* Date of Counseling HIRKO, ANDREW M. 20221003

Organization Name and Title of Counselor
HHC, 1-502D, 101ST ABN DIV (AASLT) CPT ROBERT J. MCNAMARA, CDR **PART II - BACKGROUND**

**INFORMATION**

**Purpose of Counseling:** *(Leader states the reason for the counseling, e.g. Performance/Professional or Event-Oriented counseling, and includes the leader's facts and observations prior to the counseling.)*

EVENT ORIENTED- COVID vaccine refusal

**PART III - SUMMARY OF COUNSELING**
**Complete this section during or immediately subsequent to counseling.**

**Key Points of Discussion:**
You denied receiving the DOD mandated COVID Vaccine. You applied for a COVID Vaccine waiver. This counseling is to inform you that as of 28SEP2022 your COVID Vaccine waiver has been denied.

I, CPT McNamara, am giving you a legal and lawful order to receive the COVID Vaccine. Refusal of the vaccine is grounds for receiving a General Order of Reprimand and separation from service. SM initials to acknowledge _____.

Pursuant of this order, you have two options. SM initials to indicate which course of action you will pursue.
 - I will receive the COVID Vaccine on _____(date). SM initials _____.
 OR
 - I refuse to receive the COVID Vaccine. SM initials _____.

Separation Notification: If this conduct continues, action may be initiated to separate you from the service per AR 635-200. If you are involuntarily separated, you could receive an Honorable Discharge, a General (Under Honorable Conditions) Discharge, or Under Other Than Honorable Conditions Discharge. An Honorable Discharge is a separation with honor based on the quality of service, which meets the standards of acceptable conduct and performance of duty. A General Discharge is a separation under honorable conditions, based on a military record being satisfactory but not sufficiently meritorious to warrant an Honorable Discharge. A discharge Under Other Than Honorable Conditions is based on a pattern of behavior of one or more acts of omissions that constitutes a significant departure from the conduct expected of a soldier. An Honorable Discharge may be awarded under any provisions. A General Discharge may be awarded for separation under CH 5, CH 9, CH 13, and CH 14. An Under Other Than Honorable Conditions may be awarded for separation under CH 14 for misconduct. If you receive an Honorable Discharge, you will be qualified for most benefits resulting from military service. An involuntary Honorable Discharge, however, will disqualify you from reenlistment for some period of time and may disqualify you from receiving transitional benefits (e.g. housing, commissary, health benefits) and the Montgomery GI Bill if you have not met other program requirements. If you receive a General Discharge, you will be disqualified from reenlisting in the services for some period of time and you will be ineligible for some military and VA administered benefits, including the Montgomery GI Bill. If you receive a discharge Under Other Than Honorable Conditions, you will be ineligible for reenlistment and for most benefits, including payments of accrued leave, transitional benefits, the Montgomery GI Bill and possibly transportation of dependents and household goods to home. In addition you could face difficulty in obtaining civilian employment as employers have a low regard for General and Under Other Than Honorable conditions discharges. There are agencies which you may apply in attempt to change the characterization of your discharge. It is unlikely that such application would be successful. _____ (Soldier's Initials)

**OTHER INSTRUCTIONS**
This form will be destroyed upon: reassignment *(other than rehabilitative transfers)*, separation at ETS, or upon retirement. For separation requirements and notification of loss of benefits/consequences see local directives and AR 635-200.

**DA FORM 4856, JUL 2014** PREVIOUS EDITIONS ARE OBSOLETE

Page 1 of 2 APD LC v1.04ES

**Plan of Action** *(Outlines actions that the subordinate will do after the counseling session to reach the agreed upon goal(s). The actions must be specific enough to modify or maintain the subordinate's behavior and include a specified time line for implementation and assessment (Part IV below)*

PoA #1 - I chose to accept the vaccine. SM initials _____.
I will receive the first dosage of the COVID Vaccine NLT _____ (date). SM initials _____.

---

PoA #2 - I chose to refuse the order and I deny the vaccine. SM initials _____.

**Session Closing:** *(The leader summarizes the key points of the session and checks if the subordinate understands the plan of action. The subordinate agrees/disagrees and provides remarks if appropriate.)*

Individual counseled: I agree disagree with the information above.

Individual counseled remarks:

Signature of Individual Counseled: Date: **Leader Responsibilities:** *(Leader's responsibilities in implementing the plan of action.)*

Signature of Counselor: Date:

## PART IV - ASSESSMENT OF THE PLAN OF ACTION

**Assessment:** *(Did the plan of action achieve the desired results? This section is completed by both the leader and the individual counseled and provides useful information for follow-up counseling.)*

Individual Counseled: Date of

Assessment:

**Note: Both the counselor and the individual counseled should retain a record of the counseling.**

*DA FORM 4856, JUL 2014*
Page 2 of 2 APD LC v1.04ES

Counselor:

Exhibit 2

CA128

-----Original Message-----
From: Mcnamara, Robert J III CPT USARMY 101 ABN DIV 2 BCT (USA)
<robert.j.mcnamara48.mil@army.mil>
Sent: Monday, October 3, 2022 2:41 PM
To: Hirko, Andrew M CPT USARMY (USA) <andrew.m.hirko.mil@army.mil>
Subject: FW: [INFORM]: CH Hirko's Appeal (UNCLASSIFIED)


-----Original Message-----
From: Talley, Justin L MAJ USARMY 101 ABN DIV 2 BCT (USA) <justin.l.talley.mil@army.mil>
Sent: Sunday, October 2, 2022 6:10 AM
To: Williams, David G LTC USARMY 101 ABN DIV (USA) <david.g.williams3.mil@army.mil>; Crain,  Tommy C
(Chris) MAJ USARMY 101 ABN DIV 2 BCT (USA) <tommy.c.crain2.mil@army.mil>; Cline,  Justin S CPT
USARMY 101 ABN DIV 2 BCT (USA) <justin.s.cline2.mil@army.mil>; Michaud, Brian M  SGM USARMY 101
ABN DIV 2 BCT (USA) <brian.m.michaud2.mil@army.mil>; Dawson, Julianna O (Jo)  CPT USARMY 101 ABN
DIV 2 BCT (USA) <julianna.o.dawson.mil@army.mil>; Mcnamara, Robert J III  CPT USARMY 101 ABN DIV 2
BCT (USA) <robert.j.mcnamara48.mil@army.mil>  Subject: RE: [INFORM]: CH Hirko's Appeal
(UNCLASSIFIED)


CLASSIFICATION: UNCLASSIFIED

Sir,

Nothing has changed with matters going forward for COVAX refusals. Upon notification of his denial, CH
Hirko should be given the vaccine and given a reasonable amount of time to comply, 3 days.  After
that if he has not complied or have a legal justification for not complying, then he will be in violation  of a lawful
order and the supporting evidence should be provided to the legal team to process the  issuance of a
GOMOR. The GOMOR should be processed first, then the officer elimination pursued.  Nothing prevents
starting the separation prerequisites (mental and physical evaluation, SFL-TAP) getting  started now.


Respectfully,

MAJ (OF-3) Justin Talley

Brigade Judge Advocate

2 BCT, 101st ABD

Fort Campbell, KY

SVOIP: 6728061

G Cell: 1-931-472-5366
Current Location Mihail Kogalniceanu Air Base, Romania


From: Williams, David G LTC USARMY 101 ABN DIV (USA) <david.g.williams3.mil@army.mil>
Sent: Saturday, October 1, 2022 3:47 PM
To: Crain, Tommy C (Chris) MAJ USARMY 101 ABN DIV 2 BCT (USA) <tommy.c.crain2.mil@army.mil>;
Cline, Justin S CPT USARMY 101 ABN DIV 2 BCT (USA) <justin.s.cline2.mil@army.mil>; Talley, Justin L  MAJ
USARMY 101 ABN DIV 2 BCT (USA) <justin.l.talley.mil@army.mil>; Michaud, Brian M SGM  USARMY 101
ABN DIV 2 BCT (USA) <brian.m.michaud2.mil@army.mil>; Dawson, Julianna O (Jo) CPT
USARMY 101 ABN DIV 2 BCT (USA) <julianna.o.dawson.mil@army.mil>; Mcnamara, Robert J III CPT
USARMY 101 ABN DIV 2 BCT (USA) <robert.j.mcnamara48.mil@army.mil>
Subject: Re: [INFORM]: CH Hirko's Appeal (UNCLASSIFIED)


Thanks, Chaplain.

MAJ Talley, what's the Army saying about pending law suits for COVID WRT denied RAs?


CPT Cline/CPT McNamara: I need CH notified of the appeal denial NLT Monday 1700 CST and
counseled on paper for acknowledgement. Elimination action should begin immediately pending any
additional guidance from MAJ Talley, however it's an officer elimination so not a Chapter - those are

applicable to enlisted only.

CPT Dawson, what are you tracking for COVAX refusal elimination process for officers?

Please reply all within this group to flatten coms.


T6

WIN AT ALL THINGS LARGE AND SMALL - FIRST STRIKE!

DAVID G. WILLIAMS

LTC (OF-4), Commander

1st Battalion, 502d Infantry Regiment

2d Brigade Combat Team

101st Airborne Division (Air Assault)

Current Location: Cincu Training Area, Romania

Signal: (931) 542-7429


NIPR: david.g.williams3.mil@army.mil <mailto:david.g.williams3.mil@army.mil> SIPR:

david.g.williams3.mil@mail.smil.mil <mailto:david.g.williams3.mil@mail.smil.mil>


From: "Crain, Tommy C (Chris) MAJ USARMY 101 ABN DIV 2 BCT (USA)"
<tommy.c.crain2.mil@army.mil <mailto:tommy.c.crain2.mil@army.mil> >
Date: Saturday, October 1, 2022 at 09:46:46
To: "Williams, David G LTC USARMY 101 ABN DIV (USA)"
<david.g.williams3.mil@army.mil <mailto:david.g.williams3.mil@army.mil> >
Subject: [INFORM]: CH Hirko's Appeal (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED


Sir,


You may be tracking but I received word yesterday that CH Hirko's appeal was returned to his COC as denied. Not sure if he has been notified.


I know he is expecting the judge's decision in the next 2-4 weeks.


If I can be of any assistance, please let me know.


V/R,

Chaplain (MAJ) F. Chris Crain

Brigade Chaplain

2BCT, 101st Airborne Division (Air Assault)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

ISRAEL ALVARADO, et al.,                  :
                                         :
         *Plaintiffs,*             :
                                         :
                         v.                 :      Case No. 1:22-cv-0876- ATF- JFA
LLOYD AUSTIN, III, et al.,          :
                                       :
        *Defendants.*       :
                                       :

**<u>SUPPLEMENTAL DECLARATION OF CHAPLAIN (Captain) Jacob L. Lawrence</u>**

Pursuant to 28 U.S.C. §1746, I, Jacob L. Lawrence declare as follows:

1.    My name is Jacob L. Lawrence. I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

2.    I make this Supplemental Declaration to support my challenge to the Department of Defense and Department of Army mandates requiring that I be vaccinated against COVID-19. All statements made in this Declaration are true to the best of my own personal knowledge.

3.    This declaration specifically addresses negative personnel actions I have experienced after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate and refusal to take it.

4.    These retaliatory  actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.

Page 1 of  2

5.      I was passed over by the FY 2022 Chaplain Major Promotion board as a result of derogatory information appearing on my Officer Record Brief (ORB), specifically an L4 marker (indicating a pending RAR COVID action) which I was told by my supervisory chaplain is a "serious discriminator".

6.      I was and still am forbidden to engage in official travel which seriously impacts my ability to perform my mission as a battalion chaplain and in turn affects my evaluations. Impacted evaluations hinder my ability to be competitive.

7.      My reputation was negatively impacted in the eyes of my technical channel. My character in the eyes of the U.S. Army Chaplaincy has been tarnished for holding my religious convictions and submitting a RAR. That reputation is difficult if not impossible to repair.

        I make this declaration under penalty of perjury, it is true and accurate to the best of my ability, and it represents the testimony I would give if called upon to testify in a court of law.


January 18, 2023                          /S/ Jacob L. Lawrence
                                          **Jacob L. Lawrence**



|                              |       |                                |
|------------------------------|-------|--------------------------------|
| ISRAEL ALVARADO, et al.,     | :     |                                |
| *Plaintiffs,*                | :     |                                |
| v.                           | :     | Case No. 1:22-cv-0876- ATF-JFA |
| LLOYD AUSTIN, III, et al.,   | :     |                                |
| *Defendants.*                | :     |                                |

Pursuant to 28 U.S.C. §1746, I, Joshua M. Layfield declare as follows:

1.      My name is Joshua Layfield. I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

2.      I make this Supplemental Declaration to support my challenge to the Department of Defense and Department of USAF mandates requiring that I be vaccinated against COVID-19. All statements made in this Declaration are true to the best of my own personal knowledge.

3.      This declaration pecifically addresses negative personnel actions I have experienced after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate and refusal to take it.

4.      These retaliatory  actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.

5.      I was passed over by the FY 2022 Chaplain Major Promotion board as a result of not having a good year. FY 2023 I am still not permitted to perform AT IDT duties which will give me another bad year. I am told I can only telework and my     ing Chaplain will not permit me to

CA134

telework because I am a chaplain. This will be two years in a row that I cannot perform AT IDT

to complete a good year. This affects my pay, retirement points, and promotion to Major.


I make this declaration under penalty of perjury, it is true and accurate to the best of my

ability, and it represents the testimony I would give if called upon to testify in a court of law.

January 18, 2023

 S  Joshua M. Layfield
Joshua M. Layfield

CA135

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

ISRAEL ALVARADO, et al.,                                          :
                                                                 :
        *Plaintiffs,*                                            :
                                                                 :
                                        v.                       :       Case No. 1:22-cv-0876-
                        ATF-JFA
                                                                 :
LLOYD AUSTIN, III, et al.,                                       :
                                                                 :
        *Defendants.*                                            :
                                                                 :

### SUPPLEMENTAL DECLARATION OF CHAPLAIN (COL) JAMES BRADLEY LEE

Pursuant to 28 U.S.C. §1746, I, James Bradley Lee declare as follows:

1.      My name is James Bradley Lee. I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

2.      I make this Supplemental Declaration to support my challenge to the Department of Defense and Department of the Army mandates requiring that I be vaccinated against COVID-19.  All statements made in this Declaration are true to the best of my own personal knowledge.

3.      This declaration specifically addresses negative personnel actions I have experienced after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate and refusal to take it.

4.      These retaliatory actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.

5.      The Department of Defense has insisted that no irreparable harm has been done to any plaintiffs in our case.  I submit to the court however, that administrative actions have been taken

that have indeed caused irreparable damage to the careers of several plaintiffs.  In my case, I was

originally slotted to move to the 1st Theater Support Command (TSC) at Fort Knox, KY.

However, given my "unvaccinated" status, the command there did not want me on that basis

alone.  The U.S. Army Chief of Chaplains did nothing to advocate for me and by doing so on

that basis was religious discrimination, not to mention a detriment to my career progression. As a

young Chaplain Colonel, in age at least, I had the potential to serve in positions of greater

responsibility and influence over the next 10-plus years.  And if given the chance, could have

procured the necessary military education to be competitive for 1-star.  Instead, the 1st TSC was

filled with another individual, and I was sent from one Signal Command within NETCOM to a

sister organization in Maryland.  And even that move was based on a Compassionate

Reassignment and not a regular Permanent Change of Station (PCS).  The point being that had I

been allowed to PCS to 1st TSC as originally planned, I would be positioned for not only

continued service but for positions of greater responsibility making me competitive for 1-star and

allowing me to serve not only with longevity but with freedom in our Army and in the Chaplain

Corps.

6.      Related to the former point, the evaluations that I received declined in status only after

submitting my Religious Accommodation Request (RAR) and the ensuing discrimination that

unfolded.  My very first Officer Evaluation Report (OER) was noted as "Promote to 1-star," and

included commensurate positive remarks.  To be clear, this OER was well before the COVID-19

mandate and the ensuing administrative discrimination.  My second OER, however, and by the

same Commanding General I would add, was marked as "Retain as Colonel," and included

rating language that in terms of appearing before a board would be considered benign.  Again,

the only factor that changed was my submitting an RAR and holding my sworn position of

standing for religious liberty while in military service.  My OER's now reflect a downward

CA137

rating trend, which is not looked upon favorable by any board of consideration, promotion or otherwise.

7.       Upon my PCS from my previous unit, via Compassionate Reassignment, I was submitted by the Chief of Staff for an award, specifically, a Legion of Merit (LOM).  A PCS award, as it is referred to, is a common practice to honor the service of an individual during their tenure in a respective unit or organization.  The level of award is also typically determined by rank, time in the unit, degree of impact, etc.  In practice, the awarding of a LOM to an officer in the rank of Colonel who has served in a unit for more than two years is reasonable and I would submit a standard of practice.  However, upon receiving my award in the mail after I had already arrived at my new unit, I received not a LOM, but an Army Commendation Medal (ARCOM).  Not only was this a downgraded award, but it was downgraded two steps in precedence.  Again, as a common practice when awards are downgraded, they are typically downgraded to the next level of award.  In my case, downgrading one step would have been a Meritorious Service Medal (MSM).  For the record, of all the awards I have received in my nearly 25 years of service, I have never had an award downgraded, let alone two steps.  And to downgrade an award two steps to an individual at my rank, position, and level of service, is suspect regarding the reasons why, which were not included in the accompanying paperwork with the award.  Performance is typically a significant factor in the consideration for awards.  And I submit to the court that the only element in my performance that changed during my tenure in my previous unit was my submission for an RAR.  The policies and procedures enacted with the mandate have restricted and hindered my ability to fully execute my duties and responsibilities as a Chaplain.  In that sense, my performance has been negatively impacted.  The logical explanation for this action therefore, points to the punitive and retributive attempt to diminish my record.  As with the previous two points, awards are part of one's file that is presented to any board for promotion or

CA138

otherwise.  In my case, a LOM would reflect very positively in my file making me competitive for future promotion or assignment, which I now do not have.

8.      The Department of Defense holds that the rescinding of the mandate has negated any existing or further punitive action that is or was in progress.  Furthermore, they posit that no Chaplain in our case has been separated because of their RAR appeals being denied.  And while true that none of us have been separated, the basis of our reconsideration rests on the irreparable harm applied to all of us.  Even though the mandate has been rescinded, there are accompanying and very key annexes that are still being held in place.  Despite two Fragmentary Orders (FRAGOS) that have been published since the signing of the 2023 NDAA, neither of them has addressed removing derogatory data in individual records, nor have travel restrictions been rescinded.  For example, Annex IIIII, accompanied FRAGO 34, and addressed the various travel policies that applied to the "unvaccinated."  To that end, "unvaccinated" personnel are not allowed to PCS or go TDY without an Exception to Policy (ETP) from the Under Secretary of the Army.  Many commands, including my own, are "awaiting further guidance" on the matter while adhering to the policy of denying travel, PCS or TDY, to those who are "unvaccinated."  I submit to the court that allowing this policy to remain in place, and worse following it, is in violation of federal law.  Consider the irony, adhering to a policy that supports a mandated requirement that no longer exists.  There are many outdated laws in our great Republic that still exist "on the books," if you will, that are hardly enforced as they are no longer applicable or relevant.  But to enforce a law that no longer exists truly is lunacy.  By currently not allowing me to travel is to further degrade my ability to fully execute the duties of my office and is based on a requirement that no longer exists.  And by not being able to do so, I am at further risk of receiving sub-par OER's in the future thereby, once again, perpetuating irreparable harm to my career and future opportunities.

CA139

9.      One of the hallmarks of being an Army Chaplain is one's reputation.  To that end, one of

the unspoken realities of our Corps is that one's file, i.e. OER's, determines promotion.  At the

same time, it is one's reputation that precedes selection for assignments and other opportunities,

such as being invited to actually be part of a promotion board, for example.  Unfortunately, the

discriminating label of "unvaccinated" has now become part of my reputation in our Corps,

isolating me into a category that is "less than," if you will.  I have already illustrated an example

of this in Paragraph 5., as it related to my being disqualified for a broadening assignment.  I

submit to the court that the irreparable harm to me is that my reputation in the Chaplain Corps,

and the Army for that matter, is tarnished and even if "off the record," can and already has been

used to marginalize me in consideration for assignments.  And in the Army Chaplain Corps,

assignments are what are used to not only develop Chaplains, especially at the senior level, but

also position them for greater chances and consideration for promotion.  The irreparable harm

done to me already is not erased by rescinding a mandate, or even removing derogatory

information from my record.

10.     As a related matter, the issue of reputation extends well beyond my military service.

Most employers, agencies, executive boards, etc., include an interview in their hiring and/or

selection process.  In my own experience, I have encountered interviews that inquire about

conflicts that one has had in the workplace or with a previous employer.  Some even ask about

previous involvement in litigation and the nature of such.  The very fact that I have legally

challenged my employer puts me in a position of disadvantage as a potential employer or

organization will not look favorably on that fact thereby excluding me from opportunities even

beyond my military service.

11.     In conclusion, the Department of Defense has argued that our request for reconsideration

is invalid based on jurisdiction, ripeness, and exhaustive means, to name a few.  I submit to this

CA140

court, and to any in this great land, that our case rests on the Constitutionality of free exercise.

Underpinning our entire case is the reality that our religious rights and freedoms have been

brutally violated by the Department of Defense, and the Army.  While I certainly understand that

certain laws must be applied, the foundation of our claim rests on the very document that I, and

the others that stand alongside me, have sworn to protect and defend against all enemies, both

foreign and domestic.  I thereby and humbly urge the court to not only reconsider our case but to

consider the ramifications of not doing so.  The Constitutional foundations of our nation and the

freedoms that we enjoy hang in the balance of the outcome of this case and set a trajectory for

generations to come.

I make this declaration under penalty of perjury, it is true and accurate to the best of my

ability, and it represents the testimony I would give if called upon to testify in a court of law.


January 18, 2023

LEE.JAMES.BRA
DLEY.10850095
63

Digitally signed by
LEE.JAMES.BRADLEY.1085
009563
Date: 2023.01.18 11:15:31
-05'00'

JAMES B. LEE
Chaplain (COL)
U.S. Army

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| ISRAEL ALVARADO, et al., | : | |
| | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | Case No. 1:22-cv-0876- ATF-JFA |
| | : | |
| LLOYD AUSTIN, III, et al., | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

<u>**SUPPLEMENTAL DECLARATION OF CHAPLAIN (COLONEL) BRAD P. LEWIS**</u>

Pursuant to 28 U.S.C. §1746, I, Brad P. Lewis, declare as follows:

1.      My name is Brad Lewis. I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

2.      I make this Supplemental Declaration to support my challenge to the Department of Defense and Department of Army mandates requiring that I be vaccinated against COVID-19. All statements made in this Declaration are true to the best of my own personal knowledge.

3.      The assertions I make herein are based on 22 years as an officer and a chaplain and 5 years enlisted in the US Army. For 35 months I served in the Office of the Chief of Chaplains as the Branch Account Manager. This included 11 months as one of only two chaplains to ever be stationed at Ft. Knox to work alongside Human Resources Command.  During that time, my duties included working with the DA Secretariat to identify potential board members for promotion and school selection boards, track all chaplain authorizations across the entire Army, and develop criteria for identifying candidates for various centralized boards as well as conducting analysis of promotion boards for the Chief of Chaplains. During the conduct of those duties, it became very clear that promotion within the chaplain corps and selection for various schools is extremely competitive. This often results in the rest of the Army accusing the chaplain

CA142

branch of "eating their own". It also became clear that due to this competition boards pay attention to small details, such as reputation. Frankly, considering reputation is not allowed in an official sense, but with 3 of 5 board members generally being other chaplains, reputation cannot be completely overlooked by individual board members.  The result is, that despite official denials to the contrary, selection to schools and promotions often hinge on reputation. (more to on this below).

4.      Since initially requesting a religious accommodation to the COVID-19 vaccine mandate, I have been subjected to active and passive actions and threats for no other reason than I exercised my constitutional right to the free exercise of religion in keeping with existing policy and law such as the Religious Freedom restoration Act (RFRA), AR 600-20 Command Policy, and Section 533 of the 2014 National Defense Authorization Act. These retaliatory actions have degraded and continue to negatively affect the progression of my career and will undoubtedly prejudice me when competing for promotions, schools, broadening assignments, and other opportunities that define a successful career as a Chaplain in the US Army. This declaration will focus specifically on my exclusion from certain opportunities, the impact of being warehoused, the importance of reputation, and the resultant injuries I will deal with well beyond retirement.

5.      In the recent past, the Chaplain branch, under the guidance of the Chief of Chaplains, CH (MG) Tom Solhjem, began sending hand selected chaplains of various grades to the Army's assessment for command potential or CCAP/BCAP.  Attendance at this week-long assessment us used to determine if a given officer is of the caliber, talent level, and temperament required to assume various positions such as Division Chaplain, Corps Chaplain, and various 3- and 4-star commands.  Due to being flagged for "suspension of favorable personnel actions" since October 2022, I was not invited to attend this assessment, as many of my peers were (some more than once) despite being a recent graduate of the US Army War College.  As a result, I was not

CA143

considered for the kinds of assignments senior chaplains have traditionally been given following graduation from the War College.

6.      Under normal circumstances, upon graduation from the War College, senior chaplains are assigned to positions that reflect a belief by the chaplain corps that the demonstrated qualities that resulted in selection to that school in the first place are the very qualities that will be necessary to succeed at the 3- or 4-star command level. However, instead of being given such an assignment, I was told I could not move at all and would be held in place until the "process" had been allowed to work, after which I would be involuntarily separated from the service. This warehousing continues after 7 months.  Being thusly warehoused, I felt it prudent to attempt to actually "find work" and "bloom where I had been planted". To that end, shortly after graduation, I asked the War College Deputy Commandant, COL Kimo Gallahue, and the Chief of Staff, COL Lance Oskey, how I might remain engaged in ministry once the academic year was over.  At the recommendation of the Garrison Chaplain, CH (COL) Herb Franklin, I suggested that I could serve as a temporary chaplain to the student body, an acknowledged hole in the religious support program at Carlisle Barracks. This seemed reasonable given the source of the recommendation and my need of meaningful work.  However, I was told that was not an option and was instead asked to fill a temporary vacancy in a program aimed at providing academic opportunities to the spouses of AWC Students. I asked, "Does this position have a religious element or am I just filling a hole." The response was simple, "You're just filling a hole". So instead of being held here and provided with some modicum of purpose, I was asked to be a stop gap in a position that had nothing to do with being a chaplain.

7.      The exclusion from professional development and the warehousing have led to an even greater harm.  There is a maxim in the Chaplain Corps when it comes to assignments.  It is said that, "promotions are a result of paper while assignments are result of reputation." Over the

CA144

course of the last 18 months, as I stood on Army policy and legal precedent, my reputation has been dragged through the mud. I have had multiple chaplain peers go out of their way to let me know that they find no religious element in the vaccine mandate and can't imagine why I would take the stand I have. This is an affront to my personal faith and belies ongoing conversations about me when I am not around. This damage to my reputation has already begun to impact potential assignments. With the 2023 NDAA requirement to repeal the COVID vaccine mandate and the subsequent guidance from the Secretary of Defense to comply, I have been in regular communication with the personnel section in the Office of the Chief of Chaplains to discuss assignment possibilities. In a conversation during the last week of January, the Chief of Personnel, CH (COL) Chris Archer, told me that they (ostensibly OCCH) understand my anger at the situation I find myself in but that they are concerned that my anger will prevent me from properly executing whatever duties I am assigned. This is not only a professional slap in the face, it is a personal attack on my integrity and reputation. The assertion that simply removing negative flags and paperwork from the files of those who chose to refuse the COVID EUA gene therapy is simply absurd. Such an assertion fails to recognize the value of career opportunities that are not being afforded to those same individuals. Nor does it acknowledge the high value placed on the reputation of the soldier and how that reputation impacts one's career progression. Reputation is, in a word, everything.

8.      The negative effects of the Department of Defense's actions toward me will be lasting even if the paperwork in my file is corrected. The assault on my reputation and career progression will have long term effects, not the least of which will most certainly be when the time comes to seek employment after military service. As a member of the clergy, reputation is important but integrity is paramount. When interviewing for future employment there is sure to be, as there always is, questions about prior disciplinary or negative action in the conduct of my

CA145

duties. Integrity will compel me to share with prospective employers the events that led to

negative information in my files. The format of any such question may vary but a potential

employer or "search committee" looking for a pastor, minister, or church/religious organization

leader will want to be sure that I, as a candidate, do not have a history of disciplinary issues or

problems with authority. The fact the paperwork may have been removed from my military file

doesn't change the fact that it was in there once and as a member of the clergy, I must either

deny I ever faced this problem (based on the fact the mandate was illegal and pulled from his

record) or answer "yes" and then spend the ensuing hours chasing rabbits and explaining why.

That will automatically raise a flag and require me, the "applicant", to have to again explain

about the mandate, the lawsuit, the law, the policy, the process, etc., etc. That historical fact

becomes a burden and a serious distraction unless the bad thing becomes a good thing and an

example of integrity and commitment to obey conscience as formed by faith.

9.      Finally, probably the greatest impact to me personally of the DOD's refusal to recognize

my faith is the moral injury suffered as a result.  The Moral Injury Project (Syracuse University)

defines moral injury as "the lasting emotional, psychological, social, behavioral, and spiritual

impacts of actions that violate a service member's core moral values and behavioral expectations

of self or others."[1] The Lancet says that moral injury "can cause profound feelings of shame and

guilt, and alterations in cognitions and beliefs (e.g., "I am a failure", "colleagues don't care about

me"), as well as maladaptive coping responses (e.g., substance misuse, social withdrawal, or

self-destructive acts)."[2] Moral injury often results from a betrayal of trust, especially the trust of

leadership, and results in an inability or unwillingness to trust others.  It can manifest in anger,

isolation, or an inability to engage others.  For a chaplain, or any member of the clergy charged

---

[1] https://moralinjuryproject.syr.edu/about-moral-injury/
[2] https://www.thelancet.com/journals/lanpsy/article/PIIS2215-0366(21)00113-9/fulltext

CA146

with providing spiritual care for others in distress, nothing could be more destructive to that calling than not being able to engage others.  The anger and isolation are palpable in both my personal and professional life.  When I first decided to request a religious accommodation, I reasoned a senior chaplain requesting an RAR should not be a problem.  I naively believed the Department of Defense, the Department of the Army, and the US Army Chaplain Corps took religion seriously and understood the benefit it brings to the warfighter, in both war and peace. On the contrary, the feelings of betrayal I've experienced due to the DOD's opinion that my faith and my conscience do not merit consideration, or the Chaplain Corps seeming to sit safely and silently on the sidelines while I struggled in the Valley of Elah, alone. These feelings have impacted by relationship not only with chaplains I once called "friend", but with my wife and kids as they have had to deal with my emotional absence and anger. 13 deployments and 47 months in an active war zone during the last 20 years had less negative impact on me than my leadership at all levels doing what they should not do or not doing what they should.

I make this declaration under penalty of perjury, it is true and accurate to the best of my ability, and it represents the testimony I would give if called upon to testify in a court of law.

January 17, 2023

LEWIS.BRAD.PRES
TON.1172431913

Digitally signed by
LEWIS.BRAD.PRESTON.11724319
13
Date: 2023.01.18 12:58:13 -05'00'

Brad Preston Lewis

CA147

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| ISRAEL ALVARADO, et al., | : | |
| | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | Case No. 1:22-cv-0876- ATF-JFA |
| | : | |
| LLOYD AUSTIN, III, et al., | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

**<u>SUPPLEMENTAL DECLARATION OF CHAPLAIN (CAPT) ROBERT NELSON</u>**

Pursuant to 28 U.S.C. §1746, I, ROBERT NELSON declare as follows:

1.      My name is ROBERT NELSON. I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

2.      I make this Supplemental Declaration to support my challenge to the Department of Defense and Department of the Air Force mandates requiring that I be vaccinated against COVID-19.  All statements made in this Declaration are true to the best of my own personal knowledge.

3.      This declaration specifically addresses negative personnel actions I have experienced after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate and refusal to take it.

4.      These retaliatory actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.

5.      I serve at an assignment with 11 geographically separated units.  The inability to travel on TDY to support these squadrons and detachments has hurt my career and the military.   Since I

CA148

could not offer the support to my Airmen in person, I needed to get assistance from other

chaplains in the Air Force and the Army.  Some of these Air Force chaplains tarnished my

character with my leadership and made efforts to have me moved to another location.  Since I

was unable to support these units, I could not give the care they deserved in resiliency training

and religious support.   This limitation to travel will unfortunately be reflected in my OPR since

it will not show the care I could and should be providing if I were able to travel.  My weakened

OPRs could affect future assignments and considerations for schools and my board for Major.

6.       My leadership has withheld the opportunity to submit packages for the religious support

team awards in the Air Force Chaplain Corps.   Awards are distinguishing factors in comparing

chaplain peers for a variety of assignments and for promotion.   Since I am unable to do the full

scope of my assignment in traveling and visiting my other units, it also limits my opportunity to

compete in quarterly awards.   This makes me uncompetitive in the competitive Air Force

promotion environment.

7.       I make this declaration under penalty of perjury, it is true and accurate to the best of my

ability, and it represents the testimony I would give if called upon to testify in a court of law.


January 18, 2023                                    **/S/ Robert J. Nelson**
                                                    **Robert Jon Nelson**

CA149

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

ISRAEL ALVARADO, et al.,                                          :
                                                                  :
                        *ai ti s*                                 :
                                                                  :
                                        v.              :         Case No. 1:22-cv-0876-
                        ATF-JFA                                   
                                                                  :
LLOYD AUSTIN, III, et al.,                               :
                                                                  :
                        *e e da ts.*                            :
                                                                  :

<u>**SUPPLEMENTAL DECLARATION OF CHAPLAIN (MAJ) RICK HYOK PAK**</u>

      Pursuant to 28 U.S.C. §1746, I, Rick H. Pak, declare as follows:

1.     My name is Rick H. Pak. I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

 2.    I make this Supplemental Declaration to support my challenge to the Department of Defense and Department of the United States Army's mandates requiring that I be vaccinated against COVID-19.  All statements made in this Declaration are true to the best of my own personal knowledge.

3.    This declaration specifically addresses negative personnel actions I have experienced after the submission of the *arado* Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate and refusal to take it.

4.    These retaliatory  actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.

5.      I was/am forbidden from deploying thus resulting in a PCS to a Garrison assignment.

Serving two back-to-back Garrison assignments makes me uncompetitive in the competitive

Army promotion environment. Assignment as a Brigade Chaplain in an operational unit is

essential to being competitive for promotion. My non-deployable status excludes me from such

assignments.

I make this declaration under penalty of perjury, it is true and accurate to the best of my

ability, and it represents the testimony I would give if called upon to testify in a court of law.

January 17, 2023                          /S/ Rick Hyok Pak
                                          Rick Hyok Pak



ISRAEL ALVARADO, et al.,                    :
                                            :
   *Plaintiffs,*             :
                                            :
     v.            :  Case No. 1:22-cv-0876- ATF-JFA
                                            :
LLOYD AUSTIN, III, et al.,                  :
                                            :
   *Defendants.*             :
                                            :

Pursuant to 28 U.S.C. §1746, I, Randy Pogue declare as follows:

1. My name is Randy Pogue. I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

2. I make this Supplemental Declaration to support my challenge to the Department of Defense and Department of the Army mandates requiring that I be vaccinated against COVID-19. All statements made in this Declaration are true to the best of my own personal knowledge.

3. This declaration specifically addresses negative personnel actions I have experienced after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate and refusal to take it.

4. These retaliatory actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.

5. Although my experience with the mandate in the Army Reserve has been less impactful than those serving on the active-duty side, I have, nonetheless, experienced some amount of intimidation due to my refusal to take the COVID-19 vaccine. One commander publicly

CA152

instructed us to  keep our opinions to ourselves  regarding the vaccine mandate.  Others

questioned whether I was allowed to travel to events such as Battle Focus Training.  In most

cases I was ultimately allowed to go but would be required to have documentation of a recent

 negative  COVID-19 test before allowed access.  Although it was never officially distributed, it

was discussed that Lodging in    ind (LI   ) would be limited to the vaccinated during future BA

weekends.

I make this declaration under penalty of perjury, it is true and accurate to the best of my

ability, and it represents the testimony I would give if called upon to testify in a court of law.

January 18, 2023                          S  Randy Pogue
                                         Randy    . Pogue



ISRAEL ALVARADO, et al.,                  :
                                          :
    *Plaintiffs,*                          :
                                          :
            v.                         :     Case No. 1:22-cv-0876- ATF-JFA
                                          :
LLOYD AUSTIN, III, et al.,                :
                                          :
    *Defendants.*                         :
                                          :

Pursuant to 28 U.S.C. §1746, I, Parker J. Schnet  declare as follows:

1.      My name is Parker J. Schnet . I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

2.       I make this Supplemental Declaration to support my challenge to the Department of Defense and Department of the Army mandates requiring that I be vaccinated against COVID-19.  All statements made in this Declaration are true to the best of my own personal knowledge.

3.       This declaration specifically addresses negative personnel actions I have experienced after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate and refusal to take it.

4.      These retaliatory actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.

5.      I have been unable to perform my duties as a battalion chaplain. I have been restricted from providing religious support to forward deployed units. My command has made it clear that those who put in Religious Accommodation requests are not team players or good leaders. My

last two OER ratings have reflected this opinion. I am not in a favorable position to make promotion to Major.

6.      I was also forbidden to PCS and change assignments resulting in my missing schooling necessary for promotion to the next grade. I am now behind on my career development and path.

I make this declaration under penalty of perjury, it is true and accurate to the best of my ability, and it represents the testimony I would give if called upon to testify in a court of law.

January 18, 2023                          S  Parker J. Schnet
                                          Parker John Schnet

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

ISRAEL ALVARADO, et al.,                 :
                                          :
        *Plaintiffs,*                     :
                                          :
            v.                            :        Case No. 1:22-cv-0876- ATF-JFA
                                          :
LLOYD AUSTIN, III, et al.,                :
                                          :
        *Defendants.*                     :
                                          :

**SUPPLEMENTAL DECLARATION OF**
**CHAPLAIN MAJOR DARREL LANCE SCHRADER**

Pursuant to 28 U.S.C. §1746, I, Darrel Lance Schrader declare as follows:

1.      My name is Darrel Lance Schrader. I am over 18 years of age and have personal

knowledge of and am competent to testify on the matters stated herein.

2.      I make this Supplemental Declaration to support my challenge to the Department of

Defense and Department of Air Force mandates requiring that I be vaccinated against COVID-

19.  All statements made in this Declaration are true to the best of my own personal knowledge.

3.      This declaration specifically addresses negative personnel actions I have experienced

after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a

result of my submitting a religious accommodation request (RAR) to be excused from the now-

illegal COVID Mandate and my refusal to take it.

4.      These retaliatory actions and incidents degraded and continue to affect my future career

in a negative manner and have and will prejudice me when competing for promotions, schools,

important assignments, and other opportunities associated with having a successful career.

5.      As of this writing it has been 601 days (May 26, 2021) since my Chaplain, Colonel

supervisor first created a hostile work environment by calling attention to my vaccine status in

CA156

front of the entire staff on my first day in the office. My supervisor subsequently advised me to lay aside my religious convictions or resign my commission even before I had exhausted the religious accommodation process available to me. It has been 410 (Dec 3, 2021) days since I was notified by my commander that the AF S    had denied the appeal of my religious accommodation request denial. My wife and I have lived under the emotional strain of this hostile work environment where my religious convictions are deemed incompatible with government service. I have been repeatedly treated and counseled as non-compliant and a refuser and in violation of orders. I have been denied constitutional, RFRA and Chaplain Specific 2013 NDAA section 533 religious freedom and protections for at least 410 days.

6.      As of this writing it has been 25 days since the President signed the NDAA, and eight days since the Secretary of Defense issued the rescission of the mandate memo. My situation has yet to be adjusted. No actions have been taken to restore me to full duty or to correct my records.

7.      I was wrongly removed from consideration for in-residence selection for Professional Military Education, Air Command and Staff College. On February 4, 2022,    en    ecker (then Lt    en    ecker), my senior rater, declined to recommend me for consideration to the Calendar Year (CY)22 Chaplain School Development Team Board for the required Intermediate Development Education (IDE), ACSC in-residence. This CY22 board was my third and final consideration for in-residence selection. In my first and second considerations, I received recommendations for IDE in-residence from my commander. During my second consideration, I was selected as an alternate for the 2022 23 school year as recogni ed by my senior rater, who now has not recommended me for consideration. In the year between my second consideration (when I was selected as an alternate) and my third consideration (not recommended), I finished a deployment as a    ing Chaplain in an 0-5 billet (one rank above my current rank), was recogni ed by the Air Force Central Command (AFCENT) Chaplain for leading the best team for our rotation, was

CA157

awarded two MSMs, named F  O of the year for the    ing Staff Agencies at my permanent duty station, and was selected for a vectored position as a Staff Chaplain at the Air Force Chaplain Corps College. It is unquestionable that my performance record during this period should have only strengthened my competitiveness prior to my third consideration.   owever, my senior rater chose not to recommend me.   is letter to the RAR decision authority provides evidence that this non-recommendation is because of my religious beliefs outlined in my RAR and not due to my professional performance. The impact on my career, which will not be corrected with the removal of the negative administrative actions from my record, can hardly be overstated. In the Chaplain Corps to be selected to in-residence PME is a well-known distinguishing event that affirms one s position near the top of their year group and the year groups directly before and after. It verifies that my performance record, compared with my peers, placed me near the top of my profession at that point in my career. Some say it is harder to make the IDE list than it is to be promoted. This past year, 25 Chaplain Corps Captains were selected for promotion to Major from just one year group. The competition for IDE in-residence is for four select and three alternate selects from three different year groups. The only significant negative change in my situation is that I have requested and been denied a religious accommodation.

8.     I will have three non-competitive Offer Performance Reviews (OPR) dated 31 Jan 2021, 30 Nov 2022, 31 May 2023.  Even if the referral OPR dated 31 Jan 2021 is replaced it will be a weak performance OPR, not because of my performance, but because of my religious accommodation request and the mandate, and being sidelined from work that would have made me competitive amongst my peers.

9.     I had my faculty responsibilities wrongly limited due to my vaccination status from June-December 2021 and removed completely on 15 Dec 2021 per Col Terri Jones, Eaker Center Commander (Col Terri Jones Declaration, Document 65-45 Filed 08 29 22, para 23, page 12).

CA158

This has not been the case for all members of Air University, I have been punished with administrative paperwork, and sidelined from my faculty responsibilities while other members of Air University working on faculties on the same campus have not been issued administrative paperwork and were never sidelined from their faculty responsibilities. This injustice will not be corrected by removing the negative administrative actions.

11.     During these 600-plus days of being discriminated against for my religious convictions and as a result of being prevented from participating in my primary faculty responsibilities I was not competitive for any unit or higher level awards. Awards are consistently considered distinguishing factors in an officer s career. I have a consistent track record of being awarded for my contribution to the mission over my previous 15 years of military service. I was awarded three wing-level awards to include Junior Officer of the year in 2010,     ing Staff Agency Company   rade Officer of the year in 2014,    ing Staff Agency Field   rade Officer of the Year in 2020, and one Major Command award, the Air Education and Training Command Company   rade Officer Chaplain of the year in 2019. For the rest of my career when my records are reviewed for promotion or assignments there will be a noticeable recognition gap that will not be corrected with the removal of the adverse actions from my record.

12.     I am in danger of being passed over for promotion during the 2023 Lt Col Chaplain promotion board. If my records are not completed on time, I will meet the board with a referral OPR, LOR, and UIF in my record which will certainly cause me to be passed over. If the negative paperwork is removed from my record before the board, I will still be meeting the board with three OPRs that are not competitive with my peers due to my religious beliefs. I will have gone from the top of my career field before the mandate, within the year groups being considered for promotion in the summer of 2023, to the bottom    not because of my job performance or potential to serve at a higher rank, but, but because of my religious beliefs that led to requesting a

CA159

religious accommodation. This also will not be corrected by removing the negative administrative actions.

11.     These non-competitive OPRs will have a lasting impact on my career and financial situation. In the Air Force, pinning on of the next rank is determined by racking and stacking of the newly elected officer promotees.     ith these weak, non-competitive OPRs in my record I will no longer be competitive to be near the top of this list which means I will not promote to the next rank as soon as I would have without the harm done by the illegal mandate. This not only has a monetary impact but will have an additional impact on my future promotion boards where I will have less time in grade than my peers because of the harm done by the illegal mandate.

12.     I was denied an exception to policy to travel unvaccinated in June 2022 to my annual endorser conference and chaplain training event. This is a loss of training and professional development that cannot be undone. Not all Air Force unvaccinated Air Force Chaplains were denied an exception to policy to travel to their annual conference.

13.     I make this declaration under penalty of perjury, it is true and accurate to the best of my ability, and it represents the testimony I would give if called upon to testify in a court of law.

January 18, 2023                         S  D. Lance Schrader
                                         **Darrel L. S    rader**

CA160



| ISRAEL ALVARADO, et al., | : | |
| | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | Case No. 1:22-cv-0876- ATF-JFA |
| | : | |
| LLOYD AUSTIN, III, et al., | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

Pursuant to 28 U.S.C. §1746, I,  your name  declare as follows:

1.     My name is Jonathan Shour. I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

 2.      I make this Supplemental Declaration to support my challenge to the Department of Defense and Department of Navy mandates requiring that I be vaccinated against COVID-19. All statements made in this Declaration are true to the best of my own personal knowledge.

3.      This declaration specifically addresses negative personnel actions and other abusive actions that I have experienced after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate and refusal to take it.

4.     These retaliatory actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.

<u>Emotional Abuse Caused by the Discriminatory PCS Policies</u>

6.      On 17 November 2021, the evening before my training course graduation, I was instructed to stay late after class by the Naval Chaplaincy School (NCS) staff and told that I

would be held over at NCS pending the results of my request for exemption from the COVID-19
vaccine. I asked for, but was not given any written guidance to this at the time and have not
received it since. I was held over without official notification from the assignments officer in
violation of Navy regulations. My leadership refused to share communication and documentation
regarding my hold over so that I could file for reimbursement of lodging and per diem expenses.
Due to the lack of documentation received, I still am having difficulties receiving proper back
payment for my travel expenses  I estimate that the Navy still owes me over  30,000 from this
time period.

7.      Because of my exemption request, I was held over by the Naval Chaplaincy School
(NCS) and not allowed to execute the remainder of our Permanent Change of Station (PCS).

  hile held over, my family of five   myself, my wife pregnant at the time, three children ages 7,
5, and 2   and our dog   had to live in a hotel for months with no end in sight.    e were forced to
pay out of pocket for travel expenses and not allowed to proceed on to our next duty station. My
wife was forced to home school our children as they were unable to attend local schools. My
wife was due with our fourth child and we anticipated having the child while there, bringing the
baby  home  to a hotel room. My wife struggled to keep some semblance of a schedule and
regular life while confined to a single hotel room with limited resources.    e spent Thanksgiving,
Christmas, and New Years, as well as most of our family birthdays there in the hotel.   e were
unable to obtain suitable housing there while temporarily assigned, as my status did not allow us
Basic Allowance for  ousing for the area or access to military housing. Additionally, our
household goods were already in storage at our next duty station and we were not allowed to
transfer our household goods to NCS for access to any of our household goods (clothing, baby
items, etc).   e had to spend over  2,500 dollars to purchase replacement household necessities
for our family because we were not able to get to our household goods in storage.

CA162

8.    The Navy s heavy-handed vaccine mandate, and the Navy s treatment of my family made them effectively homeless for over seven months doing immeasurable harm to my wife and children s emotional wellbeing and mental health. My children still ask about whether we will be living in our house or going back to the hotel. On a short family trip, my three-year old child had a meltdown because he was afraid to stay in a hotel for a night because he did not want to lose our house again and have to live in a hotel. The DoD s callus attempt to coerce compliance to the mandate has cause continued emotional damage to my wife and children.

<u>Career  arm Caused by Discriminatory Reassignment and Mandate</u>

9.    The mandate has caused irreparable harm to my career in multiple ways. Initially, on 5 November 2021, I was reassigned due to my verbally expressed intent to request medical and or religious accommodation from the mandate. I was originally slated to be assigned to the School of Infantry  East at Camp Lejeune, NC  I was reassigned to a lesser unit at the Camp Lejeune installation chaplain offices. I was originally assigned to SOI-E because of my prior experience because it was a higher priority assignment. The sole reason for my reassignment to a lesser position was my expressed desire to file for an exemption from the mandate. The assignment that I received was a lesser assignment and an abusive action taken in response to my desire to request exemption. It has been confirmed by many that the  installation  positions are the lowest priority  most notably, in a town hall style meeting, the current Navy Chief of Chaplains himself listed the assignment priorities and confirmed that the  installation  position to which I was reassigned is a worse position that my original assignment. Due to my desire to assert my religious beliefs and request accommodation based on my religious beliefs, I was discriminatorily reassigned to a lesser assignment as punishment for daring to defy the mandate.

10.    In initial conversations with the Camp Lejeune installation chaplain office s leadership in early November of 2021, it was discussed that I could take on a more senior division officer

CA163

position within the chapel upon my arrival. After my command was notified of my request for exemption from the mandate, upon arrival at Camp Lejeune I was given a significantly lesser position. I was not assigned any primary duties. I was given only  short-term  tasks. My personal decisions that had no bearing on my work performance were openly mocked or questioned by other staff members. My private medical exemption status was openly discussed and I was questioned by staff members who had no right or reason to know. I waited five months before being tasked to take care of a battalion. Due to the lack of assigned duties, my annual Fitness Report had less that could be included and the decision to discriminatorily refuse to assign me regular duties has brought harm to my career.

11.      Additionally, I have recently been passed over for a better assignment opportunity. I am currently assigned to Camp Lejeune s installation chaplain offices. An opportunity came up in an operational unit here at Camp Lejeune (a better assignment) and due to the prior career harms mentioned above and my stance against the mandate, the next operational assignment is instead going to a less experienced peer that is also assigned here at Camp Lejeune s installation chaplain offices. This other LT (O3) chaplain is one that I went through chaplain school with in 2021  due to my prior service, I have more experience than him and would likely be a better candidate for the assignment.     e were both scheduled to be assigned here in Nov 2021  due to the mandate, I was administratively held over at my training course for over four months and not allowed to PCS to Camp Lejeune. Due to the mandate, I have been rated lower on annual Fitness Reports than this peer. Now, this less-experienced peer is slated to receive a better operational assignment in Feb 2023. I am currently in a non-operational assignment and if not for the mandate, would likely be able to move on to the next assignment over him. My normal career progression was set back from the mandate and is now continuing to be held up and harmed by

CA164

it. These administrative issues have set back my career in immeasurable ways and the harm that

has been done will continue to negatively affect me for the remainder of my career.

12.     It would not be acceptable for someone to be held over in a hotel, given lower

performance ratings, or receive a lesser assignment due to the color of their skin or their religious

beliefs  the military should not be allowed to continue making these discriminatory and abusive

decisions because of someone s religious accommodation request from the mandate.


        I make this declaration under penalty of perjury, it is true and accurate to the best of my

ability, and it represents the testimony I would give if called upon to testify in a court of law.


January 18, 2023                           S  J C Shour
                                          Jonathan Shour

CA165



ISRAEL ALVARADO, et al.,            :
                                    :
              *Plaintiffs,*         :
                                    :
        v.                          :      Case No. 1:22-cv-0876- ATF-JFA
                                    :
LLOYD AUSTIN, III, et al.,          :
                                    :
              *Defendants.*         :
                                    :

**PP   M     D              P      P     D    D .**

Pursuant to 28 U.S.C. §1746, I, David   . Troyer declare as follows:

1.      My name is David   . Troyer. I am over 18 years of age and have personal knowledge of

and am competent to testify on the matters stated herein.

2.       I make this Supplemental Declaration to support my challenge to the Department of

Defense and Department of the Army mandates requiring that I be vaccinated against COVID-

19.  All statements made in this Declaration are true to the best of my own personal knowledge.

3.       This declaration specifically addresses negative personnel actions I have experienced

after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a

result of my submitting a religious accommodation request (RAR) to be excused from the now

illegal COVID Mandate and refusal to take it.

4.      These retaliatory  actions and incidents degraded and continue to affect my future career

in a negative manner and have and will prejudice me when competing for promotions, schools,

important assignments, and other opportunities associated with having a successful career.

5.      I was prevented from attending my the annual training provided by my DoD

Ecclesiastical Endorsing Agency, which is required in order to remain a Chaplain. I was also

prevented from attending the Chief of Chaplain s mandatory ORSLT (Operational Support

CA166

USCA4 Appeal: 23-1419      Doc: 14      Filed: 05/26/2023      Pg: 194 of 266

Religious Leadership Training), which provided guidance for all Chaplains on the way forward for the Chaplain Corps.

I make this declaration under penalty of perjury, it is true and accurate to the best of my ability, and it represents the testimony I would give if called upon to testify in a court of law.

January 17, 2023                          S  David    . Troyer

CA167

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

ISRAEL ALVARADO, et al.,                                    :
                                                            :
              *Plaintiffs,*                                 :
                                                            :
                              v.                            :        Case No. 1:22-cv-0876-
              ATF-JFA                                       :
                                                            :
LLOYD AUSTIN, III, et al.,                                  :
                                                            :
              *Defendants.*                                 :
                                                            :

**SUPPLEMENTAL DECLARATION OF CHAPLAIN CAPT JUSTIN R. WINE**

Pursuant to 28 U.S.C. §1746, I, JUSTIN RONALD WINE declare as follows:

1.      My name is JUSTIN RONALD WINE. I am over 18 years of age and have personal

knowledge of and am competent to testify on the matters stated herein.

2.       I make this Supplemental Declaration to support my challenge to the Department of

Defense and Department of the Air Force mandates requiring that I be vaccinated against

COVID-19.  All statements made in this Declaration are true to the best of my own personal

knowledge.

3.       This declaration specifically addresses negative personnel actions I have experienced

after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a

result of my submitting a religious accommodation request (RAR) to be excused from the now

illegal COVID Mandate and refusal to take it.

4.      These retaliatory  actions and incidents degraded and continue to affect my future career

in a negative manner and have and will prejudice me when competing for promotions, schools,

important assignments, and other opportunities associated with having a successful career.

Page  of  4

CA168

5.      Since submitting my religious accommodation request I have not been allowed to travel in order to complete my required duty. This denial of travel has had and will have negative implications for my career that cannot be overstated. I have been denied the opportunity to perform my required duty in such a way as to make me competitive with my peers for future assignments and promotions. In fact, I have been counseled by my Wing Chaplain that my inability to travel will likely result in a lower rating on my next OPR because I was denied access to the same service opportunities of my peers. This is despite the fact that I completed my tours of duty, including all of the tasks that were assigned to me, with integrity, selflessness, and excellence. The accolades that I received for my work, despite not being physically present, are recorded in emails and text messages between my Wing Chaplain, my active duty supervisor, and myself. Despite completion and excellence of the work that was assigned to me I have still been told to prepare for a less than deserved rating on my OPR.

6.      I have also lost out on the opportunity to participate in a number of opportunities to complete tours of duty that have been posted by the Air Force Reserve Command. At my last count I have missed out on at least thirty of these opportunities since the mandate was enforced. These tours would have been enough to keep me employed full-time on orders from the time of the mandate until now. This denial of opportunity has caused me incalculable losses in regard to OPR ratings, retirement points, pay, benefits, developmental opportunities, and more. In addition, I have been denied the opportunity to apply for at least one AGR position that the Air Force Reserve Command could not fill and had to post at least twice. The denial of the opportunity to apply for this position likely cost me an active duty retirement in the long run had I chosen to pursue it.

7.      Further, this experience has caused me significant moral injury in that I have been witness to the complete abandonment, even attack, of the rule of law and the Air Force core values by the

Page  of  4

CA169

Department of Defense and Air Force leadership. Further, this conduct has been allowed to take place with apparent immunity. Moral injury has been defined, in part, as the outcome of someone being "witness [to] or fail[ing] to prevent an act that disobeys their own moral values or personal principles".[1] I have witnessed my moral values and personal principles, values and principles that I have been and continue to be willing to lay down my life for,  be trampled upon by the Department of Defense and the Department of the Air Force. Sadly, these are the very institutions that helped engrain those values and principles in me. Moral injury is accompanied by a number of negative and harmful repercussions for one's life and career. Some of those repercussions include persistent negative emotions, reliving of events/conversations/actions/etc., avoidance, trust issues.[2] I have personally experienced all of these symptoms since the enactment of the DoD COVID-19 "vaccination" mandate. I believe that it is also important to note that the symptoms of moral injury mimic those of post traumatic stress disorder which "may occur in people who have experienced or witnessed a traumatic event, series of events or set of circumstances"[3]. Further, "[a]n individual may experience this as emotionally or physically harmful or life-threatening and may affect mental, physical, social, and/or spiritual well-being."[4] I submit that the actions and attitudes directed toward me since the enactment of the mandate certainly meet the criteria noted above. The safety and well-being of myself, my family, my livelihood, my country, and my constitutionally protected rights have all been attacked and compromised in this situation. Everything that I hold dear has been threatened and I have to live with that reality each day.

---

[1] https://www.dav.org/get-help-now/veteran-topics-resources/moral-injury/
[2] Ibid.
[3] https://www.psychiatry.org/patients-families/ptsd/what-is-ptsd
[4] Ibid.

CA170

I make this declaration under penalty of perjury, it is true and accurate to the best of my ability,

and it represents the testimony I would give if called upon to testify in a court of law.

January 18, 2023                         **/S/D. Justin Ronald Wine**
                                         **Justin Ronald Wine**



ISRAEL ALVARADO, et al.,      :
                                       :
       *Plaintiffs,*         :
                                       :
         v.              :     Case No. 1:22-cv-0876- ATF-JFA
                                       :
LLOYD AUSTIN, III, et al.,       :
                                       :
       *Defendants.*       :
                                       :

**PP     M     D                               P     (MAJ)**
## JERRY B. YOUNG

Pursuant to 28 U.S.C. §1746, I, Jerry B. Young declare as follows:

1.     My name is Jerry B. Young. I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

2.     I make this Supplemental Declaration to support my challenge to the Department of Defense and Department of Army mandates requiring that I be vaccinated against COVID-19. All statements made in this Declaration are true to the best of my own personal knowledge.

3.     This declaration specifically addresses negative personnel actions I have experienced after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate and refusal to take it.

4.     These retaliatory actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.

5.     I have experience the following additional adverse actions:

CA172

a. My last evaluation was by far the lowest senior rater potential write up which I have received in nearly 15 years of active duty service. The senior rater narrative was a significant departure from the evaluation narrative which I received from my former senior rater just 5 months prior in the same position.    ith only six weeks  notice before my evaluation, my current senior rater informed me that he needed to see LTC level organi ational impact in order to receive a  cookie,  which is code for a good evaluation.

b. My next evaluation report is up in the air. After the last evaluation, my senior rater laid out performance measure needed to earn a most qualified (M  ) block for summer 2023. I have accomplished those performance measure and yet the bar continue to move.    e questions my character and integrity without evidence.    e has said my RAR has created a toxic work environment for him. I am observed and counseled frequently.

c. I have been double-slotted since November 2022 when my command brought in my replacement 9 months early to take over my job.

d. My Officer Record Brief (ORB) which is attached to every favorable action has stated  COVID-19 VACC ACTION PENDIN  .  Due to this  marker , I have not received awards for which I was submitted by my supervisor(while others with comparable performance have), was not even considered for bi-annual instructor of the year the past 2 years, was not accepted for a broadening TDY (though all my other colleagues who submitted were), and my earned senior army instructor badge got lost (while others were processed on time).

e. I have not been allowed to travel TDY for the furtherance of my job responsibilities and career advancement.

f. Due to my RAR, I was unable to compete for the best assignments with needed brigade time for promotion. My below-  one board meets next month and my primary-  one board meets

CA173

February 2024. Due to the adverse actions from my RAR and plaintiff status, I will not be selected for promotion.

g. Furthermore, simply because of my RAR and plaintiff status, my reputation as chaplain and staff officer has been tarnished. My reputation will proceed me to my gaining unit this summer and continue in the Chaplain Corps.

I make this declaration under penalty of perjury, it is true and accurate to the best of my ability, and it represents the testimony I would give if called upon to testify in a court of law.

January 17, 2023                             /S/ *Jerry B. Young*_____

                                             JERRY B. YOUNG

CA174



|  |  |  |  |  |  |
|---|---|---|---|---|---|
| ISRAEL ALVARADO, et al., | : | | | | |
| *Plaintiffs,* | : | | | | |
| v. | : | Case No. 1:22-cv-0876- ATF-JFA | | | |
| LLOYD AUSTIN, III, et al., | : | | | | |
| *Defendants.* | : | | | | |

Pursuant to 28 U.S.C. §1746, I, Jonathan D.  agdanski declare as follows:

1.      My name is Jonathan D.  agdanski. I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

2.      I make this Supplemental Declaration to support my challenge to the Department of Defense and Department of Army mandates requiring that I be vaccinated against COVID-19. All statements made in this Declaration are true to the best of my own personal knowledge.

3.      This declaration specifically addresses negative personnel actions I have experienced after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate and refusal to take it.

4.      These retaliatory  actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.

CA175

5. a.     I was not allowed to travel to and attend the FY22 Combined Religious Area Assessments Course. This course gives Chaplains the skills and knowledge to properly advise Commanders in a given Area of Operations. Not having these skills and knowledge will degrade my ability to properly advise the Commander.

b.     I was not allowed to conduct staff assistance visits to the 36 Unit Ministry Teams personnel that I supervise in November and December 2022.

Staff Assistance Visits are important Command Chaplain activities where a Command Chaplain can train, coach, mentor all his subordinate Unit Ministry personnel as well as check their readiness to deploy in theatre. Staff assistance visits are also mandated by our higher unit s Operations Order.

c.     I will not be allowed to travel to and attend the FY23 US Army Reserve Component Battle Focused Training. This is an annual requirement per our higher unit s Operations Order. Every Chaplain in the US Army Reserves must attend this training annually.

d.     I will not be able to travel and conduct follow-up Staff Assistance Visits in April 2023.

e.     I will not be allowed to travel to and participate in our unit s Command Post Exercise during FY23. This training gives participants the tools needed in the event of deployment into an Area of Operations.

All the above negative consequences degrade the overall Army mission and make me less than competitive in the Army promotion environment.

I make this declaration under penalty of perjury, it is true and accurate to the best of my ability, and it represents the testimony I would give if called upon to testify in a court of law.

January 18th, 2023

 S  Jonathan D.   agdanski
Jonathan D.   agdanski

Page 2 of  2

CA176

USCA4 Appeal: 23-1419   Doc: 14   Filed: 05/26/2023   Pg: 204 of 266

# EXHIBIT 5

# EXTRACTS FROM PLAINTIFFS' DECLARATIONS OF INJURIES TO CAREERS AND REPUTATIONS

CA177

**Ballard**

3.　This declaration specifically addresses negative personnel actions I have experienced after the submission of the Alvarado Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate and refusal to take it.

4.　These retaliatory actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.

5.　I was also forbidden to deploy with my battalion, resulting in a second chaplain deploying with my battalion while I was moved to another battalion. The second battalion is also scheduled to deploy later this year, and I am still considered non-deployable. This makes me uncompetitive in the competitive Army promotion environment.

**Barfield**

4.　These retaliatory actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.

5.　Due to my RAR status, I was denied, and continue to be denied by AFRC/HC, the opportunity to have a duty title upgrade to "IMA to the Wing Chaplain" at 88 ABW/HC. This title has been vacant since Sept 2021 due to the retirement of Ch, Lt Col St. Rose. Although my supervisor, Ch, Col Kim Bowen requested for me to fill this title in January 2022, Ch Ellis at AFRC/HC stated to me on 4 March 2022 that AFRC/HC was waiting to "see what happens" with my RAR before deciding on my duty title change. He also stated that my lack of PME was a concern, in that they prefer chaplains to have that, but that the promotion could not be given due to my RAR status. I personally took this to mean that they did not want to give me the title if I was going to be discharged soon due to my RAR. I felt this was discrimination and expressed this to Ch Ellis. He told me it wasn't discrimination, and they were just waiting to see what happens with my RAR. Historically, a lack of PME may keep IMA Chaplains from being promoted to Lt Col, but in my year group four of us were promoted to Lt Col without PME. The chaplain who retired in Sept 2021 and thus vacated the duty title I seek was a Lt Col and held that title for eight years and never completed his PME. Thus because of my RAR status, my duty title on my June 2022 OPR, was simply "Chaplain" and as of now will be the same on my June 2023 OPR. The lack of progressive leadership duty titles weakens my OPRs because it projects to the promotion board that even though I am a Lt Col there must be incompetency since my duty title is the same as an entry level chaplain. AFRC/HC's handling of my RAR status makes me less competitive for promotion against other chaplains who have that title in their OPR. My RAR did impact AFRC/HC's decision to withhold a duty title that was given to others in the past with similar credentials. My supervisor has given me all the responsibilities this title brings, and I appreciate the confidence and professionalism he has shown me. However, AFRC/HC's decision has yet to be reversed, and even if it were reversed and I was now given the duty title, it would not change the damage done to my career because of opportunities withheld from me.

6.　Another way that AFRC has damaged my career progression is that they will not allow some RAR reservists to travel to their base to perform duty. If you live beyond 150 miles of the base, the only option for us is telework. I live 154 miles away and was denied the opportunity to perform my annual tour in January 2023 because of my RAR status. Ironically, I was allowed to

CA178

travel up until January 2023, but the policy was in place for 2022 yet not enforced by AFRC until now. The Det 5 commander at AFRC told me that this policy was put in place to protect people against unvaccinated people who could not commute to work daily. AFRC's travel ban denies me tactical opportunities to perform my mission on base and weakens my OPR, making me less competitive for my next promotion board. Overall, the RAR process has ended with the mandate's removal, but the damage to my career continues and cannot be undone. It is as if I am in a race with other chaplains and the officials made me stop running while the other chaplains without a RAR kept running. Now it appears we will soon be allowed to run, but the other chaplains have already lapped us and we will never catch them. My Colonel promotion board is soon, but I believe it is evident that I will not have a fair opportunity to compete against fellow Lt Col's who did not have a RAR.

**Booth**

5.      Beginning of July I was forbidden to PCS and attend Chaplain Captain Career Course (C4). C4 is a pivotal milestone in the career of a Chaplain. This denial caused me to be double slotted with my replacement who was not deferred to a different assignment. My leadership put in a 4187 to move me up to Brigade as an extra Soldier. However, according to the TDA I am still double slotted with another Chaplain. This is exceedingly damaging to my career as my Major board meets next year and my in the zone look for major is scheduled for 2025. The Officer Evaluation Reports (OER) I receive annually have a direct correlation to how successful I am as my documents go before the board. Since I am double slotted and due to the 4187 I have no official rating scheme. This means that whoever evaluates me as an extra Soldiers will do so with me having no job description as I no longer am a battalion Chaplain. Practically, I have been moved to Brigade and I assist the Brigade Unit Ministry Team covering down for them as they PCS or get sick. Also, I am the Senior Pastor of the Chapel who ministers to the Advanced Individual Training population. The work I do is meaningful and keeps me actively employed. However, as I have no official rating scheme when I do receive my OER it will not be as competitive as my colleagues when going before the board. This is devastating and negatively impacts how competitive I can be with my colleagues. If this happened with the first one or two of my OERs that obstacle could be overcome but now that I am so close to the board the several top blocks (highest rating) I received early on in my career will be overlooked and the latest ones will determine the outcome of my promotion.

6.      As a Soldier it is my duty to live out the Army values of Loyalty, Duty, Respect, Selfless service, Honor, Integrity and Personal courage. As a result of my personal courage and integrity to do what GOD has told me to do fulfilling my Oath to the Constitution which ends with "SO HELP ME GOD" I have been irreparably harmed. Unless all negative paperwork (OERs) are accompanied with an explanation and met with an immediate promotion as advised by previous senior raters when they said, "Promote immediately" I will be negatively impacted because I was bold enough to live out the values I swore to live out. Exercising my conscience and living out what I know to be true has cost me immeasurable stress, stress to my family, and stress to my children. I would do it all over again in order to continue to serve with a clear conscience and know that I was fulfilling the Chaplain Corps motto…For GOD and Country!

**Justin Brown**

6.      On June 22nd 2022 I received adverse paperwork (3307 P&D-41D) in my record stating I was in violation of article 90 and 92 of the UCMJ. At this time and to my knowledge no Coast Guard guidance or policy has been implemented to remove that negative paperwork, in spite of the rescinding of the mandate to take the Covid shot. Further exacerbating my harm are the numerous errors and false official statements contained in this paperwork, from nonsensical dates to the blatantly false statement that I failed to show up at the appointed place and time I was ordered[1]. The mishandling of simple documentation demonstrates a contempt for the RAR process and I have very little confidence a remedy will be reached without the aid of this honorable court. Rescinding the mandate itself has been riddled with folly, on 9 January 2023 ALCOAST 09/23 came out canceling the Covid shot mandate, only to be rescinded a few hours later by ALCOAST 011/23 re-instituting the Covid shot mandate. ALCOAST 012/23 was then released on 11 January 2023 once again rescinding the mandate, if such simple operations invite such errors it seems improbable I and others similarly situated will be made whole without this honorable court's intervention.

**Calger**

5.      I was not allowed to attend training outside of 50 miles from my home. As an Army Reservist this policy effectively ended my ability to minister to my soldiers and isolated me from my peers as my command and all but one of my companies fall outside of the 50 miles. I was not allowed to attend Annual Training with the bulk of my Battalion, I was not allowed to attend mandatory Battle Focus training with my Chaplain peers, and I have not been allowed to attend my Chaplain Career Course which means I won't be allowed to promote to Major which means I'll be separated for not promoting. The 50 mile policy has practically ended my career and has the real potential to literally end my career.

**Harris**

3.       This declaration specifically addresses negative personnel actions I have experienced after the submission of the *Alvarado* Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate and refusal to take it.

4.      Revocation of Orders: My original orders for July 2022 were revoked, as I was forbidden to PCS, while my replacement received orders to report. This situation means I have been double slotted for 6 months, always attempting to justify to command how we are to be split and divide this single battalion Chaplain slot into one integrated ministry. As all chaplains do, we come from different theological backgrounds which allows battalion sources to simply see which one of us is willing to perform any particular task, potentially setting us against each other. As the "leaving-though-not-left-yet" Chaplain, my predecessor was named "primary" by the battalion commander and battalion XO in multiple phone and personal conversations. Being relegated to the "secondary" chaplain has negatively impacted my ability to fully engage in the battalion ministry, and has hurt not only my OER ratings but my reputation with regard to my command as well. In addition, command had me move offices to an out of the way office, allowing the

---

[1]      These false statements and errors are extensively documented in my supplemental declaration dated 1 September 2022.

CA180

"primary" chaplain to have the high profile office so that he was the chaplain readily accessible to Soldiers. I was also ordered to give the unit ministry cell phone, which Soldiers contact in emergency situations, to him. It was made emotionally and abundantly clear to me that the battalion would put up with me until I was allowed to secure orders, but the new chaplain is primary while I am utilized as secondary.

5.      Mission Training and Travel: My replacement was allowed to travel TDY to visit our troops in our outlying locations while I was, and still am, currently disallowed from any TDY travel. There are currently no restrictions on personal vacation leave or medical travel (my dependent son and I have completed 2 medical trips from Japan back to the United States), but when it comes to traveling within Japan (to our Soldiers & families stationed at Camp Zama) or Guam to provide ministry to 78th Signal Battalion Soldiers, I am not allowed. This is something that has, and will, continue to damage my performance rating from my commander while elevating the performance of my peer replacement since he is given these travel assignments. I was also denied the opportunity to travel and participate in the Change of Responsibility for our CSM, hurting my reputation as a team player.

6.      Annual Officer Evaluation Reports: My yearly OER evaluations have suffered due to this entire vaccine and religious accommodation issue. Prior to any mandates, I had received back to back "Most Qualified" (MQ) rankings (the highest my rank can receive). If this mandate, and the subsequent negative "administrative actions" had not happened, there is no reason to believe that my next OER ranking would not have also been an MQ. This would have shown on my record at the promotion board as 4 out of 5 MQs, which according to promotion matrixes for recent years is exactly what is needed for promotion to Major. However, due to negative consequences of filing my RAR, my last two consecutive OER's fell a step below MQ. While this affect may seem negligible, it is impossible to get promoted to Major without the needed number of MQs. These last two lower ratings, and the subsequent one that is expected to also be lower in February 2022, have not only hurt my reputation as a chaplain, but have effectively ended my chance at promotion. And without that promotion to Major, I will be mandatorily removed from the Army on May 1, 2024 (Up or Out policy), unable to continue service through to retirement. In addition to the lower rankings I have received, are the accompanying comments on those OERs. In the Army there is a system of "key words" to be included in the comments section for any promotion board to read in order to "weed out" officers they deem not worthy of promotion. In my case, the comments reflected a ranking even lower than the physical rank I was given, and when my last OER was due my commander e-mailed me his "initial OER with comments" hoping I would just sign. Realizing the disconnect, I appealed for certain wording to be improved. Some of that written comment was improved, however, some of it was not. I have the email from my commander stating he has changed my OER comments if the court needs to see it.

7.      Weekly Nasal Swab Testing: From roughly December 2021 through roughly September 2022, I was ordered to undergo weekly nasal swab tests on every first day of the week before I could entertain doing my job. It was arranged that I would arrive a few minutes early and my battalion supervisor (XO) and I would go into the public bathroom until the test was taken and confirmed (the nasal swab had to sit in the gel for 10 minutes). During this time, multiple people would walk in the restroom to use the facilities while my nose swab was sitting in the gel. It did not matter that I never ran a fever, never felt ill or had symptoms, or never tested positive on those tests. I, as an unvaccinated individual, had to test because the faulty logic used was that this was an illness of the unvaccinated. Recently, the CDC has confirmed that the vaccinated are both

carriers and spreaders of the disease, but I as one of the few who filed a RAR had to test while others could come and go as pleased. This is a definitive definition of discrimination.

8.      Summary: These retaliatory actions and incidents damaged not only my actual career, but if not rectified in current time will continue to degrade and affect my current and future career in a negative manner, and have & will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career. If not explicitly corrected, these actions will continue to degrade the ability of every future chaplain to stand upon their constitutionally guaranteed right to freely exercise the dictates of their own religious beliefs, and to support the free exercise rights of their Soldiers.

9.      List of Actions: I was passed over by the FY 2022 Chaplain Major Promotion board as a result of lackluster OER's. My next promotion board is in March 2023, and I expect to be passed over yet again due to these negative "administrative actions." I have been denied TDY for training, ministry, and team building events. I have been double slotted and relegated as the "secondary" chaplain for 6 months, and my ORB duty description was changed from "Battalion Chaplain" to "Extra Soldier." I have also been humiliated and coerced in public and had relationships with command & senior ranking chaplains turn negative because I stood for my free exercise of religion, resulting in damage to my reputation. I also had PCS orders revoked. All of these negative effects have made me uncompetitive in the competitive Army promotion environment.

**Hart**

5.      I was passed over by the FY 2022 Chaplain Colonel promotion board and received an conspicuously bland Officer Evaluation Report (OER) on August 26, 2022. In what was my Primary Promotion Zone, my Senior Rater's narrative completely omitted any recommendation whatsoever to promote. An officer's OER typically contains language recommending promotion, such "Promote below-zone," Promote now," or even simply "Promote," as have every one of my OERS over my over-20 year career. My most recent OER's Senior Rater Narrative did not even mention the word "promote" once. In a competitive environment in which an officer's OER is noticed for what it does not say as much as what it does say, this last OER assured that I had no chance of promotion. I was an outspoken opponent of the Covid vaccine mandate among Command leadership, and I actively advocated for Soldiers who submitted RARs of their own.

6.      I have been denied attendance at three performance- and career-enhancing trainings due to my non-vaccinated status.

7.      I was tasked as the project officer to plan, coordinate and execute the annual Fort Hood Installation Prayer Breakfast On May 4, 2022, yet I was not permitted to actually attend the event because of my non-vaccinated status.

8.      I was denied PCS due to my non-vaccinated status, which has created a family hardship due to our geographical separation.

9.      On May 13, 2022 I was removed from my assignment at 13th Expeditionary Sustainment Command (Fort Hood) and reassigned to U.S. Army Garrison Fort Hood because the 13th ESC was under a Prepare-To-Deploy-Order (PTDO). As I was deemed "non-deployable" due to my vaccination status I was reassigned to the Fort Hood Garrison Chaplain's Office. This was career-damaging because (a) it is not a broadening assignment, and (b) I have already served a rotation as a Garrison Chaplain (in Alaska), and now I am serving as a Deputy Garrison Chaplain, effectively a demotion in position and overtly a "putting out to

pasture" of a qualified chaplain because he refused the vaccine.

**Andy Hirko**

9. The Army has made following my conscience as formed by my faith a crime, despite the First Amendment; the specific protections of Section 533(b) of the 2013 NDAA; the fact following my conscience is an integral part of who I am as an officer and a chaplain, a representative of my denomination to the Army and its personnel; and an expectation as shown by exhortations and reminders to speak "prophetically" and be the conscience and/or moral compass for the unit.

11. I also point out the Defendants' claim "that even if [I] were separated, that harm could be redressed with back pay and reinstatement into the military", id. is false and/or misleading; it does not reflect the reality of the military. Back pay does not compensate me or my family for the fear, anxiety and stress the Army's hostility to my "free exercise" of faith has cost me and my family, nor can it compensate for the burdening or crippling of my career through lowered or missing efficiency reports because of my perceived failure to be a team player, nor make up for missed "key" assignments that are often the difference between promotion and failure of selection in the competitive promotion selection system, nor will it repay the cost of obtaining such relief. The stress of not knowing my future in the Army because of my sincerely held religious belief has cause great damage to my marriage and my family. If I were illegally separated from a civil business, the civil legal process would compensate for those insults and wrongs, e.g., emotional distress and actual damages, and where egregious enough, can include punitive damages and attorney fees. Those remedies are not options in the military.

13. Finally, the issue in this case is under the Constitution, who controls a chaplain's conscience, especially in determining what is good and evil. There are only two options, (a) the God the chaplain represents through his/her Endorsing Agency or church, or (b) a government bureaucrat or politician who exercise temporary civil power. The Religious Liberty clauses decided that question at our founding, Defendants argue otherwise despite Section 533.

**Brad Lewis**

4. Since initially requesting a religious accommodation to the COVID-19 vaccine mandate, I have been subjected to active and passive actions and threats for no other reason than I exercised my constitutional right to the free exercise of religion in keeping with existing policy and law such as the Religious Freedom restoration Act (RFRA), AR 600-20 Command Policy, and Section 533 of the 2014 National Defense Authorization Act. These retaliatory actions have degraded and continue to negatively affect the progression of my career and will undoubtedly prejudice me when competing for promotions, schools, broadening assignments, and other opportunities that define a successful career as a Chaplain in the US Army. This declaration will focus specifically on my exclusion from certain opportunities, the impact of being warehoused, the importance of reputation, and the resultant injuries I will deal with well beyond retirement.

5. In the recent past, the Chaplain branch, under the guidance of the Chief of Chaplains, CH

CA183

(MG) Tom Solhjem, began sending hand selected chaplains of various grades to the Army's assessment for command potential or CCAP/BCAP. Attendance at this week-long assessment us used to determine if a given officer is of the caliber, talent level, and temperament required to assume various positions such as Division Chaplain, Corps Chaplain, and various 3- and 4-star commands. Due to being flagged for "suspension of favorable personnel actions" since October 2022, I was not invited to attend this assessment, as many of my peers were (some more than once) despite being a recent graduate of the US Army War College. As a result, I was not

Page 3 of 6

considered for the kinds of assignments senior chaplains have traditionally been given following graduation from the War College.

6. Under normal circumstances, upon graduation from the War College, senior chaplains are assigned to positions that reflect a belief by the chaplain corps that the demonstrated qualities that resulted in selection to that school in the first place are the very qualities that will be necessary to succeed at the 3- or 4-star command level. However, instead of being given such an assignment, I was told I could not move at all and would be held in place until the "process" had been allowed to work, after which I would be involuntarily separated from the service. This warehousing continues after 7 months. Being thusly warehoused, I felt it prudent to attempt to actually "find work" and "bloom where I had been planted". To that end, shortly after graduation, I asked the War College Deputy Commandant, COL Kimo Gallahue, and the Chief of Staff, COL Lance Oskey, how I might remain engaged in ministry once the academic year was over. At the recommendation of the Garrison Chaplain, CH (COL) Herb Franklin, I suggested that I could serve as a temporary chaplain to the student body, an acknowledged hole in the religious support program at Carlisle Barracks. This seemed reasonable given the source of the recommendation and my need of meaningful work. However, I was told that was not an option and was instead asked to fill a temporary vacancy in a program aimed at providing academic opportunities to the spouses of AWC Students. I asked, "Does this position have a religious element or am I just filling a hole." The response was simple, "You're just filling a hole". So instead of being held here and provided with some modicum of purpose, I was asked to be a stop gap in a position that had nothing to do with being a chaplain.

7. The exclusion from professional development and the warehousing have led to an even greater harm. There is a maxim in the Chaplain Corps when it comes to assignments. It is said that, "promotions are a result of paper while assignments are result of reputation." Over the

Page 4 of 6

course of the last 18 months, as I stood on Army policy and legal precedent, my reputation has been dragged through the mud. I have had multiple chaplain peers go out of their way to let me know that they find no religious element in the vaccine mandate and can't imagine why I would take the stand I have. This is an affront to my personal faith and belies ongoing conversations about me when I am not around. This damage to my reputation has already begun to impact potential assignments. With the 2023 NDAA requirement to repeal the COVID vaccine mandate and the subsequent guidance from the Secretary of Defense to comply, I have been in regular communication with the personnel section in the Office of the Chief of Chaplains to discuss assignment possibilities. In a conversation during the last week of January, the Chief of Personnel, CH (COL) Chris Archer, told me that they (ostensibly OCCH) understand my anger

at the situation I find myself in but that they are concerned that my anger will prevent me from properly executing whatever duties I am assigned. This is not only a professional slap in the face, it is a personal attack on my integrity and reputation. The assertion that simply removing negative flags and paperwork from the files of those who chose to refuse the COVID EUA gene therapy is simply absurd. Such an assertion fails to recognize the value of career opportunities that are not being afforded to those same individuals. Nor does it acknowledge the high value placed on the reputation of the soldier and how that reputation impacts one's career progression. Reputation is, in a word, everything.

8. The negative effects of the Department of Defense's actions toward me will be lasting even if the paperwork in my file is corrected. The assault on my reputation and career progression will have long term effects, not the least of which will most certainly be when the time comes to seek employment after military service. As a member of the clergy, reputation is important but integrity is paramount. When interviewing for future employment there is sure to be, as there always is, questions about prior disciplinary or negative action in the conduct of my
Page 5 of 6
duties. Integrity will compel me to share with prospective employers the events that led to negative information in my files. The format of any such question may vary but a potential employer or "search committee" looking for a pastor, minister, or church/religious organization leader will want to be sure that I, as a candidate, do not have a history of disciplinary issues or problems with authority. The fact the paperwork may have been removed from my military file doesn't change the fact that it was in there once and as a member of the clergy, I must either deny I ever faced this problem (based on the fact the mandate was illegal and pulled from his record) or answer "yes" and then spend the ensuing hours chasing rabbits and explaining why. That will automatically raise a flag and require me, the "applicant", to have to again explain about the mandate, the lawsuit, the law, the policy, the process, etc., etc. That historical fact becomes a burden and a serious distraction unless the bad thing becomes a good thing and an example of integrity and commitment to obey conscience as formed by faith.

9. Finally, probably the greatest impact to me personally of the DOD's refusal to recognize my faith is the moral injury suffered as a result. The Moral Injury Project (Syracuse University) defines moral injury as "the lasting emotional, psychological, social, behavioral, and spiritual impacts of actions that violate a service member's core moral values and behavioral expectations of self or others."[1] The Lancet says that moral injury "can cause profound feelings of shame and guilt, and alterations in cognitions and beliefs (e.g., "I am a failure", "colleagues don't care about me"), as well as maladaptive coping responses (e.g., substance misuse, social withdrawal, or self-destructive acts)."[2] Moral injury often results from a betrayal of trust, especially the trust of leadership, and results in an inability or unwillingness to trust others. It can manifest in anger, isolation, or an inability to engage others. For a chaplain, or any member of the clergy charged
[1] https://moralinjuryproject.syr.edu/about-moral-injury/ [2] https://www.thelancet.com/journals/lanpsy/article/PIIS2215-0366(21)00113-9/fulltext
Page 6 of 6
with providing spiritual care for others in distress, nothing could be more destructive to that calling than not being able to engage others. The anger and isolation are palpable in both my personal and professional life. When I first decided to request a religious accommodation, I

CA185

reasoned a senior chaplain requesting an RAR should not be a problem. I naively believed the Department of Defense, the Department of the Army, and the US Army Chaplain Corps took religion seriously and understood the benefit it brings to the warfighter, in both war and peace. On the contrary, the feelings of betrayal I've experienced due to the DOD's opinion that my faith and my conscience do not merit consideration, or the Chaplain Corps seeming to sit safely and silently on the sidelines while I struggled in the Valley of Elah, alone. These feelings have impacted by relationship not only with chaplains I once called "friend", but with my wife and kids as they have had to deal with my emotional absence and anger. 13 deployments and 47 months in an active war zone during the last 20 years had less negative impact on me than my leadership at all levels doing what they should not do or not doing what they should.

**Zagdanski**
4.      These retaliatory  actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.
5. a.      I was not allowed to travel to and attend the FY22 Combined Religious Area Assessments Course. This course gives Chaplains the skills and knowledge to properly advise Commanders in a given Area of Operations. Not having these skills and knowledge will degrade my ability to properly advise the Commander.
b.      I was not allowed to conduct staff assistance visits to the 36 Unit Ministry Teams personnel that I supervise in November and December 2022.
Staff Assistance Visits are important Command Chaplain activities where a Command Chaplain can train, coach, mentor all his subordinate Unit Ministry personnel as well as check their readiness to deploy in theatre. Staff assistance visits are also mandated by our higher unit's Operations Order.
c.      I will not be allowed to travel to and attend the FY23 US Army Reserve Component Battle Focused Training. This is an annual requirement per our higher unit's Operations Order. Every Chaplain in the US Army Reserves must attend this training annually.
d.      I will not be able to travel and conduct follow-up Staff Assistance Visits in April 2023.
e.      I will not be allowed to travel to and participate in our unit's Command Post Exercise during FY23. This training gives participants the tools needed in the event of deployment into an Area of Operations.
All the above negative consequences degrade the overall Army mission and make me less than competitive in the Army promotion environment.

**Eastman**
3.       This declaration specifically addresses negative personnel actions I have experienced after the submission of the Alvarado Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate and refusal to take it.
4.      These retaliatory actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.
5.      I was not offered another opportunity to deploy in an operational setting.
6.      I was forbidden to PCS and told I would be separated with no benefits after 18 yrs of

CA186

service June 2022.  This action caused severe stress and anxiety to our family.  My trust in Navy leadership therefore has also been gravely affected and the scarlet letter placed on me and my fellow chaplains over this matter has affected my overall well-being and ability to serve wholeheartedly
Eastman


**Pogue**
3.    This declaration specifically addresses negative personnel actions I have experienced after the submission of the Alvarado Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now illegal COVID Mandate and refusal to take it.
4.    These retaliatory actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.
5.    Although my experience with the mandate in the Army Reserve has been less impactful than those serving on the active-duty side, I have, nonetheless, experienced some amount of intimidation due to my refusal to take the COVID-19 vaccine. One commander publicly instructed us to "keep our opinions to ourselves" regarding the vaccine mandate.  Others questioned whether I was allowed to travel to events such as Battle Focus Training.  In most cases I was ultimately allowed to go but would be required to have documentation of a recent "negative" COVID-19 test before allowed access.  Although it was never officially distributed, it was discussed that Lodging in Kind (LIK) would be limited to the vaccinated during future BA weekends.


**Pak**
4.    Additionally, Army HQDA EXORD 225-21 (FRAGO 22) COVID-19 Steady State Operations dated 12 May 2022, states in paragraph 3.C.6.A.1. the following, "Soldiers who are not fully vaccinated are ineligible to PCS without advanced approval from the Under Secretary of the Army." The inability to PCS will permanently impact my career as an Army Chaplain and significantly weaken my potential for promotion.
5.    I am currently serving my three-year utilization as the USAG Bavaria Family Life Chaplain. My utilization will be complete on 23 January 2023. Before the above stated PCS restrictions, I was scheduled to PCS during the winter of 22-23. Furthermore, my replacement as the USAG Bavaria Family Life Chaplain has orders to report on 24 January 2023.
6.    Once my replacement arrives, I will be placed out of the official authorized job position as the Family Life Chaplain and moved into an un-official unauthorized role. This move will negatively impact my annual Officer Evaluation Report due to my rated time in an un-official position.
7.    During my utilization as the USAG Bavaria Family Life Chaplain, I have received two "Most Qualified" Officer Evaluation Reports. "Most Qualified" is the highest ranking/category in the Officer Evaluation Report format. Being in an unauthorized un-official job position will make it next to impossible to receive a "Most Qualified" Officer Evolution Report.
9.    Moreover, the ability to PCS would have accorded me the opportunity to broaden my career by becoming a Brigade Chaplain for an operational unit. Being a Brigade Chaplain in an

operational unit would have strengthened the likelihood of career advancement and promotion.

10.     Earlier this year, my assignments officer notified me through email that I was being considered to be a brigade chaplain for an operational unit at FT. Campbell, Kentucky, but due to my "unvaccinated" and non-PCS status that position became unavailable. My assignments officer also added that exceptions to PCS were being approved at an extremely low rate.

11.     I want to state that the inability to PCS is an adverse administrative action and punitive that will unfavorably influence my career and standing as a chaplain in the United States Army.

Pak

**Schrader**

3.     This declaration specifically addresses negative personnel actions I have experienced after the submission of the Alvarado Complaint or becoming a Plaintiff in this case. They are a result of my submitting a religious accommodation request (RAR) to be excused from the now-illegal COVID Mandate and my refusal to take it.

4.     These retaliatory actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.

5.     As of this writing it has been 601 days (May 26, 2021) since my Chaplain, Colonel supervisor first created a hostile work environment by calling attention to my vaccine status in front of the entire staff on my first day in the office. My supervisor subsequently advised me to lay aside my religious convictions or resign my commission even before I had exhausted the religious accommodation process available to me. It has been 410 (Dec 3, 2021) days since I was notified by my commander that the AF/SG had denied the appeal of my religious accommodation request denial. My wife and I have lived under the emotional strain of this hostile work environment where my religious convictions are deemed incompatible with government service. I have been repeatedly treated and counseled as non-compliant and a refuser and in violation of orders. I have been denied constitutional, RFRA and Chaplain Specific 2013 NDAA section 533 religious freedom and protections for at least 410 days.

6.     As of this writing it has been 25 days since the President signed the NDAA, and eight days since the Secretary of Defense issued the rescission of the mandate memo. My situation has yet to be adjusted. No actions have been taken to restore me to full duty or to correct my records.

7.     I was wrongly removed from consideration for in-residence selection for Professional Military Education, Air Command and Staff College. On February 4, 2022, Gen Hecker (then Lt Gen Hecker), my senior rater, declined to recommend me for consideration to the Calendar Year (CY)22 Chaplain School Development Team Board for the required Intermediate Development Education (IDE), ACSC in-residence. This CY22 board was my third and final consideration for in-residence selection. In my first and second considerations, I received recommendations for IDE in-residence from my commander. During my second consideration, I was selected as an alternate for the 2022/23 school year as recognized by my senior rater, who now has not recommended me for consideration. In the year between my second consideration (when I was selected as an alternate) and my third consideration (not recommended), I finished a deployment as a Wing Chaplain in an 0-5 billet (one rank above my current rank), was recognized by the Air Force Central Command (AFCENT) Chaplain for leading the best team for our rotation, was awarded two MSMs, named FGO of the year for the Wing Staff Agencies at my permanent duty station, and was selected for a vectored position as a Staff Chaplain at the Air Force Chaplain

Corps College. It is unquestionable that my performance record during this period should have only strengthened my competitiveness prior to my third consideration. However, my senior rater chose not to recommend me. His letter to the RAR decision authority provides evidence that this non-recommendation is because of my religious beliefs outlined in my RAR and not due to my professional performance. The impact on my career, which will not be corrected with the removal of the negative administrative actions from my record, can hardly be overstated. In the Chaplain Corps to be selected to in-residence PME is a well-known distinguishing event that affirms one's position near the top of their year group and the year groups directly before and after. It verifies that my performance record, compared with my peers, placed me near the top of my profession at that point in my career. Some say it is harder to make the IDE list than it is to be promoted. This past year, 25 Chaplain Corps Captains were selected for promotion to Major from just one year group. The competition for IDE in-residence is for four select and three alternate selects from three different year groups. The only significant negative change in my situation is that I have requested and been denied a religious accommodation.

8.      I will have three non-competitive Offer Performance Reviews (OPR) dated 31 Jan 2021, 30 Nov 2022, 31 May 2023.  Even if the referral OPR dated 31 Jan 2021 is replaced it will be a weak performance OPR, not because of my performance, but because of my religious accommodation request and the mandate, and being sidelined from work that would have made me competitive amongst my peers.

9.      I had my faculty responsibilities wrongly limited due to my vaccination status from June-December 2021 and removed completely on 15 Dec 2021 per Col Terri Jones, Eaker Center Commander (Col Terri Jones Declaration, Document 65-45 Filed 08/29/22, para 23, page 12). This has not been the case for all members of Air University, I have been punished with administrative paperwork, and sidelined from my faculty responsibilities while other members of Air University working on faculties on the same campus have not been issued administrative paperwork and were never sidelined from their faculty responsibilities. This injustice will not be corrected by removing the negative administrative actions.

11.      During these 600-plus days of being discriminated against for my religious convictions and as a result of being prevented from participating in my primary faculty responsibilities I was not competitive for any unit or higher level awards. Awards are consistently considered distinguishing factors in an officer's career. I have a consistent track record of being awarded for my contribution to the mission over my previous 15 years of military service. I was awarded three wing-level awards to include Junior Officer of the year in 2010, Wing Staff Agency Company Grade Officer of the year in 2014, Wing Staff Agency Field Grade Officer of the Year in 2020, and one Major Command award, the Air Education and Training Command Company Grade Officer Chaplain of the year in 2019. For the rest of my career when my records are reviewed for promotion or assignments there will be a noticeable recognition gap that will not be corrected with the removal of the adverse actions from my record.

12.      I am in danger of being passed over for promotion during the 2023 Lt Col Chaplain promotion board. If my records are not completed on time, I will meet the board with a referral OPR, LOR, and UIF in my record which will certainly cause me to be passed over. If the negative paperwork is removed from my record before the board, I will still be meeting the board with three OPRs that are not competitive with my peers due to my religious beliefs. I will have gone from the top of my career field before the mandate, within the year groups being considered for promotion in the summer of 2023, to the bottom – not because of my job performance or

potential to serve at a higher rank, but, but because of my religious beliefs that led to requesting a religious accommodation. This also will not be corrected by removing the negative administrative actions.

11.     These non-competitive OPRs will have a lasting impact on my career and financial situation. In the Air Force, pinning on of the next rank is determined by racking and stacking of the newly elected officer promotees. With these weak, non-competitive OPRs in my record I will no longer be competitive to be near the top of this list which means I will not promote to the next rank as soon as I would have without the harm done by the illegal mandate. This not only has a monetary impact but will have an additional impact on my future promotion boards where I will have less time in grade than my peers because of the harm done by the illegal mandate.

12.     I was denied an exception to policy to travel unvaccinated in June 2022 to my annual endorser conference and chaplain training event. This is a loss of training and professional development that cannot be undone. Not all Air Force unvaccinated Air Force Chaplains were denied an exception to policy to travel to their annual conference.

Schrader

## Diltz

4.     These retaliatory actions and incidents degraded and continue to affect my future career in a negative manner and have and will prejudice me when competing for promotions, schools, important assignments, and other opportunities associated with having a successful career.

5.     Personal & Shared Experiences. Despite an overall perception of neutral support from leadership, as a Reservist in the Air National Guard, my negative experiences have been those of a general malaise, perceived ire, passive hostility, body-language and verbal disapproval, speechless incredulity, etc., but not actions as such that fill the Unfavorable Information File (UIF). Although I was spared bold-faced confrontation, enlisted Airmen have confided in me the aggressive hostility displayed toward them. Moreover, after addressing key issues on the free exercise of religion, a commander conveyed to me that some had lost confidence in "their chaplain" (me) because I had connected the dots (via historicity and court cases) that the vaccine mandate and protocols abrogate constitutional rights, and violate autonomy and dignity. This raises concerns as to whether constitutional liberties, dissenting viewpoints, and factual pursuit of the truth are welcomed for discussion. At times, the unvaccinated were required to mask and test when the vaccinated were not, and the N95 could not be adjusted (i.e., loop around the ears) to prevent headaches and ease breathing restrictions. Without a doubt, trust has been eroded and relationships soured; many unvaccinated no longer want to serve or have already departed because they do not feel supported or respected.

6.     Speculation. One year and half ago, a lieutenant colonel called to let me know that my name appeared in a system for the RCP2 deployment cycle for FY 2023. However, I have not been selected or scheduled for deployment. I have not deployed with the ANG which hinders professional growth and promotion selection.

Diltz

CA190

**Young**

3.      I have experience the following additional adverse actions:

a. The inability to PCS with a pending RAR into a brigade position before my upcoming board for LTC is a career killer. Without this key development brigade position, I have no chance of promotion and therefore could be separated from active duty.

b. The DOD COVID-19 travel guidance updated on August 8, 2022 states that I am limited to "mission-critical" travel, but deems PCS as "mission-critical." Regardless, our Chief of Chaplains policy is that no orders will be cut for chaplains with pending RARs. On September 1, 2022, my personnel manager said on that this is because it's not fair for me to take up a slot with an RFO since I likely cannot PCS.  So, I will not be allocated an RFO this winter for my July 2023 move, but my replacement already has orders to arrive December 2022 into my position. In other words, I will be intentionally double slotted for at least 8 months. This is clearly religious discrimination which will have an adverse impact on yet another evaluation.

c. Though I have experienced support from my direct supervisor and civilian colleagues, I have experienced scrutiny, bias, and hostility from my senior rater and senior chaplain brass. Since my first meeting on April 12, 2022, my senior rater, CH (COL) Hardin, has been very direct regarding his position and desire to move me early. He asked, "Where do you want to go next?" though my move date was 15 months away and reassigning me is not his responsibility. He said, "You do not belong here." In regard to my RAR, he stated, " You are the one who has to explain why you received all the other vaccines but not this one." He has said the current EUA mandated vaccines only come from two stem cells from a very long time ago so it is not a big deal.

d. CH (COL) Hardin has threatened through my supervisor to pull me from the instructional platform on numerous occasions, as he did in June 2022 with another colleague with a pending RAR. He observes me frequently for long durations with consternation while I am instructing on the platform, but he does provide not any feedback after his observations, nor does he observe my colleagues in the same manner.

e. My last evaluation was by far the lowest senior rater potential write up which I have received in nearly 15 years of active duty service. The senior rater narrative was a significant departure from the evaluation narrative which I received from my former senior rater, CH (COL) Hysom, just 5 months prior in the same position. With only six weeks' notice before my evaluation, CH (COL) Hardin informed me that he needed to see LTC level organizational impact in order to receive a "cookie," which is code for a good evaluation.

f. Simply because of my pending RAR and knowledge of this class-action case, my senior rater, Chaplain (COL) Hardin, recently said on August 29, 2022 that I am creating a hostile work environment for him. He says my perception is skewed, and essentially, that I am wrong to doubt his objective judgment because his Anglican endorser is currently championing the cause for religious freedom. Then, he said he provided my evaluation to the Commandant along with five other "highly qualified" evaluations [likely from the bottom of his pile who are retiring] of the 25 majors he senior rates to prove that he gave me an absolutely unbiased evaluation. He then asked me if he needed to hire an attorney to protect himself.

g. Many of my favorable actions, awards, and work production efforts are either paused or sidelined.

CA191

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

| | | |
|---|---|---|
| ***ALVARADO, ET AL.*** | : | |
| | : | |
| ***v.*** | : | NO. 23-1419 |
| | : | (1:22-cv-00876-AJT-JFA) |
| ***AUSTIN, ET AL.,*** | : | |
| | : | |

**SUPPLEMENTAL DECLARATION OF CHAPLAIN (CPT) DAVID A. CALGER**

Pursuant to 28 U.S.C. §1746, I, **DAVID A. CALGER** declare as follows:

1.      My name is David A. Calger. I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

2.      I make this declaration in further support of my challenge to the legality of the Department of Defense and Department of the Army mandates requiring that I be vaccinated against COVID-19.  It supplements my earlier declarations describing the injuries to me in my career as an Army chaplain Reservist who filed a Religious Accommodation Request ("RAR").

3.      I write to specifically address the deceptive, false and/or misleading statements in the Motion to Dismiss ("MTD") filed by the Appellees Secretary Austin and other Department of Defense officials (hereafter "DoD"), ECF No. 10- 1, that say or imply that "any plaintiff that had an adverse action in his or her file has had that adverse action removed from his or her records."

4.      DoD's statement, inference, or suggestion that any damage done by the Covid-19 mandate has been remediated by its rescission and the Army's subsequent removal of "bad paper" or adverse actions is misleading and/or false.

5.      Attached as Exhibit 1is a letter from Headquarters of the Army and Headquarters, 81st Readiness Division (RD), Ft. Jackson, SC, informing me that I "must be separated not later than

the 1st day of the seventh month following the President's approval of the board results" because I have failed my second consideration for selection to the rank of Major.

6.      The exact and obvious reason I failed of selection was my inability to personally attend the "in-person" portion of the Chaplain Captains' Career Course ("C4") which is mandatory for promotion to Major, a direct result of the travel restrictions placed upon me as a result of requesting an RAR to avoid taking the COVID-19 vaccine.

7.      I was not selected by the February 2022 Reserve Chaplain Major Board and the February 2023 Reserve Chaplain Major Board.

8.      C4 has two components, first, what is called the "zero" phase which is completed online and is a prerequisite to take the next phase, the in-person instruction at the Chaplain School. I had completed the zero phase before the Mandate; I was not allowed to travel, which is necessary to attend the in-person instruction, after I submitted my RAR and was "flagged", a personnel code which means no favorable personnel actions may be granted to the individual.

9.      When it became clear the 2023 National Defense Authorization Act would order Secretary Austin to rescind the Mandate, I inquired if I could attend the in-person C4 class which met before the Major promotion board convened in February 2023. My company commander informed me I was still unable to travel and therefore could not complete the course.

10.      I am being punished for exercising my constitutional and statutory right to request an RAR. Given the compulsory requirements of C4 and other educational milestones for promotion are not hidden nor unexpected, and the impact of not being able to attend this mandatory requirement for promotion, it is difficult to believe that this is a result of mere administrative oversight are error.

11.      It should be presumed that the Army and Chaplain Corps leadership knew and understood the difficulties and damage the Mandate would and has caused for those who need to

2

complete the C4 mandatory career education requirement. Yet now, five months after the Mandate's rescission, there is no plan that I am aware of to enable those of us handicapped by what Congress has said was a very bad and prejudicial decision to resume our careers without further obstacles.

12.     It would appear that the Army does not want those of us who feel compelled by our faith to follow our conscience and address wrongdoing are being shown the door. Otherwise, the leadership would be reaching out to those adversely impacted and providing options and paths that would fix the problem, not merely offering us some uncertain hope that some bureaucratic procedure on the way out the door might rescue us. This ignores the fact that such procedures are not guarantees, take me way from my military duties and induce unneeded and unwelcome stress.

13.     Considering recruiting shortfalls, especially in the Reserves, one would expect the Army and its Chaplain Corps to demonstrate that they were interested in showing the public and religious community from which chaplains come their commitment to treating their personnel well. That would include making sure the damages incurred by the Mandate are remediated quickly and completely. My situation shows that is not on the Army's or the Chaplain Corps' agenda.

I make this declaration under penalty of perjury, it is true and accurate to the best of my ability, and it represents the testimony I would give if called upon to testify in a court of law.

May 24, 2023                               /S/ David A. Calger
                                          **DAVID A. CALGER**

3

CA194

# EXHIBIT 1



**DEPARTMENT OF THE ARMY**
**HEADQUARTERS, 81ST REAIDENSS DIVISION (RD)**
**01 WILDCAT WAY**
**FORT JACKSON SC 29207-6807**

**S: 16 July 2023**

AFRC-SSC-HRS (RN 140-10a)                                                                            15 May 2023

MEMORANDUM FOR CPT CALGER, DAVID A., 206 KINDRED BLV., PT CHARLOTTE, FL 33954-1707

SUBJECT: Options Upon Non-selection for Promotion After Second Consideration

1. The purpose of this memorandum is to provide further information concerning options available to you as a result of your recent consideration for promotion. Reserve officers not selected for promotion are considered again by a selection board approximately one year later. If they are not selected on this second consideration, they must be separated not later than the 1st day of the 7th month following the President's approval of the board results unless they:

   a. Are a CPT or MAJ and have a service obligation.

   b. Are eligible for and request transfer to the Retired Reserve (if you have completed 20 years of qualifying service for Reserve retired pay at age 60 and have a 20-year letter).

   c. Have been credited with 18 or more but less than 20 years of satisfactory Federal service for retired pay purposes.

2. You have been considered twice for promotion to the next higher grade by the Army Reserve Components Selection Board, but unfortunately you are not among those selected for promotion or selective continuation. As a result of this second non-selection, and unless sooner separated for reasons of age, physical disability, or for cause, you must be discharged on the later of (1) the first day of the month after the month in which you complete 20 years of commissioned service, or (2) the first day of the seventh month after the approval of the promotion board.

3. The Reserve Status Statement and Election of Options contained on the next page of this memo indicates your status and whether you are entitled to elect an option. You must complete the enclosed election of options and return to this command. If your election of options is not received by the suspense date shown above, you will be administratively transferred to the Retired Reserve, if eligible, or discharged in accordance with the law.

4. If you are receiving Voluntary Separation Incentive (VSI) benefits under the Transition Assistance Management Program, you must request transfer to the Retired Reserve in order to maintain your eligibility to continue to receive those benefits. Thank you for your many years of service.

5. The point of contact for this action is Ms. Howard, JoLanda, Officer Management Branch, at jolanda.l.howard.civ@army.mil

FOR THE DIRECTOR OF HUMAN RESOURCES:

*W J Wilson*

Encl                                                                            WILLIE J. WILSON
Election Option                                                              Chief, Regional Personnel Support Center

CF: HQ, 412TH THEATER GENGINEER COMMAND (TEC)

*Wildcats Never Quit*

CA196

## DATA REQUIRED BY THE PRIVACY ACT OF 1974

Your Social Security Number (SSN) and current mailing address are mandatory under Title 10, U.S. Code, Section 275, for the purpose of positive identification and maintenance of updated records. Failure to provide these items may result in non-receipt of official mail.

### RESERVE STATUS STATEMENT AND ELECTION OF OPTIONS

1. ☐  You are not in one of the excepted categories shown in paragraph 1 of the basic letter.

2. ☐  You are in the excepted category of paragraph 1a of the basic letter; upon completion of your military service obligation your discharge is mandatory. Discharge letter, orders, and certificate will follow.

3. ☐  a. You are in the excepted category of paragraph 1b of the basic letter. Since you are eligible for transfer to the Retired Reserve, request you complete the option in subparagraph d below and return it to this Command by the suspense date indicating whether you desire such transfer.

   b. Your removal is mandatory no later than the 1st day of the 7th month following the President's approval of the board.

   c. Transfer to the Retired Reserve does not automatically entitle you to pay, allowances or other benefits. Completion of 20 years total service does not entitle you to retirement pay or other benefits unless such service was qualifying service for retirement pay, and you have attained the age prescribed by law.

   d. Election of options:  (  )  I request transfer to the Retired Reserve.
                            (  )  I request to be discharged.
                            (  )  I request transfer to the Retired Reserve as a VSI recipient.

4. ☐  a. You are in the excepted category of paragraph 1c of the basic letter. Unless you request transfer to the Retired Reserve, you will be retained in an active status until you are credited with 20 years of satisfactory Federal service or whichever is earlier, unless during that time you attain age 60 or are removed from an active status because of physical disability or cause. (It is your responsibility to contact this Command and request transfer to the Retired Reserve upon completion of the 20 years qualifying service). It is requested that you complete the option in subparagraph c below and return it to this Command by the suspense date.

   b. Transfer to the Retired Reserve does not automatically entitle you to pay, allowances or other benefits. Completion of 20 years total service does not entitle you to retirement pay or other benefits unless such service was qualifying service for retirement pay and you have attained the age prescribed by law.

   c. Election of options:  (  )  I request retention to complete 20 years of qualifying service.
                           (  )  I request discharge from the Army Reserve.
                           (  )  I request transfer to the Retired Reserve.

5. Complete the lower portion of this letter and return. An addressed envelope is enclosed for your reply.


_____        _____        _____
SIGNATURE                              SSN                            DATE


_____        _____
NAME AND GRADE (Type or Print)         E-MAIL ADDRESS


_____        _____
TELEPHONE                              ADDRESS (if different from address on front page)

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

| | | |
|---|---|---|
| *ISRAEL ALVARADO, ET AL.* | : | |
| | : | |
| *v.* | : | NO. 23-1419 |
| | : | (1:22-cv-00876-AJT-JFA) |
| *LOYD AUSTIN, III, ET AL.,* | : | |
| | : | |

## SUPPLEMENTAL DECLARATION OF
## <u>CHAPLAIN MAJOR DARREL LANCE SCHRADER</u>

Pursuant to 28 U.S.C. §1746, I, Darrel Lance Schrader declare as follows:

1.      I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

2.      I make this Supplemental Declaration to support my challenge to the Department of Defense and Department of Air Force mandates requiring that I be vaccinated against COVID-19 and address the continuing illegal damage done to me and my career because I requested a religious accommodation request ("RAR") to avoid receiving the mandated treatment. All statements made in this Declaration are true to the best of my own personal knowledge.

3.      The supplement supports and updates my previous January 18, 2023, declaration that reported on the continuing harm and injury to my career because of the Air Force and its officials' response the exercise of my right to request a RAR. This declaration addresses what has happened since the Mandate's rescission and it specifically addresses what appears to be false and misleading statements in the

CA198

Appellees/Defendants (hereafter collectively "DoD") recently filed Motion to Dismiss, ("MTD").

4.    The first such incorrect and misleading statement states "any plaintiff that had an adverse action in his or her file has had that adverse action removed from his or her records." In my case that is not correct.

5.    Concerning adverse actions against me, I was given a LOR (Letter of Reprimand) for requesting an RAR and refusing to take the COVID vaccine. Per the Department of the Air Force Inspector General Office, my Letter of Reprimand is not being removed from the IG files in the Automated Case Tracking System (ACTS). This conflicts with the 24 Feb 2023 Secretary of the Airforce memo entitled Department of the Air Force (DAF) Guidance on Removal of Adverse Actions and Handling of Religious Accommodations Requests, which states, "Adverse actions removed under the provisions of this guidance memorandum contained in Inspector General files pursuant to AFI 90-301 **will be removed from those files**" (emphasis added).

6.    I inquired of the Air University Inspector General's Office whether my LOR had been removed from IG files in compliance with this instruction. On 9 May 2023, I received an email response from the AU/IG that stated:

> As far as the IG database goes, the admin actions are **not actually removed**. As I understand it, what actually happens is that a case note is added, at the SAF/IG level, which acknowledges that the admin actions were removed/rescinded by command and that those action

[sic] should not be considered for officer screening/promotions.
(Emphasis added.)

7.     In like manner, per Air Force Personnel Center, the Air Force Surgeon

General appeal denial memo is also not being removed from my permanent record.

When I inquired about this memo being removed, the email response I received

said, "The RaR denial letter will remain in your ARMS record." This is unfair

treatment as not all Airmen who applied for a RAR even received their RAR or

Appeal denial prior to the rescission of the mandate. This means that only those of

us like me, who made it all the way through the RAR denial process have this

noted in our permanent file.

8.     In addition, damage has been done to my career because my performance

reports severely suffered due to my stand on the Mandate and/or joining the

litigation, and this has not been fixed. During my 1 Feb 21 - 31 Jan 22 Officer

Performance Report (OPR) period, on 12 Jan 22 I received a Letter of Reprimand,

which was sustained on 27 Jan 22. This means that with only four days left in the

reporting period the entire period was a referral OPR stating that I did not "meet

standards" of "professional qualities" because of my stand against the Mandate.

9.     This OPR included 10 months of work prior to my RAR appeal being denied

(to include documenting the 2020 Wing Staff Agencies Field Grade Officer of the

Year award received during my time in the 81st TRW at Keesler AFB) and 361

days prior to the sustained LOR. After the Mandate was rescinded, it is this OPR

CA200

that was deleted from my record and replaced with a blank Letter of Evaluation

(LOE) that states "Not rated for the above period. Evaluation removed by order of

the SECAF." This blank LOE is not fully corrective, rather leaves a hole in my

record with no explanation. My record shows I was assigned to an important Air

Force Agency, the Air University, which happens only after a screening process;

now I have no OPR. That is a warning sign to any evaluator or reviewer of my

record. This supposed fix has actually become an impediment, which anyone

familiar with the competitiveness of Air Force promotions would understand and

acknowledge. This impediment is another continuing consequence of the damage

done to my career because I requested an RAR in accordance with my conscience.

10.     For the entire next OPR period 1 Feb 22 - 30 Nov 22 I was removed from

my primary duties and relegated to other as assigned duties. This OPR also

received a second or third tier job push recommending a Joint Position or a one

deep position (ostensibly stating that even though my rank and experience indicate

I should be leading teams of people, my commander recommends I should be

assigned next to a position where I am not leading others). The appropriate job

recommendation for me having been at the top of my year group(s) prior to the

mandate would have been for a Wing Chaplain or future Staff or Strategic

Chaplain Corps leadership.

11.     My next OPR is due 31 May 2023. I have not seen a final draft of it, but it

CA201

will reflect a record that was hampered by my being sidelined. This will be the third OPR impacted by the now-rescinded mandate and the highly prejudicial treatment I received because of it.  Depending on whether or not the May 2023 OPR is considered in my June 2023 consideration for promotion two of the four, or three of the five OPRs I received during my time in the rank of Major have been directly negatively impacted by the Mandate.

12.     Concerning fair treatment, I am still not being treated fairly and am not allowed to serve at my full capacity in a manner that will execute the mission, manage resources, improve the unit, and lead people (the Unit Effectiveness Major Graded Areas for the Air Force). These are the items upon which my effectiveness as an officer is evaluated. Hampering my ability to demonstrate excellence in these areas not only has a negative consequence for my own career advancement in my profession of service, but also has negatively impacted the Chaplain Corps and Air Force mission. Naturally, being withheld from functioning at my full capacity for two years is having a negative effect on my career when it comes to assignments, schooling, and/or promotion opportunity; it has robbed me of the opportunity for life-changing ministry and superior performance to the Air Force as I've been able to do in the past.

13.     I was officially removed from my Instructor, Course Director, and Student Mentor duties as a Staff Chaplain and Instructor at the Air Force Chaplain Corp

CA202

College in early December 2021 after being issued a Letter of Counseling. (This is documented in my commander's previous declaration for this case.) My commander and my supervisor very reluctantly returned me to instructor duties on 27 Apr 23. This was done not because the mandate was rescinded and my record cleaned; it was only because of a staff shortage on the team. To be clear on this point: I was removed form duty in December 2021 and not returned even to partial instructor duties until late April 2023, well after the mandate was rescinded.

14.    I was never allowed in my two years as a Staff Chaplain to serve as a course director or seminar group leader or to represent the AFCCC in any other instructor capacity across Air University as would be normal for Staff Chaplain Instructors at AFCCC. It should be noted that I am not the only Air University staff or instructor to not receive the COVID-19 shot, but the others weren't removed from their jobs and they continued to teach, direct, etc. This is true in multiple schools throughout Air University and can be proven by personal testimony of these individuals. There is no doubt I was treated differently and more harshly than other officers in Air University.

15.    Despite the Mandate's rescission, the Individual Medical Readiness (IMR) record still shows a COVID-19 Vaccine status as "Admin (Refusal)". This information is reviewed for every assignment, deployment, etc., despite there being no requirement. This suggests the only purpose is to further penalize my career by

CA203

keeping what is in effect, a red flag. Since there is no policy requiring this, it should be removed giving all Airmen the same status.

16.    Concerning my opportunity for promotion, I am in my primary promotion zone for Lieutenant Colonel (O-5) with the promotion board scheduled to meet on 12 June 23. This is my first look for this promotion. When the results are announced the names will be ranked with the strongest records promoting first.

17.    Prior to the Mandate the record shows I was in the top third of my year group. Prior to the Mandate I was selected as an alternate for in-residence Intermediate Development Education (Air Command and Staff College). After the mandate, it seems that I was removed from the alternate list and the Air University Commander and President chose to not recommend me for my third and final look despite the strengthening of my record between my second and third consideration.

18.    As my 1/18/2023 declaration, ¶ 7 states:

> In the year between my second consideration (when I was selected as an alternate) and my third consideration (not recommended), I finished a deployment as a Wing Chaplain in an 0-5 billet (one rank above my current rank), was recognized by the Air Force Central Command (AFCENT) Chaplain for leading the best team for our rotation, was awarded two MSMs, named FGO [Field Grade Officer] of the year for the Wing Staff Agencies at my permanent duty station, and was selected for a vectored position as a Staff Chaplain at the Air Force Chaplain Corps College. It is unquestionable that my performance record during this period should have only strengthened my competitiveness prior to my third consideration. However, my senior rater chose not to recommend me. His letter to the RAR decision authority provides evidence that this non-recommendation is because of my religious beliefs outlined in my RAR and not due to

CA204

my professional performance.

19.    In the letter to the RAR decision authority referenced above, my senior rater

(the Commander and President of Air University) revealed his prejudice against

me and what could be his basis for not recommending me because of my religious

sincerity and his interpretation of the oath of office:

> While I accept the sincerity of Maj Schrader's beliefs, his position that
> getting the vaccine constitutes an act of worship to a false God (i.e.,
> the State) arguably appears to be in conflict with his service as a [sic]
> an officer—service he entered voluntary [sic] and in doing so bore
> allegiance to the State, which at times requires him to do it's [sic]
> bidding. His assertion on this point, through sincere, seems
> inconsistent and falls flat.[1]

20.    Had it not been for the Mandate and my RAR request I would have likely

attended during the 2022-23 school year (as an alternate) which would have

ensured my position near the very top of my year group for promotion in June

2023. Had I not attended in that year, and the Mandate had not happened, I would

have likely been selected as a primary attendee in the 2023-24 school year and

again been positioned near the very top of my year group for promotion in June

2023.

21.    Of the three Chaplains on the 2022-23 alternate list, I am the only one who

will have not attended ACSC in residence. I have tried to ascertain my rank among

those other alternates but the Chief of Chaplains' office would not give me the

---

[1] Lt Gen James B. Hecker, 1st Ind, AU/CC, 13 Oct 2021, Religious Accommodation Request for Maj Darrel L. Schrader, MEMORANDUM FOR AETC/CC, para 3.

CA205

information. The negative and adverse actions described herein make promotion in a competitive environment questionable. This is due solely to the consequences of challenging the Mandate and exercising my right to request a RAR.

22.    Lingering hostility remains due to my challenging a corrupt and hostile system that has shown it punishes those who follow their conscience, which is especially concerning given that chaplains are supposed to follow their conscience, and Section 533 protects that right.

23.    I have been the recipient of further religious discrimination as a result of my RAR for the COVID-19 Vaccine and involvement in litigation. I submitted a RAR for the influenza vaccine on 6 Dec 2021 and received no response or update until 6 Jan 2023. On 6 Jan 2023 I was called into my commander's office and given a written order to receive the flu vaccine even though I already submitted an RAR and by regulation had a temporary exemption while my request was pending. I was ordered to repeat the entire process and interviews again. Finally on 19 May 2023, 530 days after submitting the request, I received a denial of my request. (While the flu shot is not the focus of this case, it does show a continuation of the pattern of denial without satisfying the requirements of RFRA or respecting the Section 533 protections for Chaplains. This shows a pattern of discrimination in the Air Force.)

24.    As a result of being removed from instructor duty as outlined above with no hope that my supervisor or commander would let me return to full duty despite the

CA206

rescission of the mandate, I requested a permanent change of station a year early. I was told I would need to accept a Deputy Wing Chaplain assignment if I was granted my request. I was happy to do so even though it was at best a lateral move and would reduce my staff Chaplain experience by a year. This may or may not negatively impact my career progression, but it was necessary for the mental health of my family and none of it would have happened had it not been for the mandate and denial of my religious accommodation request.

25.     I also want to directly address the MTD's absurd and false statement attacking the "plaintiff's theory of post-rescission injury" on page 12. DOD claims this

> boiled down to the assertion that their careers will be impeded, either because of opportunities they could not pursue while the vaccine requirement was in effect or because decisionmakers will view them negatively on the basis of their religious exemption requests.

That is not speculation, but reality as shown by this declaration and other Appellants/Plaintiffs. It is a disgrace that anyone who knows anything about the competitive nature of Air Force promotions would suggest that having taken a stand against something like the Mandate that was pushed from the highest levels would not have serious consequences. This is willful blindness or outright religious hostility.

26.     As paragraphs 14 and 15 above show, my record before the Mandate was highly competitive reflecting great potential and promise. The difference between

CA207

then and now is my conscience required I request a religious accommodation, for which I have been illegally and unconstitutionally punished by 2+ years of retaliation and bigotry.

I make this declaration under penalty of perjury. It is accurate and true to the best of my ability and reflects the testimony I would give under oath in a court of law.

May 25, 2023

/S/ D. Lance Schrader
DARREL LANCE SCHRADER

CA208

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

| | | |
|---|---|---|
| ***ISRAEL ALVARADO, ET AL.*** | : | |
| | : | |
| ***v.*** | : | NO. 23-1419 |
| | : | (1:22-cv-00876-AJT-JFA) |
| ***LOYD AUSTIN, III, ET AL.,*** | : | |
| | : | |

## SUPPLEMENTAL DECLARATION OF
## <u>CHAPLAIN LIEUTENANT JONATHAN SHOUR</u>

Pursuant to 28 U.S.C. §1746, I, Jonathan Curtis Shour declare as follows:

1.      I am over 18 years of age and have personal knowledge of and am competent to testify on the matters stated herein.

2.      I make this Supplemental Declaration to support my and other chaplains' challenge to the Department of Defense and its subordinate military departments' mandates in violation of the constitutional rights of tens of thousands as well as to address the continuing harms done to me, my career, and the careers of others because they submitted a religious accommodation request ("RAR"). All statements made in this Declaration are true to the best of my own personal knowledge.

3.      This supplemental declaration lists the many continuing harms that have occurred to many members of the case, Alvarado v Austin (The Chaplains' Case) despite the 'rescission' of the Department of Defense and its subordinate military departments' mandates to vaccinated against COVID-19. This declaration updates

CA209

and reports on the continuing harm and injury to the careers of many exceptional

chaplains in response to their right to request religious accommodation. This

declaration addresses what is happened, continued to happen, or not been corrected

and rescinded since the Mandate's rescission and it specifically addresses what

appears to be false and misleading statements in the Appellees/Defendants

(hereafter collectively "DoD") recently filed Motion to Dismiss, ("MTD").

4.      I am an active duty chaplain in the United States Navy serving at the rank of

Lieutenant. I have served since 2005 in the Air Force and Navy as an enlisted

language analyst and chaplain. I am currently assigned to the United States Marine

Corps at the Marine Corps Installation – East Chaplain's Office at Marine Corps

Base Camp Lejeune, 67 Virginia Dare Blvd, Camp Lejeune, NC.

5.      I have volunteered some of my off-duty time to support the other chaplains

on this case and the legal team as a voluntary administrative team member. The

following is the result of the combined efforts of our Chaplains' Case admin team

on behalf of the plaintiffs. Due to the short deadline we were unable to ensure

responses from the entirety of the plaintiffs, but the following shows a sampling of

the continued harms to not just our plaintiffs, but to thousands across the DoD and

subordinate military departments. The following shows some of the harms to our

plaintiffs at large, showing the continued harms in multiple areas: (1) Adverse

Actions, (2) Performance Reports, (3) Disparate Treatment, (4) Promotion, and (5)

CA210

Other Harms.

### **Continued Harm via Adverse Actions (GOMOR, Article 15, Letter of Counseling, Reprimand, etc.) that have not been fully removed from the member's records.**

**Plaintiff Alvarado**: In February of 2022, **I was removed from operational status**

and sent on Temporary Orders (TAD orders) to a shore command, thus I was

not allowed to deploy with my command in August 2022. At the end of my

tour in October 2022, I received a detaching fitness report (FITREP) below

my Reporting Senior's Cumulative Average (RSCA), which sends a negative

message about me to the promotion board, not to mention the omission of

critical words that stand out to the board, instead my FITREP's headline and

recommendation read: "PROMISING FIRST TOUR CHAPLAIN" and

"TRACK TO LCDR". This **missed opportunity to deploy** will negatively

affect my career as the promotion board looks favorably at deployments and

those who don't deploy tend to get passed over and end up eventually

getting separated for failing to promote. This missed deployment is an

irreparable harm that I cannot remediate since it places me behind those

chaplains who deployed during their first tour.

**Plaintiff Ballard**: However, my Religious Accommodation Request (RAR) was

for multiple vaccines, so I had to resubmit back in February. I am still

pending approval/denial from The Surgeon General (TSG). If they deny my

CA211

request and order my to take the other vaccines, then I will likely receive a GOMAR. More to follow….

**Plaintiff Booth**: **I was supposed to attend Chaplain Captain Career Course (C4) July of 2022.  I will not be able to attend** the resident course until January of 2024! The Exception to Policy (ETP) was directed to the Under-Secretary of the Army months before being told that I was officially dropped from the 2022 July course. As an outcome from this I have NO official title and NO official job description.  According to my ORB I am titled "over strength Chaplain", according to the updated IPPS-A documentation I am titled "Standard Excess".  My MAJ board meets in 2025 and will see that I filled NO position for a year and a half!  I am enrolled in the online portion of C4 and have completed the online portion of the class.  However, the lack of position is detrimental to a career this close to a board.

**Plaintiff Eastman**: **Prevented from going to an Overseas (OCONUS) billet or PCS** with the threat of discharge at 18 yrs with no retirement benefits - instead kept local with no apology for pain and suffering throughout this bogus, gundecking process of elimination.

**Plaintiff Harris**: I never received a General Officer Memorandum of Reprimand (GOMOR), but my orders to Ft. Carson (Summer, 2022) were revoked and I

CA212

was held in place while my replacement arrived and I was double-slotted in the single spot for 8 months. While I can not prove it, this changed many things regarding my career … to include my Officer Evaluation Reports (OERs) and the perception of superiors that I was indeed remaining engaged in my job. My job title on my board ORB stated that I was "Standard Excess" (This may affect whether this year's board (March 2023–results not yet released) will seriously consider me for promotion. I may not be able to prove it, but I believe it nonetheless. I was **unable to go on Temporary Duty (TDY) for training opportunities** or command gatherings, which also greatly affected their perception of me as a "Team Player." According to IPPS-A I am still labeled "Standard Excess" even though I am serving in a position MTOED for an O-4 (Resource Manager at JBSA).

**Plaintiff Lee**:  I was originally slated to PCS to the 1st Theater Support Command (TSC) at Fort Knox, KY, in the summer of 2022.  However, **as a result of my pending RAR and "unvaccinated" status, that assignment was rescinded.**  I still have the Request for Orders (RFO) showing my initial assignment and report date.  I was eventually assigned to the 7th Signal Command (Theater) at Fort Meade, MD, and PCS'd there in October 2022. The adverse action of this assignment process is clearly defined in what could be called a "Standard of Practice," within the Chaplain Corps at least.

CA213

My previous assignment was the 311th Signal Command (Theater).  The 1st TSC was what is commonly referred to as a broadening assignment, taking into account my skillset, potential for increased responsibility, and ultimately an assignment that would have potentially set me on a course for more challenging assignments and possibly promotion.  Assigning me to the 7th SC (T), however, is a redundant assignment and is an obvious indicator in my record to stagnate any potential for increased responsibility or chance for promotion.  My career in essence has come to a halt, at least according to my record.

**Plaintiff Lewis**: I had a GOMOR generated just days before the NDAA was signed so they never gave it to me. Also, throughout the RAR process I received several "counseling statements" from the Deputy Commander at the US Army War College that directed me to get vaccinated or they "could" begin separation proceedings.  This threat came up at every stage of the process from the initial denial of my RAR to the denied appeal.  In her memo denying my appeal, **the Acting Under Secretary of the Army (Manpower and Reserve Affairs), Ms. Yvette K. Bourcicot "strongly" encouraged me to reconsider my position, indicating that her understanding of my "position" as mere opinion rather than as a constitutionally protected belief.**

CA214

**Plaintiff Schrader**: Per guidance from Department of the Air Force Inspector

General Office and in conflict with the Secretary of the Air Force guidance

on Adverse Action my **Letter of Reprimand is not being removed from**

**the IG files** in the Automated Case Tracking System (ACTS); Per Air Force

Personnel Center the Air Force Surgeon General appeal denial memo is not

being removed from my permanent record (this is unfair treatment as not all

10K Airmen who applied for a Religious Accommodation Request (RAR)

even received their RAR or Appeal denial prior to the recession of the

mandate. This means that only those of us, like me who made it al the way

through the RAR denial process have this noted in our permanent file.);

**Plaintiff Young**: (1) On February 13, 2023, **I received negative event-oriented**

**counseling** from my rater and negative counseling from my senior rater for

correctly following the directives of our unit Chaplain Account Manager

(Deputy Commandant COL) to contact personnel IOT to correct an

inaccurate report date for my PCS orders in IPPS-A. My senior rater relied

on third hand information from someone in personnel who claimed I acted

aggressively. This false narrative was used as reprisal in the form of second

consecutive OER with a highly qualified (HQ) block instead of the promised

most qualified (MQ- MQ is better than HQ) needed for promotion in a few

months, though my senior rate states that I am #3 of the 22 MAJs he senior

CA215

rates in achievements and I accomplished his requested objectives. (2)

Although assigned with orders to a brigade with supervisory responsibilities

for summer 2023, **my assignment was electronically rescinded due** to

"other considerations" on April 13, 2023 after I made contact with the unit

the day prior. My re-assignment position does not have supervisory

responsibilities, thus I will have no brigade time prior to my primary zone

board next March and I will not be competitive for promotion. (3) My below

the zone board met March 2023 with my officer record containing a

derogatory remark in Section X, "Pending Covid-19 Vaccine Action." This

derogatory remark was not removed until April 2023, after my board met.

Furthermore, my personnel manager who was unwilling to assign me to a

brigade due to my religious accommodation request, sat and voted on my

promotion board, along with three other chaplains who were aware of my

status.


### Continued Harm via Downgrades to Performance Reports (Officer Efficiency Report, Fitness Report, Officer Performance Reports, or other type of performance reports)

**Plaintiff Botello**: Refusal to acknowledge active duty service (ADOS) (Part I.g) on

OER while performing in a federal funded position. Refusal to list officers

who had first hand knowledge of my duties and responsibilities as rater and

senior raters while in this ADOS position.

**Plaintiff Harris**: Initially covered above, but yes **my OER reports these last two years have been greatly affected**. Three years ago I had just received back to back 'most qualified' MQ's (went to that board with 3-4). After COVID and its resulting mandate, my Commander has given me back to back "Milque-Toast" OER's. Because of when I PCS'd and when the March board convened, they only saw one of those OER's, but If I don't get selected this year, my final look will be March 2024 and the MQ's I do have (total of 3) will be so far back, it will look to the board as if I peaked, leveled off, and essentially gave up. NOT TRUE!

**Plaintiff Eastman**: Awaiting important fitness report from a command that may have been tainted by the covid press from prior billet.

**Plaintiff Lee**: **In February 2023, the Brigadier General promotion board convened**, for which I was an eligible candidate.  However, as a result of IPPS-A, my record was "frozen," meaning that the items contained in my record were permanently affixed and unremovable.  As such, the derogatory remark in Section X., "Pending Covid-19 Vaccine Action," remained in my file for any and all to see.  As such, **my file was presented with that information for board members to see and know that I was one that remained "unvaccinated."**  For myself, and others as well, not only are we denied a fair and equitable chance for promotion and the opportunity to

CA217

serve at higher echelons within the Chaplaincy, we are financially impacted as well with the denial of promotion and increased remuneration serving at a higher rank.

**Plaintiff Lewis**: I have had no evaluations since the submission of my RAR. However, following the Academic Evaluation Report (AER) from the War College, which was a reasonable evaluation of my time as a student, **I have 11 unrated months. That 11 months should have resulted in an OER**, which is generally a requirement to PCS, but because I was held at the War College but not in an authorized billet, I was not rated. **A year of unrated time is a career killer.**

**Plaintiff Schrader**: During my 1 Feb 21 - 31 Jan 22 Officer Performance Report (OPR) period I received a Letter of Reprimand on 12 Jan 22 which was sustained on 27 Jan 22. This means that with only four days left in the reporting period the entire period would be a referral OPR stating that I did not meet standards. This OPR included 10 months of work prior to my RAR appeal being denied and 361 days prior to the sustained LOR. After the mandate was rescinded it is this OPR that was deleted from my record and replaced with a blank Letter of Evaluation that states the officer was not rated during this time period. For the entire next OPR period 1 Feb 22 - 30 Nov 22 I was removed from my primary duties and relegated to other as

assigned duties. This OPR also received a second or third tier job push recommending a Joint Position or a one deep position. The appropriate job recommendation for me having been at the top of my year group(s) prior to the mandate would have been for a Wing Chaplain or future Staff or Strategic Chaplain Corps leadership.

**Plaintiff Shour**: Due to shot mandate policies and only due to these mandate policies, I have **received lesser marks on my Fitness Reports** (FITREPS). I was placed on an 'Administrative Hold' (admin hold) after graduating from Officer Training and the Naval Chaplain School because I filed for an exemption request. There was no other reason for this admin hold. I was on admin hold for 4 months and I was unable to complete my PCS to my first duty station, Camp Lejeune. I graduated in November 2021 with two other classmates who were destined for Camp Lejeune, both were able to continue their orders directly from graduation and proceed to Camp Lejeune. Only I was delayed due to the mandate. One of these other members (LT O.) is in my command and I am directly rated against LT O on our FITREPs. On our January 2023 FITREP (the first FITREP where we were compared), I was rated as number 2 of 2 chaplains against LT O in the Command. In my FITREP feedback session with my O6 Command Chaplain, I was directly told that the reason I was being rated as number 2 is that LT O had been

CA219

there longer than me. On our June 2023 FITREPs, I was again rated as number 2 of 2 against him in the Command. Again, in the feedback session for my FITREP, I was told by the Command Chaplain that I was being rated number 2 of 2 again because LT O arrived first. I was told at one point by the Senior Enlisted Leader in our office, that 'I was number 1, hands down.' The Command Chaplain even seemed to allude to the fact that he would recommend that I be rated number 1 of 2 if it were not for the mandate. **It seems clear that the only reason that I have received lesser ratings is due to the** mandate policy that has not been effectively rescinded as directed by congress. **These initial FITREPS are reviewed for assignment selection, special duty selection, education board selection, and eventually for promotion board selection. These lesser marks harm my career, promotion, and assignments and these harms have not been corrected.**

**Plaintiff Young**: I experienced a pattern and practice of reprisal from my senior rater over the last 17 months. The most detrimental retaliation has included two consecutive officer evaluations with high-qualified blocks, rather than a final evaluation before my board with a most-qualified blocking as assured. My senior rate states that I am #3 of the 22 MAJs which he senior rates in achievements and I accomplished his requested objectives. He is able to give MQs to 7 to 10 MAJs of which he currently senior rates. He has been hostile

CA220

to me due to my involvement in this class action, and has said that my

involvement has created a hostile work environment for him.

### **Continued Harm via Disparate Treatment (not being treated fairly, not allowed to do what your job, missed a school, required or special training, missing critical schools or assignments, to operational units, etc.)**

**Plaintiff Botello**: Resigned my commission due to choosing less qualified

chaplains to deploy, hostile work environment, mental health and well-

being.

**Plaintiff Cox**: As a direct result of the Covid 19 Mandate policy, from September

30, 2021 to April 5, 2023, **I was refused opportunities to take orders of**

**any kind**: AT, ADT, ADOS etc...**I was refused opportunities to provide**

**Funeral Honors** with my fellow Sailors. September 2021, I was on Active

Duty Orders and planning to fulfill a new set of Orders for October 1, 2021

to September 30, 2022 when these orders were suddenly defunded and no

other funding was allowed to keep me in my Billet. I was suddenly out of

employment. However, during the year and half I was refused opportunities

by the Navy because of the Mandate policy, I continued to work as a

Chaplain, assisting NSW Sailors with Religious Accommodation request,

providing Counseling, and Instruction, training, two Retirements, and two

Weddings, traveling at my own personal expense. The loss of an O-5 Sallary

during this period of time was significant to my family and our well being,

mental health etc…When this Mandate first came out, my training in the

Constitution made it very clear that this Vaccine Mandate was unlawful and

unconstitutional. Nothing has fallen more squarely in the lap of the Military

Chaplain then this Vaccine Mandate and I made this clear to my

Commanding Officer who denied my claim and called it Lawful simply

because it was handed down. Now the truth is out that the Mandate was

unlawful and unconstitutional, but it has left many in serious circumstances,

professionally, financially, compromised physical health and more. The

consequences of this reckless abuse of power and forcing an unproven

vaccine on service members while many other simpler methods were

available demonstrates the ulterior motives and agenda. This case being

brought before the courts requires an admission of wrong by the DOD,

CDC, the WHO, the White House and others for the damage that has been

perpetrated on our services members. An honest admission of wrong and a

benevolent response in compensation and restoration to those who have lost

so much.

**Plaintiff Diltz**: I have **not deployed**. Full-disclosure: I am the only Chaplain at our

Wing; that alone is a significant reason to not be selected in order to not

leave our Wing "empty" of a Chaplain (even though we have California

CA222

State Guard Chaplains who service our Wing when our team is absent and Memorandum of Understanding (MOU) with another Wing). However, 2-years ago, a Lt Col said that my name appeared as a potential deployer for our RCP-2 bucket 2023-year. Our troops are headed downrange while nothing materialized for me. Last week at the Senior Religious Support Team (RST) Symposium, NGB said they will not select a Chaplain for TDY (i.e., Operation DEEP FREEZE) if the bench is only 1-deep. I've been applying to ODP since 2017. It might be the case that I have not been selected due to being the only Chaplain, but I do not know with certainty.

**Plaintiff Harris**: Orders to Ft. Carson revoked as that Brigade (BDE) was on the chart for deployment. I **was told that as 'an un-vaxxed' I may not be able deploy** and hence I was not to be considered mission critical. This was the entirety of the argument that resulted in my ETP to PCS (for the Under Secretary of the Army) being denied and sent back. As of 3 weeks ago, that unit had not filled their Chaplain slot. They chose to be without a chaplain (for 9 months) than to accept a chaplain who was un-vaxxed. This is the power of COERCION at the highest level pressuring commanders to "follow orders without question."

**Plaintiff Jackson**: My Officer Promotion Report (OPR) had the recommendation for a "one-deep" position which could have been a True North position

CA223

[preferred assignment and one which gives promotion consideration] on the base. Leadership in the Major Command (MAJCOM) was considering me for a True North position on the base which would have advanced my skillset/experience and therefore my career. My wing chaplain was in touch with MAJCOM and informing them of my pending RAR. I was baited to abandon my conviction and get the COVID shot in order to get the position. When my RAR appeal came back denied, and I did not receive the shot, they gave the position to another chaplain and ceased considering me at all. I was also **denied opportunity to go to Maxwell AFB for chaplain spiritual leadership course**, even though the website said I only needed a negative COVID test to attend. My wing chaplain told me he called the school and they said I could not come without the COVID vaccine. I also have been eligible for Squadron Officer School (SOS) as a captain for a couple years. I was automatically disqualified for SOS and not even considered for this Professional Military Education that is required for advancing in rank.

**Plaintiff Lee**: Another glaring example of unfair treatment, that is also reflected in my record, occurred after my PCS from the 311th Signal Command (T). As I departed, I was aware that **my Chief of Staff had submitted me for the Legion of Merit award**, which is a reasonable award given my rank and tenure in the unit. **However, I received my award by mail after I had**

CA224

**already PCS'd and was surprised to receive an Army Commendation medal.**  Downgrading an award is not necessarily uncommon. **Downgrading an award two levels however, is very uncommon.**  At a minimum, and according to standard practice, I would have received a Meritorious Service Medal, which would have only been one level downgraded in precedence.  From the point of fairness, most other Colonel's at this juncture in their career have at least one Legion of Merit.  I have none.

<u>Plaintiff Lewis</u>: Having just arrived at my new assignment, (Communications and Electronics Command, Aberdeen Proving Ground) the determination of "fair" is difficult but I will keep you informed.  **The assignment itself does not require Senior Service College training, supervisory skills, or even administrative acumen. It is, functionally, a battalion level assignment [far below the level of a Chaplain, Colonel].**  I have no supervisory duties and no downtrace. My peers and friends throughout the Chaplain Corps believe that this is a punitive assignment meant to meet the letter of the law (2023 NDAA). Even the Chaplain Corps Personnel Director, when he called to inform me of my assignment said, "Chaplain Solhjem just told me (and I quote), 'I'm sending Brad Lewis to CECOM.'"  When I asked him (the PER Director) "why", he simply responded with "I know!".  The people here are

CA225

kind and very "chaplain friendly", but the responsibilities are minimal. Interestingly, the Commanding General for CECOM was the senior commander responsible to approve the decision of the court in the Court Martial of 1LT Mark Bashaw. Coincidence?

**Plaintiff Pak**: I was a "penciled-in" to take a Brigade at Fort Campbell. I need Brigade (supervisory) time to be competitive for promotion. **Due to my non-vaccination status I was considered not deployable. My name was removed for consideration for Fort Campbell and was assigned to another Garrison assignment.** I will have no Brigade time primary zone next year. **I will not be competitive for promotion**.

**Plaintiff Schrader**: I was officially removed from my I instructor, course director and student mentor duties as a Staff Chaplain and Instructor at the Air Force Chaplain Corp College in early December 2021 after being issued a Letter of Counseling. (This is documented in my commander's previous declaration for this case). I was only returned to instructor duties on 27 Apr 23, with great reluctance from my supervisor. **I was never allowed to serve as a course director or seminar group leader** or to represent the AFCCC in any other instructor capacity across Air University as would be normal for Staff Chaplain Instructors at AFCCC. It should be noted that I am not the only Air University staff or instructor to not receive the COVID-19 shot, but the

others weren't removed from their jobs and continued to teach, direct erc.

This is true in multiple school throughout Air University and can be proven

by personal testimony of these individuals. There is no doubt I wastewater

differently and more harshly than other officers in Air University;

**Individual Medical Readiness (IMR) despite mandate being rescinded**

**still show COVID-19 Vaccine status as "Admin (Refusal)"**. This is

information that is reviewed for every assignment, deployment etc despite

there being no requirement. Since there is no policy all Airmen should have

the same status.

<u>**Plaintiff Shour**</u>: Due to the shot mandate, I have been reassigned to a lesser

assignment, my assignment selection date has been negatively pushed back

and my competitiveness for future promotion has been harmed. 1. **When I**

**shared my intent to file for an exemption from the shot mandate, I was**

**immediately reassigned to a lesser assignment**. In a town hall in 2022

with Admiral Todd, the current chief of chaplains, he shared how the

chaplain corps views assignments: my previous assignment was a better

assignment; my current assignment is new least priority of assignment. Due

to the shot mandate, I received a worse assignment and as of 16 May 2023,

in conversation with the detailer, the detailer said that there is 'no policy' or

'guidance' on undoing the harms caused by the mandate. In other words, the

CA227

Navy has no interest in correcting the harms that they know they caused. 2.

My Projected Rotation Date (PRD) was negatively affected by my admin

hold (please see previous responses and declarations for the full extent of my

family hardship). My PRD from Camp Lejeune should be Nov 2024, but

instead has been pushed back to Mar 2025. **The negative push back of my**

**PRD mean that my peers and have their pick at more competitive and**

**preferred assignments due to their earlier PRD.** My peers, graduates of

my peer group at the Chaplaincy School, will be up for assignments sooner

than me and have their pick at more competitive and preferred assignments

due to their earlier PRD. This will give them better future assignments and

more competitive assignments to set them up for a favorable look at the

promotion board. Even now, I was not considered for a move to an

operational unit due to the PRD change. The other LT at my command (LT

O) was considered to move early to an operational unit already (Dec 2022)

while I was not. 3. The assignment that I have is a 'lowest priority'

assignment. By comparison, the original assignment (the one that I lost due

to the mandate policies) was considered a higher priority assignment as well

as being considered 'arduous' duty. The Promotion Board Convening Order

specifically directs that promotion boards give 'favorable consideration' be

given to those who have completed an arduous assignment. **My**

**reassignment has negatively impacted my competitiveness at my**

**promotion board, directly removing me from favorable consideration.**

**The Navy and detailer, in failing to consider any reassignment or**

**corrective measures has directly allowed the harms caused by the**

**mandate to continue.**

**Plaintiff Young**: Due to my vaccination status, I was the only instructor who was

doubled slotted. My senior rater showed great partiality to the major with

whom I was double slotted for 7 months. I was continually scrutinized and

compared to my double slotter. More than any other instructor, I was

tracked, inspected and counseled. **My senior rater said my religious**

**accommodation and case created a hostile environment for him and that**

**I should not be there**. He said, "You make a very good Major," implying

that there was no growth potential for promotion. He told me that I was

deceived and had a skewed outlook if I thought for a moment that he was not

fair and completely by the book. A LTC once came in while I was

instructing a class of captains and told the class that it's funny how many of

the 22 majors for whom my senior rater rates incorrectly assume that they

are in the top third (clear implication toward me). **I was denied TDY for 3**

**years**, including a TDY with 2 other Majors to Israel which only required

airfare to JFK. A special letter was written which said the unit only had funds for 2 MAJs to fly to JFK (and thus I was ineligible).

### Continued Harms via Promotion (passed over, in zone but unlikely promotable)

**Plaintiff Calger**: Due to the punitive travel restrictions from the Covid Mandate as well as the Army Chaplain School's own policy to not admit Chaplains who sought a Religious Accommodation Request for the Covid vaccine I was not allowed to attend Phase 2 of the Chaplain Career Course. I missed out on two opportunities to attend. **As a result of not being allowed to attend the needed professional military education I was passed over for promotion to Major this past February 2023 and subsequently received notice that I would be separated from the Army for not promoting.**

**Plaintiff Diltz**: Promotion is pending. I promoted to Major in July 2019, so the "below the zone" opportunity to promote with 4-years TIG is approaching. I put together my packet and am awaiting the CC's signature/approval for a Board date.

**Plaintiff Fussell**: Passed over twice [for promotion].

**Plaintiff Harris**: I have been passed over the last 2 years. I am currently in the final year of my SELCON selection (granted by the 2020 board), and while I

CA230

technically should be looked at in March 2024, even if that board does select

me, those results will not post until after my MRD date of 1 May 2024.

**Plaintiff Lee**:  Eligible (first time) for the Brigadier General board in February

2022, the results of which have yet to be released.

**Plaintiff Lewis**: I have been in contact with the appropriate personnel at Human

Resources Command regarding the FY 23 Chaplain Brigadier General

Board.  They will provide me with the records that went before the board on

22 Feb so I can determine if the Adverse Action Flag was seen by the board.

If I determine that the flag was visible to the board, I will begin the process

of asking for a reconsideration by that same board.  **The NDAA was signed**

**on 16 Dec 22, SECDEF Memo was issued on 10 Jan 23, SECARMY**

**memo was issued 24 Feb 23, and my Adverse Action flag was lifted that**

**same day, 2 days after the Brigadier General Promotion Selection**

**Board.**

**Plaintiff Pak**: I am below the zone this year. 2024 will be my primary zone for

Lieutenant Colonel.

**Plaintiff Schrader**: I am in my primary promotion zone for Lieutenant Colonel (0-

5) with the promotion board scheduled to meet on 12 June 23. This is my

first look for this promotion. When the results are announced the names will

CA231

be ranked with the strongest records promoting first. Prior to the mandate we know I was in the top third of my year group. Prior to the mandate I was selected as an alternate for in-residence Intermediate Development Education (Air Command and Staff College). Had it not been for the mandate I would have likely attended during the 2022-23 school year which would have ensured my position near the very top of my year group for promotion in June 2023. Had I not attended in 2022-23, and the mandate not happened I would have likely been selected as a primary attendee in the 2023-24 school year and again been positioned near the very to of my year group for promotion in June 2023.

**Plaintiff Young**: **I am not competitive for promotion to Lieutenant Colonel in 2024 due to not having brigade time and not receiving a MQ block in two consecutive evaluations because of my vaccination status.** And yet prior to the vaccine mandate, I was personally nominated to instruct other chaplains at the schoolhouse because of my skill set, performance, and potential. I have taught over 1,100 chaplains in the past 40 months and my senior rater states that my achievements ranks me #3 of the 22 majors he senior rates.

CA232

**<u>Other lingering hostility due to your vaccination status or the shot mandate:</u>**

**<u>Plaintiff Botello</u>**:  resigned my commission due to choosing less qualified

chaplains to deploy, hostile work environment, mental health and well-

being.

**<u>Plaintiff Cox</u>**: Still the DOD refuses to admit the fraud behind this "Pandemic"

and perpetuates policy and instructions that ignore the facts and the true

science, as well as many other alternative remedies to combat Covid and flu

etc… which keeps me from taking orders overseas or positions where

deployment may be required.

**<u>Plaintiff Diltz</u>**: In our Declarations (Aug 2022) I attached an MFR from Brig Gen

Butow (Jul 2021) that categorically called the unvaccinated selfish because,

in his estimation, we are putting "Self before Service" (contrary to the AF

core value: Service before Self). That type of indignation still pervades. I

submitted an influenza RAR that has yet to be decided. I refused the Td

(tetanus) vaccine; however, per my inquiry to apply for Operation DEEP

FREEZE, my IMR went from Red, to Pink, to Green *sans* a RAR or any

other action. Injury (moral, emotional, psychological, physical) is still a real,

malingering threat. In a brief conversation with the CC on the Friday of last

UTA, I stated that his understanding of the morale of the Wing would be

CA233

better informed if he heard from other Airmen besides me. By Sunday, we had a roundtable, open discussion. I opened by expressing our intent to love-on and appreciate the burden of leadership shouldered by our CC and other Senior Leaders and how they have approved all of our RARs thus far. However, leadership is more than approving paperwork; leadership entails advocacy and robust defense for what is right, moral, and constitutional–and that simply has not happened. The unvaccinated stated their impassioned testimonies; some of the unvaccinated stated they will not take another C-19 anything again. One of the strongest voices came from a Chief who is still recovering from heart-surgery that he 100% attributes to the experimental vaccines. The CC, VC, and CCM were all open and grateful. We are planning the follow-ups. **Airmen continuously express their regret for receiving the experimental drugs, their disappointment in leadership who failed to protect them, coerced them, caused duress, and did not inform them that they actually had a choice.** Trust is eroded.

**Plaintiff Harris**: **Moral Injury in ways I am only beginning to feel**. After 16 plus years (reserve and AD), of being told that I was the SME (Subject Matter Expert) for the command when it came to all things religious, and that as a Staff Officer I had a "seat at the table" my own Religious Accommodation is questioned and not acted upon for more than 15 months

CA234

because of a political policy. Will I ever be trusted again to be a SME and have a "voice at the table" as a staff officer? What has been said behind my back from one commander to another about that "troublesome Chaplain, who refused to follow orders?" I also believe (but cannot prove) that the chief of Chaplains himself has sought to "assist us RAR folks out of the Chaplain Corps. Did he "GIVE INSTRUCTIONS" to the past two boards regarding those who filed litigation? We may never know.

**Plaintiff Jackson**: During the pandemic, our wing commander ordered all military personnel to wear a mask off-base in all buildings (except your home). During church service off-base, periodically I would remove my mask during service. The majority of our church family did not wear masks. I was reported to my wing chaplain who then had my supervisor give me a memo for record stating I will wear my mask off base, requiring me to sign. Although I was in the wrong for not wearing my mask all the time at church off-base, I was singled out for misconduct. Eventually, I was the only person in our 200+ church service wearing a mask, even though half of the church was military. I was told "someone" had seen me not wearing a mask and told my boss. **I was targeted and watched even off duty and at my church service, as someone who did not get the COVID vaccine.** Was I discriminated against?

CA235

**Plaintiff Schrader**: I have been the recipient of further religious discrimination as a result of my RAR for the COVID-19 Vaccine and involvement in litigation. I submitted a RAR for the influenza vaccine on 6 Dec 2021 and received no response or update until 6 Jan 2023. On 6 Jan 2013 I was called into my commander's office and given a written order to receive the flu vaccine even though I already submitted a RAR and by regulation had a temporary exemption while my request was pending. I was ordered to re-accomplish the entire process and interviews again. Finally on 19 May 2023 530 days after submitting the request I received a denial of my request; As a result of being removed from instructor duty as outlined above with no hope that my supervisor or commander would let me return to full duty despite the rescission of the mandate I requested a permanent change of station a year early. I was told I would need to accept a Deputy Wing Chaplain assignment if I was granted my request. I was happy to do so even though it was a lateral move and would reduce my staff Chaplain experience by a year. This may or may not negatively impact my career progression, but was necessary for the mental health of my family and none of it would have happened had it not been for the mandate and denial of my religious accommodation request.

CA236

**Plaintiff Shour**: I am accused of various 'wrongdoings' without evidence or proof. Senior leadership causes a toxic environment by having lower ranking staff members check in on my whereabouts. I've walked up on senior leaders and office staff speaking poorly about me in front of others. The questions that I raise regarding the mandate and often other things are shut down and ignored, written off as 'baggage' that I need to just 'let go'. My trust and integrity are continually questioned. I have been directed to move offices with no operational reason. I have been denied teleworking opportunities granted to other members of the staff. I have been denied TAD and conferences offered to the other staff. I have been made called in from liberty and denied 96-hour liberty (four day weekends) that other staff members have received. I have a disproportionately receive special liberty upon request; the other LT chaplain here has been given special liberty for 'allergies' and 'not feeling well' while I have been denied liberty over holiday weekends. The other LT has first pick of the equivalent weekend liberty (comp time) schedule, receiving his preferred day off (Friday and Saturday) for the equivalent weekend liberty while I have Saturday and Monday. Inconsistent enforcement of policy favoring other chaplains. I have had religious services as well as the form and manner of my religious

CA237

services infringed upon/told I cannot practice according to the form and manner of my religious organization's endorsement.

**Plaintiff Young**: **Not only is my promotion potential and future career/ministry/pension harmed, but my reputation has been deliberately marred**. I was required to wear a mask and continually give account for my unvaccinated status though I was never out sick the past 3 years. After nearly 16 years of service, I never experienced moral injury like I am now. Not only do the effects of the vaccine mandate reprisal continue, but shadow policies and defamation of character continues. I am a marked man simply because I have a sincerely held religious belief against an experimental EUA drug.

**Plaintiff Zagdanski**: I was not able to properly discharge my duties and responsibilities as the 353 CACOM Command Chaplain. Specifically, **I was not allowed to go visit all my subordinate Chaplains**. Once the COVID vaccine policy was rescinded, I was told that funding was not available. I was therefore not able to do my job properly in FY23 and I am sure this will reflect in my latest OER.

I make this declaration under penalty of perjury. It is accurate and true to the

CA238

best of my ability and reflects the testimony I would give under oath in a court of

law.

May 26, 2023

/Signed/ J C SHOUR

JONATHAN CURTIS SHOUR

CA239